IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAMES L. DEAN, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | COMPLAINT AND JURY DEMAND |
| | ) | |
| RICHARD T. SMITH, in his official and | ) | |
| individual capacities; DEP. | ) | |
| BURDETTE SEARCEY, in his official | ) | |
| and individual capacities; DEP. | ) | |
| GERALD LAMKIN, in his official and | ) | |
| individual capacities; DEP. KENT | ) | |
| HARLAN, in his official and individual | ) | |
| capacities; DEP. MARK MEINTS in | ) | |
| his official and individual capacities; | ) | |
| SHERIFF JERRY O. DEWITT, in his | ) | |
| official and individual capacities; | ) | |
| WAYNE R. PRICE, PhD, in his official | ) | |
| and individual capacities; GAGE | ) | |
| COUNTY SHERIFF'S OFFICE, a | ) | |
| Nebraska political subdivision; GAGE | ) | |
| COUNTY ATTORNEY'S OFFICE, a | ) | |
| Nebraska political subdivision; and | ) | |
| THE COUNTY OF GAGE, | ) | |
| NEBRASKA, a Nebraska political | ) | |
| subdivision, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

James L. Dean, plaintiff, alleges:

PRELIMINARY STATEMENT

This is a civil rights action arising out of the violation of Plaintiff's constitutional

rights in a state criminal proceeding.  Plaintiff brings this case for violation of his civil

rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United

States Constitution.  At issue are the policies, procedures, practices and customs of the

1

County of Gage, Nebraska, by and through the Gage County Sheriff's Office and the
Gage County Attorney's Office.

Plaintiff was unconstitutionally arrested, maliciously prosecuted, and wrongfully
convicted and imprisoned for the murder of Helen Wilson on February 5, 1985, which
he did not commit. Defendants solicited, fabricated, and manufactured evidence that
did not coincide with the immutable physical evidence at the scene of Wilson's murder.

Plaintiff seeks damages for Defendants' reckless, intentional, and conspiratorial
actions that deprived him of freedom and inflicted profound personal suffering on him
that continues to this day.

## FACTS APPLYING TO ALL COUNTS

1.    PARTIES:

a.    Plaintiff James L. Dean is a United States citizen and resident of the State
of Kansas.

b.    Defendant Sheriff Jerry O. DeWitt, was at all times herein the duly elected
Sheriff of Gage County, Nebraska and is sued in his individual and official
capacity. DeWitt is a resident of the State of Nebraska.

c.    Defendant Deputy Burdette Searcey was at all times herein an agent and
employee of the Gage County Sheriff's Office, Nebraska and is sued in his
individual and official capacity. Searcey is a resident of the State of Nebraska.

d.    Defendant Deputy Gerald Lamkin was at all times herein an agent and
employee of the Gage County Sheriff's Office, Nebraska and is sued in his
individual and official capacity. Lamkin is a resident of the State of Nebraska.

2

e.      Defendant  Deputy Mark Meints was at all times herein an agent and employee of the Gage County Sheriff's Office, Nebraska and is sued in his individual and official capacity.  Meints is a resident of the State of Nebraska.

f.      Defendant Deputy Kent Harlan was at all times herein an agent and employee of the Gage County Sheriff's Office, Nebraska and is sued in his individual and official capacity.  Harlan is a resident of the State of Nebraska.

g.      At all relevant times herein, DeWitt was the direct supervisor of Searcey, Lamkin, Meints, and Harlan.

h.      Defendant Wayne R. Price, Ph.D. was at all times hereinafter a professional licensed psychologist of the State of Nebraska and a Deputy Sheriff of Gage County, Nebraska and is sued in his individual and official capacities. Price is a resident of the State of Nebraska.

i.      Defendant Richard T. Smith at all times was the County Attorney of Gage County, Nebraska and actively participated and directed the investigation of the homicide of Helen Wilson.  Smith is a resident of the State of Nebraska.  He is sued in his individual and official capacities.

j.      The County of Gage, Nebraska (hereinafter, "Gage"), is a Nebraska political subdivision.

k.      Gage County Sheriff's Office (hereinafter, "GCSO"), is a Nebraska political subdivision.

l.      Gage County Attorney's Office (hereinafter, "GCAO"), is a Nebraska political subdivision.

3

m.     At all times hereinafter, Defendants DeWitt, Searcey, Lamkin, Meints and Harlan were employees of Gage County, Nebraska, and the Gage County Sheriff's Office.

n.     At all times hereinafter, Defendant Price was an employee of the Gage County Sheriff's Office and Gage County, Nebraska.

o.     At all times hereinafter, Defendant Smith was an employee of Gage County, Nebraska.

p.     At all times alleged, all said Defendants were acting within the scope and course of their employment with their various employers.

2.     JURISDICTION:

a.     This lawsuit involves the deprivation of Plaintiff's constitutionally guaranteed rights by Defendants under color of state law.  It is brought pursuant to 42 U.S.C. §1983.  Jurisdiction is proper under 28 U.S.C. §§1331 and 1343. The rights sought to be enforced include Plaintiff's guaranteed rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Plaintiff requests that this Court take supplemental jurisdiction of related state claims pursuant to 28 U.S.C. § 1367(a).

b.     The events at issue in this case transpired primarily, but not exclusively, in and around Gage County, Nebraska.  Trial on this matter is proper in Lincoln, Nebraska.

3.     HISTORY OF THE UNDERLYING CRIMINAL CASE:

a.     On February 5, 1985, Helen Wilson was a 68 year-old widow residing

4

alone at 212 N 6th St, Beatrice, Nebraska.

b.      At approximately 9:30 a.m. on February 6, 1985, Helen Wilson's sister discovered her body in the living room of her apartment.  A substantial amount of blood and a knife were discovered in her bedroom, indicating a murder and rape had taken place there.

c.      On that day, the Beatrice Police Department (hereinafter, "BPD") began an examination of the crime scene and investigation of the circumstances surrounding Wilson's death.  The GCSO became involved in the investigation of Wilson's death on the same day.  Eventually, the Nebraska State Patrol (hereinafter, "NSP") and Federal Bureau of Investigation (hereinafter, "FBI") also became involved in the investigation.  Smith and the GCAO worked closely with both the BPD and the GCSO during the murder's initial investigatory phase.

d.      An FBI report after analysis of the crime scene evidence concluded, "We can state with almost total certainty that this crime was committed by one individual acting alone."

e.      Serological analysis of blood recovered from Wilson's bedroom and semen recovered from Wilson's body indicated that the assailant had type B blood and was a non-secretor of blood group substances in his bodily fluids.

f.      Under Smith's direct supervision, the BPD, the GCSO, and the NSP interviewed anyone who was known to law enforcement or was the subject of rumors circulating around Beatrice regarding the murder.  Plaintiff was not interviewed at this time.

5

g.      Neither the BPD, the GCSO, nor the NSP ever considered Plaintiff or his alleged "accomplices" to be serious suspects during the 1985 phase of the Wilson homicide investigation.

h.      By 1987, no one had yet been arrested for Wilson's murder.  In January 1987, however, Searcey joined the GCSO as a Deputy Sheriff.  Searcey had, in 1985, conducted his own private and unofficial "investigation" into Wilson's homicide; so in 1987, he asked for, and received access to, the official investigatory file.  Searcey then began to re-interview witnesses, which led him and Smith to arrest Plaintiff and alleged "accomplices" based on information and suppositions they knew, or should have known, to be false.

4.      James L. Dean

a.      Plaintiff was born April 15, 1964.  He is the father of two children, is employed as a commercial truck driver, and resides in Salina, Kansas.

b.      During his early years, Plaintiff suffered from emotional disabilities and came from a broken home.  He spent time in several institutions in his youth.  At the time of his arrest, he was diagnosed as low range to borderline range of intellectual function; mixed personality disorder with dependent and antisocial features and "psychogenic amnesia in remission"; and adjustment disorder with depressed mood, resolved and suicidal tendencies.

c.      On February 5, 1985, Plaintiff resided in Lincoln, Nebraska with his mother, Geraldine Dean (deceased).  He was dating Kathy Bartak, a young mother of two children, who was residing in Beatrice.  He had been with Bartak

6

earlier that day.  That day, Plaintiff's mother picked him up at Bartak's residence at about 4:00 p.m., drove to Lincoln and from there his sister, Laura Tomka (deceased) drove him to Fremont, Nebraska to visit with her and her family. Plaintiff spent the next week in Fremont.

d.      Plaintiff had nothing to do with Wilson's murder and knew nothing about it.

e.      Debra Brown, later Shelden, was dating Clifford Shelden on February 5, 1985.  She later married Shelden.  Brown was a friend of Bartak and knew Plaintiff.  On February 5, 1985, Brown and Shelden spent the night at Bartak's apartment in Beatrice.  Nobody ever asked Bartak about this.

f.      During the next years, Plaintiff continued his relationship with Bartak and they parented two children.  They were living in Lincoln.  Plaintiff was employed.

g.      Plaintiff's name first surfaced to law enforcement authorities in a statement made by Clifford Shelden suggesting that Dean had been at the scene of the crime involving Helen Wilson and he had observed it.   This was a false statement.

h.      Debra Brown Sheldon was known by defendants to be of low intelligence, with emotional problems dating from childhood.  On April 13, 1989, Searcey and Lamkin interviewed Debra Brown Sheldon, who stated that White, Winslow, Taylor and she were involved in the Wilson case.  Dean was never mentioned. She indicated that nothing was left out of her statement.

i.      On April 14, 1989 Debra Brown Sheldon changed her story and implicated Dean in the murder.  She now stated she was at the home of Helen Wilson in

7

the late evening of February 5, 1985, saw the murders and that Dean was also there "attempting to look for money to take from Helen Wilson." It had been determined that there was over $1000.00 in cash in the apartment of Helen Wilson, which was easy to find and was never taken.

j.      On April 14, 1985, an arrest warrant was issued for Plaintiff on the basis of an affidavit by Defendant Searcey, which relied on the changed statement made by Debra Brown Sheldon, who had married Clifford Sheldon. On April 15, 1989, Dean was arrested in Lincoln, Nebraska.

k.      Immediately after his arrest, Plaintiff denied any knowledge of the Helen Wilson incident.

l.      On April 16, 1989, in an unrecorded interview taken by Searcey at Smith's direction, Plaintiff denied all involvement with Wilson's murder. Plaintiff volunteered to provide a blood sample, which demonstrated that he had blood type O, instead of B, which had been found at the murder scene.

m.      On April 29, 1989 Smith requested, and Plaintiff agreed to submit to a polygraph examination. Again, Plaintiff denied all involvement in Wilson's murder. During the examination, the examiner, Paul Jacobson, pressured Plaintiff to consider "leveling" with his attorney and pleading to a lesser charge rather than face conviction for first-degree murder and execution in the electric chair.

n.      On May 2, 1989, Smith and DeWitt arranged for Plaintiff to meet with Price, who was a psychologist employed as a Deputy Sheriff by GCSO. Price

8

interviewed Plaintiff, pretending to be Plaintiff's "therapist."  Price told Plaintiff his polygraph results revealed, at a subconscious level, his involvement in Wilson's homicide; counseled him that he was traumatized by the violence he witnessed to Wilson; and told Plaintiff he was "repressing" his memories of the murder. Price counseled Plaintiff that if he relaxed and tried to picture Wilson's apartment, his memory of the Wilson murder would return to him. Price showed plaintiff a videotape of the crime scene showing Helen Wilson, which had a profound effect on him.  As a result of Price's "counsel", Plaintiff told Smith, DeWitt, Harlan, Searcey, Meints, and Lamkin that he "remembered" pieces of the Wilson homicide, mostly in dreams.  Plaintiff eventually began to recite a story similar to the false narrative of the Wilson homicide first proposed by Clifford Sheldon, and later adopted by Debra Brown Shelden and the others. While in Gage County Jail, Plaintiff had copies of statements made by Cliff Shelden and Debra Shelden and had access to newspaper and television accounts of the Wilson case.

o.      Price, Searcey, and/or other defendants informed Plaintiff that if he did not cooperate and plead guilty to a lesser offense than first degree murder, he would be prosecuted for first degree murder and could be sentenced to execution.

p.      Plaintiff was faced with the possibility of electrocution and, upon advice of counsel, agreed to accept a reduced plea despite the fact that he was not guilty of anything.

9

q.      On May 19, 1989, Plaintiff's then attorney, Richard Schmeling, filed an affidavit in the District Court of Gage County stating in part that Plaintiff had no recollection of the incident to which he was intending to plead guilty and only after working with Defendant Price did he begin to have fragmentary memories; and requesting that the court appoint a mental health provider not employed by the prosecution to consult with Plaintiff.

r.      On June 5, 1989, plaintiff pled to a reduced charge of aiding and abetting second degree murder in the District Court of Gage County, Nebraska, despite the fact he did not remember and had no knowledge of the crime.  Plaintiff agreed to cooperate with authorities.

s.      From June through October 1989, Defendants continued to suggest new evidence for Plaintiff to "remember" that supported the "accomplices'" false narrative of Wilson's homicide.  Plaintiff testified at the trial of White during November 1989.  His testimony was false and only done under threat by defendants of a possible execution.  Pursuant to the plea agreement, Smith reduced the murder charge against Plaintiff in exchange for his agreement to testify at White's trial consistent with the false narrative of the Wilson homicide constructed by Defendants.  Plaintiff pleaded guilty to aiding and abetting Second Degree Murder and was sentenced to serve ten years imprisonment.  See *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991).

t.      Plaintiff ultimately served in excess of five years in the Nebraska State Penitentiary.

10

u.      Plaintiff returned to civilian life and is currently gainfully employed and has been since his release.

5.      Others convicted of the Helen Wilson murder.

Others were implicated in the murder of Helen Wilson, and none of these individuals were guilty.

a.      Joseph White was convicted after a trial of first degree murder, and was sentenced to life imprisonment.  He was the only person tried.

b.      Tom Winslow pled no contest to second degree murder and was sentenced to 50 years in prison.

c.      Kathy Gonzalez pled no contest to second degree murder and was sentenced to 10 years in prison.

d.      Joanne Taylor pled guilty to aiding and abetting second degree murder and was sentenced to 10–40 years in prison.

d.      Debra Brown Shelden pled guilty to aiding and abetting second degree murder and was sentence to 10 years in prison.

6.      Post-trial proceedings

a.      On October 26, 2005, White and Winslow filed motions for DNA testing pursuant to the DNA Testing Act.  The Gage County District Court denied the motions, but the Nebraska Supreme Court reversed the district court and allowed DNA testing for the semen sample police had recovered from Wilson's body. *State v. White*, 274 Neb. 419, 740 N.W.2d 801 (2007).

b.      Once DNA testing was performed, the results conclusively demonstrated

11

that neither White nor Winslow was the contributor of the semen.  Instead,

further testing conclusively demonstrated that the sole contributor of the semen

and blood found at the Wilson apartment was Bruce Allen Smith, an individual

completely and totally unassociated with Plaintiff or any of his "accomplices."

White's conviction was overturned and he was released from prison on

November 7, 2008.  Winslow was resentenced to 10 years and released around

the same time.

c.      The Nebraska Attorney General requested that the Nebraska Parole

Board convene a special hearing.  The Parole Board held a hearing on

November 10, 2008.  Assistant Attorney General Corey O'Brien testified that,

upon discovering that DNA evidence exonerated Joseph White and Thomas

Winslow in Wilson's murder, his office convened a task force to determine who,

in fact, committed the murder.  The task force concluded that Bruce Allen Smith

was the sole perpetrator of Wilson's rape and murder, and that Smith had no

association with Plaintiff, Taylor, White, Winslow, Gonzalez, or Sheldon.

d.      The above conduct of the defendants, and each of them, was done with

malice, lead to the prosecution, trial and conviction of plaintiff, and his

imprisonment for five years, four months and twenty-four days.  Ultimately the

case was resolved in plaintiff's favor by public statement by the Attorney General

of Nebraska that plaintiff, and the others were wrongfully convicted and

imprisoned, which lead to a full pardon of plaintiff on January 26, 2009.

12

## COUNT I

### 42 U.S.C. §1983 -- MALICIOUS PROSECUTION LEADING TO WRONGFUL CONVICTION

7.      Defendants Gage, GCSO, GCAO, Smith, DeWitt, Searcey, Harlan, Meints, Lamkin, and Price deliberately and purposefully brought about Plaintiff's illegal conviction and confinement by acting with deliberate indifference to Plaintiff's constitutional rights.

8.      Defendants, individually and acting in concert, deliberately and with reckless disregard of the truth, solicited, fabricated, manufactured and coerced evidence they knew, or reasonably should have know, was false, fraudulent, and profoundly lacking in reliability. Defendants filed false affidavits with the courts; prepared false investigative reports; repeatedly lied about the evidence during the course of all interrogations; mentally coerced Plaintiff to gain false evidence; and threatened Plaintiff with life imprisonment or execution in the electric chair if he did not cooperate and recite Defendants' false narrative of Wilson's homicide.

9.      To bring about Plaintiff's wrongful conviction, Defendants solicited, fabricated, manufactured, and coerced evidence that was demonstrably unreliable, misleading, false, and failed to comport with the known immutable evidence of Wilson's homicide, for purposes of:

    a.      Providing untrue probable cause for Plaintiff's arrest and confinement;

    b.      Obtaining orders preventing Plaintiff from securing release on bond;

    c.      Corrupting the judicial system so that Plaintiff could not possibly receive a

13

fair trial; and

d.    Coercing Plaintiff to plead guilty to a crime he did not commit.

10.    Defendants did not attempt to determine the truth in their investigation of Wilson's rape and murder.  Their investigation of Wilson's murder was intended to prove a case against Plaintiff despite his actual innocence, which was known or should have been known in the absence of Defendants' deliberate indifference to Plaintiff's constitutional rights.  Had Defendants not been deliberately indifferent to Plaintiff's constitutional rights, they would have known that Plaintiff was actually innocent of any involvement in Wilson's murder.

11.    Defendants' actions constitute unreasonable seizure of Plaintiff in violation of the Fourth and Fourteenth Amendments to the Federal Constitution.  Defendants' actions deprived Plaintiff of his liberty without due process of law in violation of the Fifth and Fourteenth Amendments to the Federal Constitution.  Defendants' actions deprived Plaintiff of his right to a speedy public trial by an impartial jury in violation of the Sixth and Fourteenth Amendments to the Federal Constitution.  Defendants' actions constitute deliberate infliction of cruel and unusual punishment upon Plaintiff regarding his incarceration for five years, four months, and twenty-four days for a crime he did not commit, in violation of the Eighth and Fourteenth Amendments to the Federal Constitution.

12.    Defendants' conduct as set forth above resulted in Plaintiff's unlawful and malicious prosecution, conviction, and confinement for five years, four months and twenty-four days;

14

13.     Gage, GCSO, GCAO, Smith, and DeWitt are accountable under 42 U.S.C.
§1983 because they established policies and practices that were intended to and did
encourage, endorse, and reward their agents and employees for violating Plaintiff's
constitutional rights.  At the very least, Defendants acted with deliberate indifference to
Plaintiff's constitutional rights.

## COUNT II

### 42 U.S.C. §1983 -- CONSPIRACY TO VIOLATE CIVIL RIGHTS

14.     Defendants, together and under the color of law, reached an agreement or
understanding, engaged in a course of conduct, and otherwise conspired and colluded
among and between themselves to deprive Plaintiff of his constitutional rights to free
association and privacy; to be free from unreasonable arrest and seizure; to be free
from wrongful imprisonment and punishment; to be free from malicious prosecution and
abuse of process; to fair access to the courts; to effective assistance of competent
counsel; to due process of law; and to be free from cruel and unusual punishment for a
crime that Plaintiff did not commit.

15.     Defendants, together and under the color of law, committed the overt acts set
forth above, culminating in Plaintiff's malicious prosecution and wrongful conviction and
incarceration.  Defendants deliberately and purposely solicited and procured false
statements; fabricated evidence that did not exist; knowingly manufactured false
evidence; coerced Plaintiff and other witnesses to provide false evidence under the
threat of life imprisonment or death by electrocution; filed false or misleading
investigative reports; and filed false affidavits with the court; all for the purpose of

15

convicting Plaintiff of a crime he did not commit.

16.     Defendants together engaged in these actions with actual knowledge of, or deliberate indifference to, the truth and Plaintiff's constitutional rights.  Had Defendants investigated the crime with any modicum of objectivity, they would have known that Plaintiff was actually innocent of any involvement in Wilson's rape and murder.

17.     Defendants' conspiracy to wrongfully convict Plaintiff of, and incarcerate him for, Wilson's murder, and their overt acts in furtherance thereof, violated Plaintiff's constitutionally protected rights.

**COUNT III**

**42 U.S.C. §1983 — VIOLATIONS COMMITTED BY GAGE, GCSO, AND GCAO**

18.     GCSO, by and through its relevant final policy maker, the Gage County Sheriff; the GCAO, by and through its relevant final policy maker, the Gage County Attorney; and Gage, by and through GCSO and GCAO; both before and at the time of the events alleged in this complaint, had in effect policies, practices, and customs that deprived Plaintiff of his constitutional rights.

19.     The policies, practices, and customs include, but are not limited to the following:

   a.     failing to properly train and supervise officers in the techniques of investigating serious crimes;

   b.     using interrogation techniques that had an extreme likelihood of obtaining false and unreliable information from suspects and witnesses;

   c.     failing to discipline officers who violate the Constitution or law or otherwise violate the rights of criminal suspects during the course of a criminal

16

investigation;

d.    investigating crimes in a manner designed to prove a case against a convenient suspect by procuring unreliable evidence;

e.    falsifying and fabricating evidence without regard to whether policies, practices, and customs might result in the conviction of persons who are actually innocent; and

f.    deliberate indifference to the violation of the rights of a suspect by an officer or employee.

20.    The policies, practices, and customs, separately and together, were deliberately and purposefully implemented to deprive the targets of criminal investigations of their constitutional rights.  At the very least, Defendants implemented these policies with a deliberate indifference to the rights of a target of a criminal investigation.

21.    These policies, practices, and customs were a direct and proximate cause of the violation of Plaintiff's Constitutional rights and the injuries visited upon Plaintiff as set forth above.

22.    All of Defendants' actions taken pursuant to these policies, practices, and customs were deliberate, reckless, wanton and cruel, with total and deliberate indifference to Plaintiff's rights as a citizen and human.  They caused Plaintiff to suffer severe psychological harm, humiliation, embarrassment, loss of wages, loss of earning capacity, and other damages for which Plaintiff is entitled to monetary relief.  The intentional or reckless misconduct of the Defendants, as set forth above, furthermore entitles Plaintiff to punitive damages in an amount to be determined at trial.

## DAMAGES APPLICABLE TO ALL COUNTS

23.    As the result of the Defendants' conduct as herein before set forth,

Plaintiff was damaged as follows:

      a.      Pain, suffering, and mental anguish, past and future.

      b.      Loss of earning capacity.

      c.      Lost wages in the amount of approximately $250,000.00.

      d.      Medical expenses, past and future.

      e.      Punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendants and each of

them for appropriate compensatory and punitive damages, together with interest of pre-

and post-judgment, costs, and a reasonable attorneys' fee, and for such other relief as

the court deems just and equitable.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff demands that this case be tried to a jury in Lincoln, Nebraska.

DATED this _14th_ day of _July_ , 2009.

                                      JAMES L. DEAN, Plaintiff

                          BY:    FRIEDMAN LAW OFFICES
                                    Attorneys for Plaintiff
                                    3800 Normal Blvd., Suite 200
                                    PO Box 82009
                                    Lincoln, NE  68501
                                    (402) 476-1093

                                    Herbert J. Friedman          #11390
                                    Attorney for Plaintiff