# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAMES L. DEAN,<br>          Plaintiff,<br>     v.<br><br>RICHARD T. SMITH, et al.,<br>          Defendants. | ) ) ) ) ) ) ) ) | 4:09CV3144 |
| KATHLEEN A. GONZALEZ,<br>          Plaintiff,<br>     v.<br><br>RICHARD T. SMITH, et al.,<br>          Defendants. | ) ) ) ) ) ) ) ) | 4:09CV3146 |
| THOMAS W. WINSLOW,<br>          Plaintiff,<br>     v.<br><br>RICHARD T. SMITH, et al.,<br>          Defendants. | ) ) ) ) ) ) ) ) | 4:09CV3147 |
| ADA JOANN TAYLOR,<br>          Plaintiff,<br>     v.<br><br>RICHARD T. SMITH, et al.,<br>          Defendants. | ) ) ) ) ) ) ) ) | 4:09CV3148 |

## MEMORANDUM AND ORDER

## I. Introduction

In 1989, the plaintiffs in these four § 1983 actions, James Dean, Kathleen Gonzalez, Thomas Winslow, and Joann Taylor, pleaded guilty or no contest to committing, or else aiding and abetting the commission of, second-degree murder in connection with the 1985 death of Helen Wilson in Beatrice, Nebraska. A fifth criminal co-defendant, Deb Shelden, also entered a plea of guilty to aiding and abetting second-degree murder, but she has only recently filed a § 1983 action in this court (Case No. 4:11CV3099). A sixth criminal co-defendant, Joseph White, was tried and convicted of first-degree murder. White brought suit in another § 1983 action (Case No. 4:09CV3145) which is assigned to the Honorable Warren K. Urbom. Subsequent to filing suit, White died and that action is being prosecuted by the personal representative of White's estate.

In 2009, the plaintiffs and Shelden received full pardons after White, who had been sentenced to life imprisonment, was granted a new trial on the basis of DNA testing and the State thereafter dismissed the case against him. The Nebraska Pardons Board was informed that recent DNA testing of semen, blood, and hair specimens collected from the crime scene in 1985 established that Helen Wilson had been raped and murdered by a single individual, Bruce A. Smith, who had no known connection to any of the six persons who were convicted of the crime. *See* filing 110-4 (Dean's Ex. 24).[1] Bruce Smith apparently died in 1992. *See id.* at 8.

───────────────

[1] Except as otherwise indicated, all filings are referenced (and hyperlinked) solely to the docket sheet in Case No. 4:09CV3144, which was designated as the "lead case" when these actions were consolidated for purposes of discovery and pretrial. *See* Memorandum and Order entered on January 8, 2010 (filing 36). Identical documents were filed in the other cases (using the "spread text feature" of the court's CM/ECF system), but the filing numbers may be different.

2

The plaintiffs claim that the Gage County Attorney (Richard Smith), the Gage County Sheriff (Jerry DeWitt), and three sheriff's deputies (Burdette Searcey, Wayne Price, and Gerald Lamkin)[2] violated their due process rights by using false evidence and otherwise coercing them to plea bargain despite their innocence.[3] The false evidence consists primarily of statements made by the plaintiffs themselves and Shelden. Taylor, Dean, Shelden and Gonzalez testified against White at his jury trial.

The Nebraska Supreme Court, in affirming White's conviction on appeal in 1991, summarized the evidence that was presented at his trial as follows:

> The record shows that on the night of February 5, 1985, White, James Dean, Thomas Winslow, Ada JoAnn Taylor, and Debra Shelden forcibly entered the victim's apartment in Beatrice for the purpose of robbing her. A sixth accomplice, Kathy Gonzalez, entered the apartment during the course of the robbery. The record shows that White participated in at least four planning sessions concerning this incident. During those discussions, White proposed sexually assaulting Mrs. Wilson as well as robbing her.
>
> Most of the details of the Wilson homicide are set out in *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991). Specifically, Mrs. Wilson was forced into her bedroom and was threatened and physically abused when she refused to tell the intruders where she kept her money. She was then forced back to the living room, screaming and kicking, and either tripped or was pushed to the floor. At this point, White and

---

[2] Two other deputies, Kent Harlan and Mark Meints, were originally named as defendants but were later voluntarily dismissed from the action. *See* Memorandum and Order entered December 23, 2010 (filing 125).

[3] Previously, in ruling on motions to dismiss filed by the defendants in their individual and official capacities, I determined that the statute of limitations barred additional claims that the plaintiffs' constitutional rights were violated when they were arrested and allegedly coerced to incriminate themselves. Despite the plaintiffs' continuing arguments regarding these dismissed claims, my previous rulings stand.

3

Winslow took turns sexually assaulting Mrs. Wilson. According to Taylor, White had vaginal intercourse with the victim, saying that she "deserved it," while Winslow held the victim's legs. Winslow then sodomized the victim while White held her down. Meanwhile, Taylor suffocated Mrs. Wilson with a pillow.

Mrs. Wilson did not move after she was raped, and appeared to be either dead or near death. The intruders proceeded to search the apartment for money. Taylor went into the kitchen and made some coffee for White and Winslow. Dean testified that after they left the apartment building, there was a general conversation between Taylor and White "about how nice it was to do it. They would do it again. It was fun. If they had the opportunity, they would do it again." White, Taylor, Winslow, and Dean then went to a truckstop and had breakfast.

When Mrs. Wilson's body was found the next morning by her brother-in-law, she had a complete fracture through the lower part of the left humerus, fractured ribs, a fractured sternum, a 2-centimeter vaginal tear, and numerous bruises, abrasions, and scratches. Her hands were loosely tied with a towel, and a scarf was tightly wrapped around her head and tied.

*State v. White*, 477 N.W.2d 24, 24-25 (Neb. 1991); filing 54-3 (Defendants' Ex. 1E) at 53-54.

The defendants, in their individual capacities, have moved for summary judgment on the basis of qualified immunity. Richard Smith also claims absolute immunity.

For the reasons discussed below, the defendants' motions will be granted. Because I determine as a matter of law that the plaintiffs' constitutional rights were not violated, I will also dismiss their claims against the defendants in their official capacities and their claims against Gage County. Caused largely by the need to address the facts in minute detail, this opinion is long. Therefore, a summary of my

4

ultimate conclusions will be provided now to orient the reader to the detailed discussion that follows. That is:

1.   As a matter of due process, it was clearly established in 1989 that police officers and prosecutors could not coerce criminal defendants to plead guilty (or no contest) by illegitimately threatening the accused or fabricating evidence. Viewing the evidence in the light most favorable to the plaintiffs, there is no evidence that the defendants illegitimately threatened the plaintiffs or fabricated evidence. On the contrary, each of the plaintiffs, with the assistance of competent counsel, were fully aware of the strength and weaknesses of the prosecution's case and voluntarily elected to enter pleas. Those pleas were accepted by a judge who complied with all the required constitutional formalities. Therefore, all the defendants are entitled to qualified immunity on the coerced-plea claims.

2.   It was not clearly established in 1989 that police officers were required to conduct criminal investigations in any particular fashion in order to avoid liability under a substantive due process theory. The only substantive due process limitation that existed in 1989 was that criminal investigations must not be conducted in a manner that "shocks the conscience." Viewed in the light most favorable to the plaintiffs, the behavior of the defendants does not shock the conscience. Therefore, all of the defendants have qualified immunity on the substantive due process claims.

3.   The prosecutor has absolute immunity.

4.   All of the other claims are either barred by the statute of limitations or have no merit.

5

### A.  Defendants' Statement of Material Facts

Our local rules provide that a party moving for summary judgment "must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1).  "The statement of facts should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph. . . . The statement must not contain legal conclusions." NECivR 56.1(a)(2) (emphasis in original).  The defendants have generally complied with Rule 56.1(a) by including in their supporting brief a lengthy statement of material facts, including references to filed exhibits.[4]

Our local rules also provide that "[t]he party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies.  <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>"  NECivR 56.1(b)(1) (emphasis in original).

The plaintiffs have made no effort to comply with the requirements of Rule 56.1(b)(1) by addressing each numbered paragraph of the defendants' statement of facts.  Instead, they have responded with lengthy narratives of their own.  While I will

---

[4] In many instances, however, the defendants have failed to pinpoint where a stated fact can be found in the referenced exhibit.  This failure makes review of the defendants' statement of facts an unnecessarily burdensome process.

6

give due consideration to any additional facts that are properly referenced in the plaintiffs' briefs and supported by admissible evidence, *see Jenkins v. Winter*, 540 F.3d 742, 747 (8th Cir. 2008) (holding that district court erred in not considering statement of facts presented in opposition to summary judgment motion), the defendants' statement of material facts, to the extent it is supported by the record and does not contain legal conclusions, will be deemed admitted by the plaintiffs.[5] *See, e.g., Ballard v. Heineman*, 548 F.3d 1132, 1133 (8th Cir. 2008) ("We follow the district court in considering [the defendants'] statements of fact in support of their motions for summary judgment 'deemed admitted' under Nebraska Local Civil Rule 56.1(b) because [the plaintiff] did not respond to those statements of fact."); *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007) (district court was not obliged to scour record looking for factual disputes and did not abuse discretion in deeming admitted moving party's statements of undisputed facts where opposing party's responses violated Iowa Local Rule 56.1); *Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 991 (8th Cir. 2006) (district court did not abuse discretion in deeming admitted defendants' uncontroverted facts where plaintiff's response violated W.D. Missouri Local Rule 56.1; district court was not required to give specific notice of rule violation before disregarding the response); *Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (district courts may adopt local rules designed to streamline resolution of summary judgment motions). *See also Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1014-15 (D. Neb. 2005) (granting summary judgment based in part on opposing party's failure to address each numbered paragraph of moving party's statement of material facts).

---

[5] In Section II of this opinion, I will set forth the defendants' statement of facts and will supplement their statement with additional facts referenced by the plaintiffs.

7

### B. Plaintiffs' Evidence

"To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of [former] Fed.R.Civ.P. 56(e) [or current Rule 56(c)]." *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009) (quoting *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005)).[6] "Documents which do not meet those requirements cannot be considered." *Shanklin*, 397 F.3d at 602; *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635-36 n.20 (8th Cir. 2000). *See also* NECivR 7.0.1(b)(2)(C) ("An affidavit must identify and authenticate documents filed with the index [of evidence offered by a party opposing a motion]. The affidavit must be made on personal knowledge, set forth facts that would be admissible in evidence, show affirmatively that the affiant is competent to testify to the matters stated, and identify the related motion."); NECivR 56.1 ("[T]he procedures of Nebraska Civil Rule 7.0.1 apply to summary judgment motions.").

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). That is, "[t]he party authenticating the exhibit 'need only prove a rational basis for that party's claim that the document is what it is asserted to be.'" *Jones v. National American University,*

---

[6] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. Prior to amendment, Rule 56(e)(1) provided, in part: "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." This language, with minor modifications, now appears in Rule 56(c)(4), which states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

608 F.3d 1039, 1045 (8th Cir. 2010) (quoting *United States v. Wadena*, 152 F.3d 831, 854 (8th Cir. 1998)).  "Testimony that a matter is what it is claimed to be" suffices. Fed. R. Evid. 901(b)(1).

As noted by the defendants, many of the plaintiffs' exhibits are not properly authenticated.  Although affidavits have been filed by the plaintiffs' attorneys, they only establish that documents were obtained through discovery;[7] there is no showing that the attorneys have any other personal knowledge concerning these documents. Thus, James Dean's counsel has submitted an affidavit in which he "identifies" 31 exhibits and then states: "All of the aforementioned documents, with the exception of the witness' Affidavits, were disclosed to Plaintiff James Dean by Defendants in

---

[7] On August 25, 2009, while acting as the referral judge in these cases and also in Case No. 4:09CV3145, following the retirement of Magistrate Judge David L. Piester, I entered orders granting the defendants' motions to stay discovery pending disposition of their motions to dismiss.  (Filing 30 in Case No. 4:09CV3144; filing 41 in Case No. 4:09CV3145; filing 40 in Case No. 4:09CV3146; filing 40 in Case No. 4:09CV3147; filing 40 in Case No. 4:09CV3148.)  On January 8, 2010, after the motions to dismiss were decided, I entered a progression order which consolidated the five cases for purposes of discovery, required the parties to serve their Rule 26 mandatory disclosures by February 6, 2010, and established a discovery deadline of November 1, 2010. (Filing 36.)  The plaintiffs served interrogatories, requests for production, and requests for admission on the defendants and subpoenaed documents from third parties.  (Filings 43, 44, 45.)  On June 30, 2010, the defendants moved for another stay of discovery after filing their motions for summary judgment.  (Filing 64.)  Following a telephone conference with counsel, I granted the motions to stay discovery on August 9, 2010.  (Filing 99.) Although the plaintiffs resisted the motions to stay discovery, they made no showing that without conducting further discovery they would be unable to present facts to justify their opposition to the motions for summary judgment.  *See* former Fed. R. Civ. P. 56(f); current Fed. R. Civ. P. 56(d). Indeed, the plaintiffs would be hard-pressed to make that claim since they had at least seven months of discovery in this case.  Moreover, they took depositions in the state litigation and I consider those depositions in this case.  The plaintiffs responded to the motions for summary judgment on November 22, 2010.  (Filings 103, 104.)

discovery, or were obtained by Plaintiff James Dean as the result of a subpoena served on the Nebraska Attorney General's Office. Accordingly, I hereby authenticate the documents filed as evidence with the Plaintiff's Brief in Opposition, and believe that all of the documents are what they purport to be."  (Affidavit of Herbert J. Friedman (filing 113), ¶ 7.)  Counsel for Kathleen Gonzalez, Thomas Winslow, and Joann Taylor similarly states in his affidavit that "I personally know that the [149] exhibits accompanying this affidavit are true and correct copies of the documents received in discover [sic] or pursuant to mandatory disclosure, or obtained from the authentic source of such document."  (Affidavit of Jeffry D. Patterson [8] (filing 114 at 9), ¶ 3.)

Swearing that exhibits are true and correct copies of documents obtained through discovery or from an "authentic source," or expressing a personal belief that "the documents are what they purport to be," does not satisfy the authentication requirement of Rule 56(c).[9]  *See Cordray*, 356 F. Supp. 2d at 1016 n.5 (D. Neb. 2005) ("Authentication means more than 'my opponent gave me a document.'").  Because the following plaintiffs' exhibits are not properly authenticated by affidavit, and are objected to by the defendants on foundational grounds (*see* filing 128-1), they will not be considered in connection with the pending motion for summary judgment:

---

[8] Mr. Patterson also represents Joseph White in Case No. 4:09CV3145.

[9] For example, the plaintiff James Dean's Exhibit 1 (filing 105-1), a 30-page document, is identified in the accompanying evidence index as "Crime Scene Data and Diagrams prepared by the Beatrice Police Department on February 6, 1985." (Filing 105 at 1.)  Mr. Friedman's affidavit provides no facts to establish that such description is accurate.

| Exhibit[10] | ECF [11] | Description[12] |
|---|---|---|
| Taylor's Ex. 103 | 117-13 | BPD report by Meints re Winslow 11/17/84 |
| Taylor's Ex. 105 | 118-1 | BPD Report by Wiebe, Strickland re Winslow 12/22/84 |
| Taylor's Ex. 44 | 115-4 | BPD Report by Hanson 2/2/85 |
| Taylor's Ex. 19 | 114-15 | BPD Report by ? re Taylor 2/4/85 |
| Dean's Ex. 1 | 105-1 | BPD Report of Crime Scene Data and Diagrams 2/6/85 |
| Taylor's Ex. 85 | 116-4 | Same as Dean's Ex. 1 |
| Taylor's Ex. 86 | 116-5 | Photos of crime scene |
| Dean's Ex. 2 | 105-2 | BPD Report by Wiebe, Stevens 2/6/85 |
| Dean's Ex. 3 | 105-3 | BPD Report by Wiebe 2/6/85 |
| Taylor's Ex. 2 | 114-2 | BPD Report by Stevens 2/6/85 |
| Taylor's Ex. 3 | 114-3 | BPD Report by Scholl 2/6/85 |
| Dean's Ex. 4 | 105-4 | BPD Report by Wiebe 2/7/85 |
| Dean's Ex. 5 | 105-5 | BPD Report by Waltke 2/7/85 |
| Dean's Ex. 6 | 106-1 | BPD Report by Waltke 2/7/85 |
| Taylor's Ex. 88 | 116-7 | Same as Dean's Ex. 6 |
| Taylor's Ex. 4 | 114-4 | BPD Report by Fitzgerald 2/7/85 |
| Dean's Ex. 7 | 106-2 | BPD Reports by Unknown, Hawkins 2/8/85 |
| Dean's Ex. 10 | 106-5 | BPD Report by Hawkins 2/16/85 |
| Taylor's Ex. 92 | 117-2 | Same as Dean's Ex. 10 |
| Taylor's Ex. 139 | 119-22 | BPD Reports by Various re Taylor 2/7-2/22/85 |
| Taylor's Ex. 93 | 117-3 | NSP Report by Becker with B Smith brother 2/28/85 |

---

[10] Exhibits identified as "Taylor's Ex." are filed by Taylor, Gonzalez, Winslow, and White. Exhibits identified as "Dean's Ex." are filed by Dean. Dean's evidence index (filing 114) also purports to incorporate by reference all other filed exhibits.

[11] This column shows each exhibit's filing number in the court's electronic case filing ("ECF") system.

[12] The exhibit descriptions are as shown in the defendants' filing 128-1.

11

| | | |
|---|---|---|
| Taylor's Ex. 94 | 117-4 | NSP Memo by Becker w/ girls re B Smith 2/28/85 |
| Taylor's Ex. 95 | 117-5 | NSP Memo by Becker w/ Hyatt re B Smith 2/28/85 |
| Taylor's Ex. 96 | 117-6 | NSP report by Becker re B Smith face scratches 2/28/85 |
| Taylor's Ex. 7 | 114-5 | BPD Report by Waltke 3/2/85 |
| Taylor's Ex. 8 | 114-6 | BPD Interview Transcript of Goodson 3/2/85 |
| Dean's Ex. 11 | 107-1 | BPD Report by Fitzgerald 3/9/85 |
| Dean's Ex. 12 | 107-2 | NSP Memo by Becker 3/11/85 |
| Taylor's Ex. 98 | 117-8 | Same as Dean's Ex. 12 |
| Dean's Ex. 9 | 106-4 | NSP Lab Report by Dr. Roy for BPD 5/15/85 |
| Taylor's Ex. 9 | 114-7 | BPD Report by Stevens re Woodard 10/17/85 |
| Taylor's Ex. 10 | 114-8 | BPD Interview Transcript of Woodard by Stevens 10/17/85 |
| Taylor's Ex. 11 | 114-9 | BPD report by Stevens re Winslow 12/5/85 |
| Taylor's Ex. 101 | 117-11 | BPD report by Stevens re Winslow blood report 12/9/85 |
| Taylor's Ex. 12 | 114-10 | BPD report by Stevens re Taylor, White 12/9/85 |
| Taylor's Ex. 13 | 114-11 | BPD report by Stevens re Taylor dated 12/11/85 |
| Taylor's Ex. 145 | 121-4 | BPD Report by Stevens re B Smith 3/1/86 |
| Taylor's Ex. 102 | 117-12 | Evaluation of White by Dr. Mead 9/22/89 |
| Dean's Ex. 23 | 110-3 | DNA Report, UNMC 12/8/08 |
| Taylor's Ex. 100 | 117-10 | Same as Dean's Ex. 23 |

The defendants have also filed a motion to strike additional documents which have been filed as exhibits by the plaintiffs. Three categories of documents are listed in the motion to strike: (1) "the Affidavits of Donald Luckeroth and Richard Leo, Ph.D., Plaintiff Dean's exhibits 27 and 28 [filings 111-2, 111-3] and White, et al.'s Exhibits 144, 142" [filings 121-3, 121-1]; (2) "any and all depositions taken in 2010"; and (3) "any exhibits . . . created between 1985 and 1989 by the Beatrice Police Department." (Filing 127 at 2.) These items will be taken up in reverse order.

The defendants object to the Beatrice Police Department records as being irrelevant to the issue of qualified immunity because there is no showing that the records were considered by the Sheriff's Office in its investigation of the murder. This objection is overruled, but the exhibits in question are the same as those listed above as lacking proper foundation; therefore, they will not be considered.

The defendants object to the use of any depositions taken in 2010 because in orders entered on August 25, 2009 (filing 30), and August 9, 2010 (filing 99), the court stayed all discovery in these cases. However, all of the depositions which are filed as plaintiffs' exhibits were taken in connection with state court proceedings. These depositions were not taken in violation of the stay orders and are admissible for purposes of deciding the pending summary judgment motion. "Sworn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding. Such testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c), and may be used against a party on summary judgment as long as the proffered depositions were made on personal knowledge and set forth facts that were admissible in evidence." *Gulf USA Corp. v. Federal Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) (citation omitted). The defendants' objection is overruled.[13]

Finally, the defendants move to strike the affidavits of two expert witnesses. Donald Luckeroth, who was Chief of Police in Beatrice from 1974 to 1992, opines

---

[13] The defendants also assert blanket objections on grounds of "Hearsay, Relevance, Foundation" to the deposition testimony of Donald Luckeroth (Taylor's Ex. 89 [ECF 116-8]), Ralph Stevens (Taylor's Ex. 91 [ECF 117-1]), William Fitzgerald (Taylor's Ex. 99 [ECF 117-9]), Thomas Winslow (Taylor's Ex. 104 [ECF 117-14]), Kathy Gonzalez (Taylor's Ex. 109 [ECF 118-5]), Joann Taylor (Taylor's Ex. 115 [ECF 118-11] and Taylor Ex. 140 [ECF 119-23]), James Dean (Taylor's Ex. 122 [ECF 119-5]), and Corey O'Brien (Dean's Ex. 26 [ECF 111-1]). (*See* filing 128-1.) These blanket objections are also overruled.

13

that the Sheriff's Office violated the plaintiffs' constitutional rights by obtaining "obviously false and uncorroborated" confessions from Dean, Taylor, and Shelden which led to the plaintiffs' convictions.  (Filings 111-2, 121-3.)  Richard Leo, a law professor with expertise "in the area of police interrogation practices, the psychology of police interrogation and suspect decision-making, psychological coercion, false confessions, and wrongful convictions" has the same opinion.  (Filings 111-3, 121-1.)

Mr. Luckeroth, after stating his understanding "that all people we investigate have certain rights that are protected by both the Constitution of the United States and the Constitution of the State of Nebraska, as well as the customs and usage of Nebraska law enforcement officers," and detailing these rights, offers an opinion, based on an extensive review of documents, that he "believe[s] the conduct of the defendants in this case violated the Constitutional rights of the plaintiffs, . . . and that this conduct was made with reckless or deliberate indifference to their Constitutional rights and disregard of the facts and resulted in their unlawful prosecution and conviction[.]" (Filings 111-2, 121-3.) Specifically, he believes (1) that "Deb Shelden, James Dean and Ada Joann Taylor were coerced under the threat of the death penalty to give confessions that were completely false;" (2) that "Deb Shelden, James Dean and Ada Joann Taylor were provided with facts and information which were false in an effort to obtain confessions and guilty pleas . . . ;" (3) that "County Attorney Richard Smith was leading and participating in the investigation of the entire Beatrice Six case and not acting in the role of a prosecutor, but more in the role of an investigator;" (4) that "Searcey, DeWitt and Lamkin, would interrogate James Dean and Kathy Gonzalez on numerous occasions without counsel present and threatened that if they did not cooperate and accept the plea agreement and make a confession, they would be subject to capital punishment;" (5) that "Searcey, DeWitt and Lamkin on many occasions advised James Dean that his lawyer, Richard Schmeling, knew they were interrogating him without his presence and that he had approved of the interrogations, when in fact Richard Schmeling knew nothing of the interrogations and would have instructed James Dean not to have conversations with law

enforcement officers without his presence . . . and all during this time they continued to threaten him with the death penalty;" (6) that confessions obtained from Dean, Shelden and Taylor were not "corroborated by the physical evidence found at the crime scene, a fact which any competent law enforcement officer would have recognized from the beginning of the 1989 investigation[;]" (7) that "[t]he confessions of Dean, Shelden and Taylor did not corroborate one another, let alone match the physical evidence found;" (8) that "Gonzalez was forced to accept a No Contest plea based on false evidence, the threat of capital punishment and her supposed 'repressed memory' of a crime she had no knowledge of and took no part in committing;" (9) that "Searcey, Lamkin, DeWitt, Price and Smith ignored the FBI profile prepared in the Beatrice Police investigation despite that it pointed to the fact that the wrong individuals had been arrested;" (10) that "Searcey, Lamkin and DeWitt consistently provided 'facts' to Taylor so that she could restore her 'repressed memory' and render a false confession despite the fact they knew that she was a drug and alcohol user, was susceptible being lead [sic] and had no independent memory of the 'facts' to which she ultimately testified at the trial of Joseph White, and which 'facts' did not corroborate the evidence at the crime scene;" (11) that "Seacey [sic], Lamkin and DeWitt consistently provided 'facts' to James Dean to restore his 'repressed memory' and render false testimony of witnessing the murder of Helen Wilson;" (12) that "Price advised Dean, Shelden, Taylor and Gonzalez that they had 'repressed' the memory of the crime and encouraged or coerced them into believing that they had in fact committed and been witness to the crime, which in fact they did not commit, and to falsely confess and fabricate a story about the facts of the case which were not true;" (13) that "Searcey, DeWitt, Lamkin, Price and Smith recklessly disregarded the abundance of physical evidence found at the crime scene which in essence matched none of the false confessions of Dean, Shelden and Taylor, which shows a reckless disregard for the Constitutional rights of the parties;" (14) that "Dean was forced to plead guilty to Aiding and Abetting Second Degree Murder of Helen Wilson and to testify against White . . . with continuous threats of the death penalty and by convincing him that he was in fact present and had 'repressed' the

memory of the crime, so that Dean in fact actually believed that the events occurred, when in fact he had actually no knowledge of the crime and took no part in committing the crime;" and (15) that "Searcey prepared an Affidavit for Arrest Warrant for James Dean mentioning only the statement of Debra Shelden of April 14, 1989, but excluding prior statements she made on April 13, 1989, and two statements made by Taylor, three statements made by Winslow, and one from Shelden that specifically did not mention Dean as being present at the scene of the crime," and "neither Searcey, Lamkin or DeWitt sought to verify the alleged statement of Shelden on April 14, 1989, by corroborating that with the other witnesses who were allegedly there."  (*Id.*)

Dr. Leo in his affidavit discusses "the social scientific study of police interrogation and false confessions," "the social psychology of police interrogation," "the three sequential errors that lead to false (but detailed and persuasive) confessions," "evaluating the reliability of incriminating statements, admissions and confessions," and "the problem of contamination." (Filings 111-3 at 6-22; 120-1, 121-1.)  He then describes, based on a review of documents, various ways in which the defendants mishandled the murder investigation.  (*See id.* at 22-29.)  He concludes:

> In summary, it is my professional opinion that Searcey, Smith, DeWitt, Lamkin, and Price all acted with reckless disregard for and indifference to the truth in their police investigation and interrogations of White, Dean, Gonzalez, Taylor, Shelden and Winslow; that, with reckless disregard for the truth, they misclassified these individuals as guilty when reasonably and properly trained investigators would have known that no evidence remotely suggested their involvement in or detailed knowledge about the Helen Wilson murder; that with reckless disregard for the truth, they coerced and manipulated demonstrably false and unreliable confessions, eyewitness testimony and/or guilty or no contest pleas from Dean, Gonzalez, Taylor, Sheldon [sic] and Winslow; and that, with reckless disregard for the truth, they contaminated, fed and fabricated false confessions and statements from Dean, Taylor, Shelden and Winslow.  It is also my professional opinion that, with

16

reckless disregard for the truth and in reckless violation of national standards of proper police investigation and interrogation at the time, Searcey, Smith, DeWitt, Lamkin and Price coerced a *persuaded* false confession from Dean, and then recklessly attributed misleading specialized knowledge to him as well as the others.  Finally, in my professional opinion, any reasonably trained police investigators following proper police procedures and with proper regard for the truth would have immediately realized that the incriminating statements and/or narrative confessions of Dean, Taylor, Shelden and Winslow were demonstrably false, were not supported by any logic or corroborated by any credible evidence, were inconsistent with one another and with known crime facts, were contradicted by existing case evidence, and were replete with multiple indicia of unreliability and no indicia of reliability.

(*Id.* at 29 (emphasis in original).)

In *Peterson v. City of Plymouth,* 60 F.3d 469 (8th Cir. 1995), the United States Court of Appeals for the Eighth Circuit had occasion to consider whether expert opinion testimony was admissible to establish a defense of qualified immunity.  The plaintiff claimed that he was unlawfully arrested.  A self-described "police practices and procedures expert" was allowed to testify that the arresting officers had acted reasonably and in accordance with national standards and the Fourth Amendment. The Court of Appeals ruled it was reversible error to allow this testimony because it consisted of legal conclusions.  The Court explained:

Murphy's testimony was offered to show that Officers Lindman and Bevins had acted reasonably in their encounter with Peterson.  Over the course of his testimony, Murphy set forth his opinion as to why each action the officers took was consistent with "nationally accepted standards."  His overall opinion was that the officers' conduct comported with the "standards under the Fourth Amendment."

Expert opinion testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."

> Fed.R.Evid. 702. . . . [T]he only disputed issues at trial involved whether the officers actually had probable cause and whether, under qualified immunity analysis, they could reasonably believe they had probable cause. Both probable cause and qualified immunity are ultimately questions of law. *See Estes v. Moore*, 993 F.2d 161, 163 (8th Cir.1993) (per curiam) (probable cause); *Engle v. Townsley*, 49 F.3d 1321, 1323 (8th Cir.1995) (qualified immunity). The jury's role is limited to settling disputes as to predicate facts. *See Arnott v. Mataya*, 995 F.2d 121, 123-24 (8th Cir.1993). In this case, that means the jury was entitled to determine what facts were known to the officers at the time of the arrest. None of Murphy's testimony assisted the jury in this regard. Murphy's testimony involved only his views concerning the reasonableness of the officers' conduct in light of "Fourth Amendment standards." To that end, his testimony was not a fact-based opinion, but a statement of legal conclusion. *See Estes*, 993 F.2d at 163. The legal conclusions were for the court to make. It was an abuse of discretion to allow the testimony.

*Id.* at 475. *Cf. Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009) (expert opinions regarding reasonableness of evidence collection and strip-search procedures were impermissible legal conclusions).

Similarly, the opinions of the plaintiffs' experts in the present case cannot be used to establish the existence of a genuine issue of material fact concerning the defendants' entitlement to qualified immunity. Neither Mr. Luckeroth's knowledge about the practices of law enforcement officers in Beatrice, Nebraska, nor Dr. Leo's familiarity with national standards for police investigation and interrogation are helpful to me in determining whether the defendants should be immune from suit under 42 U.S.C. § 1983. "Qualified immunity is a question of law not a question of fact." *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005).

"The threshold issue in a qualified immunity analysis is whether the facts viewed in a light most favorable to plaintiff show that the state actor's conduct violated a federal constitutional or statutory right." *Id.* The plaintiffs' experts do not

18

profess to have any first-hand knowledge of facts surrounding the homicide investigation (*i.e.*, the "predicate facts"); they only know what they have read in reports, affidavits, and depositions. Their opinions that the plaintiffs' constitutional rights were violated are inadmissible conclusions of law.[14]

The second question asked in analyzing qualified immunity is "whether that [federal constitutional or statutory] right was clearly established at the time of the alleged violation, such that a reasonable official would have known that [his] actions were unlawful." *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010). Considering that the plaintiffs were convicted 22 years ago, this is not an insignificant question in these cases. The plaintiffs' experts do not address this question in their affidavits – and properly so, since this is "a legal question for the court to decide." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 (8th Cir. 2011) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)).[15]

---

[14] Bruce A. Smith, Wilson's killer, was quickly ruled out as a suspect after investigators from the Beatrice Police Department ("BPD") and the Nebraska State Patrol ("NSP") went to Oklahoma in March of 1985 to find Smith and take blood, saliva, and hair samples. While the samples were obtained with the help of an Oklahoma investigator, they were apparently turned over to Oklahoma authorities. Scientific testing in Oklahoma determined, apparently in error, that Smith was a secretor while scientific testing in Nebraska determined that the assailant was a non-secretor. There is no evidence that the BPD and NSP investigators requested that the samples taken from Smith be retested by the same person in Nebraska who conducted the scientific testing of the specimen taken from the victim. The fact that the BPD, then under the direction of Mr. Luckeroth, was directly involved in the mistake that misdirected the investigation raises serious questions about the reliability of Mr. Luckeroth's proposed expert testimony. Beyond flagging this issue, however, it is enough to conclude that Luckeroth's affidavit is inadmissible for the reasons stated in the text.

[15] "To be clearly established, there need not be a case decided on all fours with the present factual circumstances. Rather, it need only be apparent from pre-existing law that the conduct is unlawful." *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001) (citations omitted).

## II.  *Factual Background*

Richard Smith ("Smith") was the duly elected Gage County Attorney during all times relevant to this matter. Smith has practiced law in Nebraska since his admission in July of 1976. Smith has practiced law in Beatrice since February of 1977. The Gage County Board of Supervisors appointed Smith as Gage County Attorney on April 1, 1980. Smith was elected to the position in 1982 and remained Gage County Attorney until January 5, 2007. Smith is currently an attorney in private practice in Beatrice, Nebraska.  (DSF ¶ 1 (Ex. 1 [ECF 51-1, Affidavit of Richard Smith]).)[16]  Also, during all times relevant to this matter and pursuant to Neb. Rev. Stat. § 23-1210 (2007), Smith served as the ex officio Coroner for Gage County. In the Helen Wilson homicide, Smith performed all duties required of a coroner under Neb. Rev. Stat. § 23-1801, *et seq*. (DSF ¶ 2 (Ex. 1 [ECF 51-1]).)

Burdette Searcey ("Searcey") was employed from 1977 to 1982 as an investigator with the Beatrice Police Department ("BPD"). Searcey left law enforcement to farm. While farming, Searcey began the process of becoming licensed as a private investigator. In 1987, Searcey was hired as a Deputy Sheriff for the Gage County Sheriff's Office ("GCSO") where he worked until he resigned in November, 1992. Since November 2007, Searcey has been a duly appointed Deputy Sheriff with the GCSO.  Searcey completed all courses of training required by the Nebraska Commission on Law Enforcement in the State of Nebraska. (DSF ¶ 3 (Ex. 2 [ECF 59-1, Affidavit of Burdette Searcey], ¶ 2; Ex. 2A [ECF 59-2 at 1-2, Nebraska Law Enforcement Center certification]).)

---

[16] References are to numbered paragraphs of the defendants' statement of facts ("DSF").  Exhibits listed in secondary parentheses are the defendants' exhibits referenced in that paragraph of the defendants' statement of facts.  The bracketed information includes the exhibit's filing number and a description of the exhibit as contained in the defendants' evidence index (filing 51). The description is only shown the first time an exhibit is listed.

Wayne Price, Ph.D., ("Price") was a commissioned Deputy Sheriff with the Gage County Sheriff's Office and served as a police psychologist during all times relevant to this matter. As a police psychologist for Gage County, Price received a retainer of $1 per year and was involved with multiple cases with Gage County as a patrol officer, as a negotiator, and in investigations. Since his separation from the U.S. Army as an Army Psychologist, Price attended hundreds of workshops and classes in a wide variety of issues as well as workshops in law enforcement issues. Price performed hundreds of court evaluations and criminal evaluations and consulted on a multitude of criminal cases. (DSF ¶ 5 (Ex. 3 [ECF 62-1, Affidavit of Wayne Price, PhD.], ¶ 2; Ex. 3A [ECF 62-2 at 1-9, CV of Dr. Price]).) Price was either asked by the criminal defendant or his/her defense counsel to consult or evaluate criminal defendants Shelden, Taylor, Dean, and Gonzalez. (DSF ¶ 6 (Ex. 3 [ECF 62-1], ¶ 4).)

Jerry DeWitt ("DeWitt") was the duly elected Sheriff of Gage County from January 8, 1987, to when he retired in January 2007. Prior to his position as Gage County Sheriff, DeWitt was a Nebraska State Trooper from October 1, 1963, to December 31, 1986. DeWitt completed all courses of training required by the Nebraska Commission on Law Enforcement in the State of Nebraska to be a trooper and then again to perform the duties of Sheriff. DeWitt, along with his deputies, was required to take continuing law enforcement education. After DeWitt became Sheriff in 1987, he hired Searcey as a Deputy for the GCSO. (DSF ¶ 7 (Ex. 4 [ECF 62-3, Affidavit of Jerry DeWitt], ¶¶ 2, 4; Ex. 4A [ECF 62-4 at 1-2, Nebraska Law Enforcement Training Center Certification]).) DeWitt's role in the Wilson homicide was more administrative than investigative. He mostly coordinated interviews and meetings, traveled with the officers to arrest Taylor, White, and Gonzalez, and assisted in transporting the criminal defendants as needed. (DSF ¶ 8 (Ex. 4 [ECF 62-3], ¶ 5).)

Gerald Lamkin ("Lamkin") was a duly appointed Deputy Sheriff of Gage County, Nebraska, at all times relevant to this matter. He completed all courses of

training required by the Nebraska Commission on Law Enforcement in the State of Nebraska. (DSF ¶¶ 9, 11, 13 (Ex. 5 [ECF 63-1, Affidavit of Gerald Lamkin], ¶ 2; Ex. 5A [ECF 63-2 at 1, Nebraska Law Enforcement Training Center Certification]).)

During the late night hours of February 5, 1985, or the early morning hours of February 6, 1985, Helen Wilson ("Wilson") was raped and murdered in her apartment.[17]  The Beatrice Police Department headed up the investigation in its early stages, interviewing many persons and gathering forensic evidence from a multitude of persons of interest in the case.  The investigation continued with some activity following leads and gathering evidence, but no arrests were made. (DSF ¶ 16 (Ex. 2 [ECF 59-1], ¶ 4; Ex. 3 [ECF 62-1], ¶ 3; Ex. 4 [ECF 62-3], ¶ 3; Ex. 5 [ECF 63-1], ¶ 3; Ex. 6 [ECF 63-3, Affidavit of Kent Harlan], ¶ 3; Ex. 7 [ECF 63-5, Affidavit of Mark Meints], ¶ 3).)

BPD Chief Donald Luckeroth assigned BPD Sergeant Ralph "Sam" Stevens and BPD Lieutenant William Fitzgerald to the case. (Taylor's Ex. 89 [ECF 116-8, Deposition of Donald Luckeroth, 8/19/10] at 14].)[18]  At Smith's request, the GCSO and the Nebraska State Patrol ("NSP") provided assistance to the BPD.  (*Id.* at 16; Ex. 1 [ECF 51-1], ¶¶ 3, 5.) Luckeroth testified he didn't think BPD needed the help. (Taylor's Ex. 89 [ECF 116-8] at 17.)

---

[17] On February 6, 1985, as the Coroner, Smith authorized an autopsy of Wilson. On or about February 15, 1985, Smith received the findings of the autopsy from Dr. Porterfield. On February 14, 1985, Smith received a letter from Dr. Porterfield wherein he stated the time of death was somewhere between 8 p.m. and 12 p.m. plus or minus. (DSF ¶ 17 (Ex. 1 [ECF 51-1], ¶ 4; Ex. 1A [ECF 51-2 at 1-9, Autopsy of Wilson]; Ex. 1B [ECF 51-2 at 10, Letter from Dr. Porterfield dated February 14, 1985]).  *See also* Taylor's Ex. 45 [ECF 115-5, Wilson autopsy report, 2/14/85].)

[18] The descriptions of "Taylor's Exhibits" are taken directly from the evidence index filed by Taylor, Gonzalez, and Winslow (filing 114).

On March 9, 1985, Lt. Fitzgerald reported that he and NSP Investigator Terry Becker had driven to Oklahoma City, Oklahoma, to attempt to obtain body fluid samples from Bruce A. Smith, who was a suspect in the Wilson homicide. (Taylor's Ex. 97 [ECF 117-7, BPD report, 3/9/85, Fitzgerald to Oklahoma for BA Smith].) With the assistance of an Oklahoma City police detective, Robert Bonny, they located Smith on March 7 in Edmond, Oklahoma, and Bonny persuaded Smith to return to Oklahoma City to voluntarily provide samples of his blood, saliva, and hair. (*Id.* at 2.) Less than an hour after the samples were taken, a lab technician at the Oklahoma City Police Department advised them "that in checking the blood sample she had received from Mr. Smith to see if he was a secretor or not she advised that it appeared as though he was a secretor." (*Id.*) This information evidently was incorrect.

On May 5, 1985, a written report was prepared by Dr. Reena Roy, a serologist at the NSP Criminalistics Laboratory, concerning the results of her examination of physical evidence the BPD recovered from Wilson's apartment. (Taylor's Ex. 90 [ECF 116-9, NSP lab report, 5/8/85, serology report on crime scene evidence].) Two blood types, O and B, were found on certain clothing and bedding items. It was determined from a sample of Wilson's blood that she was type O. (*Id.* at 2-3.) Testing of semen specimens recovered from Wilson's body indicated her assailant was a non-secretor of blood group substances. (*Id.* at 3-4.) Sgt. Stevens reported that the BPD first received this lab test information through the county attorney's office on February 12, 1985. (Taylor's Ex. 1 [ECF 114-1, BPD report 3/31/89, Stevens' final report] at 2.)

Sgt. Stevens also reported that Joseph White stopped into the police station about the second week of February 1985 because he was planning on leaving town and had heard that he was wanted for questioning in connection with the Wilson homicide. After a brief interrogation during which White produced a military card showing he had type O blood, Stevens told White he could leave. (*Id.* at 3.) In early December 1985, however, Stevens asked authorities in North Carolina, where White

23

was believed to be residing with Taylor, to contact White for the purpose of obtaining a blood sample; it was reported back that White could not be located.[19] (*Id.* at 4.)

On May 30, 1985, Sgt. Stevens received an offender profile that was prepared by FBI Special Agent Peter Klismet. (*Id.* at 3; Taylor's Ex. 87 [ECF 116-6, FBI report and analysis of Wilson crime scene]; Dean's Ex. 8 [ECF 106-3, FBI Criminal Personality Profile].)[20] After considering the possibility there were two offenders,[21] and specifically noting "the large amount of semen found inside the victim," Klismet opined that "[t]he crime appears to have been committed by one single male individual." (Taylor's Ex. 87 [ECF 116-6] at 6; Dean's Ex. 8 [ECF 106-3] at 6.) He thought it was "highly unlikely" that two offenders were involved in the crime because of "the likelihood that one of the two offenders[,] if there were two, would probably have elected to take money." (*Id.* at 8.) He also opined that the "considerable amount of money and other negotiables found inside the victim's residence" showed that "robbery [was] definitely not . . . the motive for this attack."

---

[19] Stevens' report indicates that he subsequently received a telephone call from Taylor, who was then in Texas; Taylor stated that she had not seen White since leaving Beatrice. (Taylor's Ex. 1 [ECF 114-1] at 4.)

[20] The defendants object to Taylor's Ex. 87 and Dean's Ex. 8 as being "Hearsay, Speculative." (Filing 128-1 at 14.) This objection is overruled regarding the stated opinions of Special Agent Klismet.

[21] Sgt. Stevens reported that he initially thought there could be two offenders because Wilson's body appeared to have been moved from the bedroom into the living room without disturbing a rug in between, suggesting that the body was carried. (Taylor's Ex. 1 [ECF 114-1] at 1.) From viewing the crime scene, Lt. Fitzgerald "always thought there was more than one perpetrator." (Taylor's Ex. 99 [ECF 117-9, Deposition of William Fitzgerald, 8/83/10] at 98.)

(*Id.* at 5.) Klismet concluded that "[w]e can state with almost total certainty that this crime was committed by one individual acting alone." (*Id.* at 8.)[22]

At the time of the Wilson homicide, Searcey was farming.[23] Due to his experience in law enforcement and his knowledge of the Wilson family, Searcey began to investigate the matter at the behest of Wilson's daughter. As a private citizen, Searcey was unable to obtain information about the homicide from the Beatrice Police Department.[24] In 1985, Searcey contacted numerous individuals who were known to him from his years in law enforcement as persons who hung around the streets of Beatrice day and night. He was able to ascertain that White had been arrested by the BPD around the area where assaults had been occurring on elderly women. Further, Searcey's former confidential informants assisted in identifying

---

[22] Wayne Price testified that he also was consulted by police shortly after the Wilson homicide and was "asked for some indications of what type of person would commit that type of crime." (Ex. 3L [ECF 62-2 at 49, Price Deposition taken on September 28, 1989].) He testified, "My impression at that time . . . was that it was a one-person crime; that the degree of violence would indicate a great degree of anger on the part of the perpetrator, and that very likely there was anger directed at an older female person, very likely a mother or grandmother . . . ." (*Id.*)

[23] Chief Luckeroth testified he "wasn't sorry to see [Searcey] leave" the BPD to take up farming because "[h]e wasn't a team worker." (Taylor's Ex. 89 [ECF 116-8] at 25-26.) Luckeroth complained that it "[s]eemed like [Searcey] was always up at the County Attorney's Office" and would not share reports with other officers. (*Id.* at 25.) Sgt. Stevens thought Searcey "was out to get [him] for some reason." (Taylor's Ex. 91 [ECF 117-1, Deposition of Ralph Stevens, 8/18/10 at 49.)

[24] Chief Luckeroth believed Searcey "apparently got some reports from some of the other officers" because "he had some information that was only in the reports." (Taylor's Ex. 89 [ECF 116-8] at 31.) Luckeroth further speculated that "[m]aybe he got it from the county attorney." (*Id.*) Lt. Fitzgerald admitted giving some information to Searcey, but denied providing him with any reports. (Taylor's Ex. 99 [ECF 117-9] at 42-43.)

several persons who frequented the area where the Wilson homicide occurred. Searcey's investigation led him to Joseph White, Thomas Winslow, Joann Taylor, Cliff Shelden, Mark Goodson, Beth Johnson, Debbie Brown (Shelden) and Charlotte Bishop as persons of interest. (DSF ¶ 19 (Ex. 2 [ECF 59-1], ¶¶ 5, 8; Ex. 2B [ECF 59-2 at 3-9, Searcey report dated February 28, 1989]).) Some of the persons of interest were known by alternate names according to various witnesses. White was also known as "Lobo." (*Id.* (Ex. 2 [ECF 59-1], ¶ 13; Ex. 2C [ECF 59-2 at 10-23, Transcript of Searcey interview with Podendorf on January 15, 1989]).) Charlotte Bishop was also known as Charlotte Mindenhall or Charlotte Crumb. (*Id.* (Ex. 2 [ECF 59-1], ¶¶ 8, 13, 27; Ex. 2B [ECF 59-2 at 3-9]; Ex. 2C [ECF 59-2 at 10-23]; Ex. 2O [ECF 60-1 at 36-38, LPD Van Butsel's report dated March 21, 1989]).)

Searcey verified that Cliff Shelden was at the hospital on the night of Wilson's homicide. Goodson indicated he was out of town that night and he had no knowledge of the incident other than what he had heard. Johnson claimed she had no knowledge of the crime, and Searcey verified that she was with her parents on that night. Winslow also claimed that he had no knowledge of the crime and that he was at work at a truck stop on that night.[25] When Searcey called to verify Winslow's statement, his employer indicated that Winslow had not shown up for his entire shift the night of Wilson's homicide. Further, all of the persons interviewed stated that they had no knowledge of the whereabouts of White and Taylor, as they both abruptly left Beatrice shortly after the Wilson homicide and had not been heard from since then.[26]

---

[25] Winslow testified Searcey told him that his car was seen in the vicinity of Wilson's apartment building on the night of the murder. (Taylor's Ex. 104 [ECF 117-14, Deposition of Thomas Winslow, 9/16/10] at 19.) According to Winslow, Searcey asked to take the car to the police station so that it could be "gone over." (*Id.*) Winslow said he released the car to Searcey, who returned it after about half a day, saying that it was "fine." (*Id.*)

[26] Sgt. Stevens reported that Mark Goodson and Cliff Shelden came to the police station on June 3, 1985, and that Goodson gave a taped statement in which he

(DSF ¶ 20 (Ex. 2 [ECF 59-1], ¶ 9; Ex. 2B [ECF 59-2 at 3-9]).) Due to Winslow's lie about where he was on the night of Wilson's homicide, Searcey recontacted one of his confidential informants who indicated that Lisa Podendorf might have information pertaining to the Wilson homicide. Podendorf advised that she received information from Taylor but that she was afraid to tell because Taylor threatened to kill her. (DSF ¶ 21 (Ex. 2 [ECF 59-1], ¶ 10; Ex. 2B [ECF 59-2 at 3-9]).)

On April 7, 1985, Searcey took a voluntary statement from Lisa Podendorf. She indicated that during a conversation the day after Wilson's homicide, Taylor admitted that she and White had killed Wilson. To prove it to Podendorf, Taylor described how and where Wilson's body was lying in the apartment. Podendorf repeated that she was scared to come forward because she feared for her life. (DSF ¶ 22 (Ex. 2 [ECF 59-1], ¶ 7; Ex. 2B [ECF 59-2 at 3-9]).)  According to a report prepared by Searcey on February 28, 1989, Podendorf provided Searcey with the following information in April 1985:

> Lisa stated that at approximately 0730 hours or 0800 hours on February 6, 1985, while she was standing in Charles Park located by the Junior High School in the City of Beatrice, Nebraska, she was approached by JoAnn[27] Taylor who began to visit with her.  She stated that during their conversation she noted that there were several police cars in and about the apartment building located across the street from the Junior High building . . . and that she had made a comment to JoAnn Taylor . . . that she wondered why all the police cars were at that location.[28] . . . JoAnn

---

stated that he had spoken on the telephone to Joann Taylor.  Goodson related that Taylor told him that she had left Beatrice for North Carolina because she and her brother, whom Goodson thought was Joseph White, were involved in the Wilson homicide.  (Taylor's Ex. 1 [ECF 114-1] at 2-3.)

[27] This spelling of Taylor's middle name appears frequently in reports.

[28] The plaintiffs contend Podendorf's statement was false because Wilson's body was not discovered until later that morning. *See, e.g.*, the affidavit for arrest

Taylor then replied to her[,] "Oh haven't you heard, there was an older lady killed there last night."  Lisa . . . asked JoAnn Taylor what had happened, and JoAnn Taylor stated to her that an older lady was killed there and that she was killed by suffocation.  Lisa . . . asked JoAnn how she knew that and JoAnn stated that I know that because Lobo (Joseph White) and myself did it.  Lisa . . . replied back to JoAnn "Oh sure" in disbelief and . . . JoAnn Taylor said[,] "Look I can tell you where the lady is laying and what happened to her." . . . JoAnn then advised her that the woman could be found laying in her living room near a hallway on her back with her hands bound and that her face would be covered with an afghan.  Lisa . . . made a comment to JoAnn "Oh sure I'll bet you did it." . . . JoAnn Taylor then replied to Lisa[,] "Hey look I can prove it, I can even tell you the color of the foot stool that's laying by the body" and JoAnn Taylor proceeded to state that there would be a foot stool laying by the body turned upside down and that the foot stool was vinyl covered, green in color.

(Ex. 2B [ECF 59-2 at 8], p. 6; Taylor's Ex. 111 [ECF 118-7, GCS report, 2/28/89, Searcey's report of PI work & GCS investigation] at 6.)

On April 15, 1985, Searcey took another voluntary statement from Lisa Podendorf.  Searcey knew from a BPD lieutenant that half of a $5 bill was found at the crime scene.[29]  Podendorf indicated that White often performed a trick in which

_____

warrants prepared by Searcey on March 14, 1989, stating that "Mrs. Wilson's body was found at approximately 9:00 a.m., February 6, 1985[.]" (Ex. 2F [ECF 59-2 at 42, Searcey affidavit and addendum to the affidavit dated March 14, 1989], p. 2; Taylor's Ex. 112 [ECF 118-8, Arrest affidavit, White & Taylor, 3/14/89] at 2.); Stevens' report of March 31, 1989, stating that he was summoned to Wilson's apartment to help investigate a possible homicide at approximately 9:30 a.m. on February 6, 1985. (Taylor's Ex. 1 [ECF 114-1] at 1.)

[29] In his affidavit, Searcey states that Lisa Podendorf "had knowledge of the torn $5 bill in the apartment, which she gained from Taylor."  (Ex. 2 [ECF 59-1], ¶ 2.) His report of February 28, 1989, does not corroborate this statement, however.  According to the report, Searcey asked Podendorf "if she had ever known Tom

he would tear a $5 bill in half. Searcey spoke to the owner of the R & S bar that White frequented who stated that he was always ending up with torn bills in his cash drawer but that he had not seen White tear money in half. Winslow also confirmed that White would do a trick where he would tear a dollar bill in half. Based upon Searcey's independent investigation, he was of the opinion that multiple persons committed the crime. Those suspects included White, Taylor, and Winslow. (DSF ¶ 23 (Ex. 2 [ECF 59-1], ¶¶ 6, 12; Ex. 2B [ECF 59-2 at 3-9]).)

Searcey does not appear to have shared this information with the Beatrice Police Department. Chief Luckeroth, Sgt. Stevens, and Lt. Fitzgerald all testified that Searcey did not provide them with any leads. (Taylor's Ex. 89 [ECF 116-8] at 32; Taylor's Ex. 91 [ECF 117-1] at 52-53; Taylor's Ex. 99 [ECF 117-9] at 44.) Fitzgerald indicated he and Searcey "might have talked about" Searcey's investigation, but he never received "reports or anything." (Taylor's Ex. 99 [ECF 117-9] at 44.) Stevens said he was told Searcey "had an informant that he wanted me to interrogate sometime," but he never actually produced any information. (Taylor's Ex. 91 [ECF 117-1] at 52-53.)

In 1987, DeWitt became Sheriff of Gage County and hired Searcey as a Deputy Sheriff for the Gage County Sheriff's Office. (DSF ¶ 24 (Ex. 4 [ECF 62-3], ¶ 6).) As a Deputy Sheriff, Searcey was then able to review BPD reports and obtain more information about the Wilson homicide. Searcey thought the reports verified the information he received during his independent investigation and confirmed his theory that more than one person was involved in the crime. (DSF ¶ 25 (Ex. 2 [ECF 59-1], ¶ 7; Ex. 2B [ECF 59-2 at 3-9]).) Searcey began expressing interest in the

Winslow, Cliff Shelden or Joseph White to ever have any torn money or halves of dollar[] bills in their possession." (Ex. 2B [ECF 59-2 at 8], p. 6; Taylor's Ex. 111 [ECF 118-7] at 6.) Lisa Podendorf responded that she had seen Joseph White perform a joke "probably twenty or thirty times while she was attending parties" or at a bar, and this joke involved the tearing of a one- or five-dollar bill in half.  (*Id.*)

Wilson homicide investigation about three months after DeWitt hired him. Over the next five or six months, DeWitt and Searcey had several meetings wherein Searcey would go over what he had discovered during his own investigation of the matter. However, Searcey had not prepared official reports on that investigation since he was doing it on his own. (DSF ¶ 26 (Ex. 2 [ECF 59-1], ¶ 7; Ex. 2B [ECF 59-2 at 3-9]).)

During early January 1989, DeWitt went to Smith's office to talk about the Wilson homicide. DeWitt reported that Searcey believed that he had information concerning the Wilson homicide that merited further investigation. DeWitt told Smith, generally, that Searcey had an informant who claimed that an individual admitted to the crime. At that time, there were no written reports. Smith told DeWitt, as DeWitt knew since becoming Sheriff in 1997, that "if it's not on paper it didn't happen." DeWitt agreed to get reports written and submitted to the County Attorney's Office. (DSF ¶ 28 (Ex. 1 [ECF 51-1], ¶9).) DeWitt instructed Searcey to write down everything Searcey had done on his own and how his own investigation had progressed so that DeWitt could review it and consult with Smith in order to make a determination as to how to proceed. Searcey prepared an extensive report detailing his investigation from February 1985 through February 1989. (DSF ¶ 30 (Ex. 2 [ECF 59-1], ¶ 7; Ex. 2B [ECF 59-2 at 3-9]; Ex. 4 [ECF 62-3], ¶ 4).)

After Searcey compiled his investigative report, it was forwarded to Smith. It detailed the information Searcey had secured while he was a private citizen. DeWitt conferred with Smith, and together, they decided that Searcey's theory and information were worth investigating further. Smith was advised that Searcey would continue the investigation and make regular written reports. Smith also requested at that time that Sheriff DeWitt keep all law enforcement agencies that had worked on this case, the Beatrice Police Department, Nebraska State Patrol, the Lincoln Police Department, and Gage County Sheriff's Office, current on the status of the investigation. DeWitt told Searcey to proceed with the investigation through the

GCSO. (DSF ¶ 31 (Ex. 1 [ECF 51-1], ¶¶ 7, 10; Ex. 2 [ECF 59-1], ¶ 7; Ex. 2B[ECF 59-2]; Ex. 4 [ECF 62-3], ¶ 4).)

On January 12, 1989, Searcey took a voluntary statement from Lisa Podendorf which was recorded. Podendorf confirmed that Searcey had talked with her in 1985 and that the information was only from the source and was not provided by Searcey.[30] Podendorf also verified that Searcey did not arrange for Podendorf to come in to give a statement or tell her what to say. (DSF ¶ 32 (Ex. 2 [ECF 59-1], ¶13; Ex. 2C [ECF 59-2 at 10-23]).) This statement was recorded, and a transcript of Podendorf's statement is included in the record. (Ex. 2 [ECF 59-1], ¶13; Ex. 2C [ECF 59-2 at 10-23]; Taylor's Ex. 16 [ECF 114-12, GCS recorded statement, 1/12/89, Lisa Podendorf Brown].)

As in her previous statements, Podendorf said that Joann Taylor spoke to her at about 7:30 on the morning after the Wilson homicide occurred. (Ex. 2C [ECF 59-2 at 12-13], pp. 3-4 [31];Taylor's Ex. 16 [ECF 114-12], pp. 3-4.) According to Podendorf, Taylor approached her and asked her if she knew why police cars were around Wilson's apartment building on 6th Street. (*Id.*, p. 5.) Podendorf replied to Taylor, "I had heard that somebody had killed her." (*Id.*) Taylor then told Podendorf that she knew who did it, and she showed Podendorf some scratch marks on her neck that, according to Taylor, were put there by Wilson. (*Id.*) Taylor told Podendorf that "me and Lobo" did it, and she threatened to kill Podendorf if she told anyone. (*Id.*)

---

[30] In a letter written to Joann Taylor's attorney on August 14, 1989, Richard Smith stated that "Deputy Searcey advises me he has no written reports regarding any statements taken from Lisa Podendorf in 1985." (Taylor's Ex. 110 [ECF 118-6, Correspondence from R. Smith to L. Koenig, 8/14/85].)

[31] Exhibit 2C is one of several exhibits contained in the defendants' filing 59-2. The page references shown outside the brackets (preceded by "p." or "pp.") are to the individual exhibit rather than to the combined ECF document. This format will also be used in page references to other defense exhibits.

According to Podendorf, Taylor said that the police would find Wilson "laying on the living room floor by a foot-stool" that had been turned over, and that Wilson would be found with "her hands tied behind her back." (*Id.*, p. 6.) Taylor then said that she needed money so that she could leave town before the police found her. (*Id.*) Podendorf told Searcey that she knew Taylor to be friends with "Charlotte Crumb, um which is would be now Charlotte uh Bishop, and Debbie Brown, and Cliff I'm not sure what his last name is, it's Debbie Brown's husband, and Todd [sic] Winslow, and Beth Johnson, . . . ." (*Id.*) Podendorf said she often saw White tear a piece of currency in half while telling a joke at parties. (*Id.*, pp. 8-9.) She also said that White bragged about using "more than one name" and talked about being "involved with killing somebody in North Carolina." (*Id.*, p. 10.)

Podendorf told Searcey that on the night of the homicide, she and her husband were "riding around" and found themselves behind Tom Winslow, Beth Johnson, Joann Taylor, and Joseph White, who were riding in a green 1972 Oldsmobile with a brown top. (*Id.*, pp. 10, 13.) Podendorf said that she and her husband followed them, and she saw them park and exit their vehicle near Wilson's apartment building at 10:18 p.m. (*Id.*, p. 10.) In his affidavit, Searcey says that Podendorf claimed to have seen Winslow, Johnson, Taylor, and White "go into the apartment building." (Ex. 2 [ECF 59-1], ¶ 13.) In her statement, however, Podendorf said that she did not "see anything else" after she watched the group exit their vehicle. (Ex. 2C, p. 11 [ECF 59-2 at 20]; Taylor's Ex. 16 [ECF 114-12], p. 11.)

On February 13, 1989, Searcey re-interviewed Winslow and confronted him with the lie about being at work on the night of the Wilson homicide. Winslow admitted that he lied and that he skipped work on February 5, 1985. (DSF ¶ 33 (Ex. 2 [ECF 59-1], ¶14; Ex. 2B [ECF 59-2 at 3-9]).) According to Searcey's February 28, 1989, report, Winslow said during this interview that he loaned his vehicle – "a 1973 Oldsmobile Cutlass brown over green" – to Joann Taylor and Joseph White on the

evening of the homicide;[32] that Winslow was aware that his vehicle had been "seen in and about the alley located by the apartment complex where Helen Wilson resided"; that Winslow became "scared" Taylor and White were involved in the homicide after he heard them say that "the police are going to be coming and questioning" Winslow; and that Winslow was scared he would become involved in the case. (Ex. 2B [ECF 59-2 at 7-8], pp. 5-6; Taylor's Ex. 111 [ECF 118-7 ] at 5-6.) The interview took place at the Lancaster County Correctional Center where Winslow was in custody. (*Id.*, p. 5; Taylor's Ex. 18 [ECF 114-14] at 1.) Winslow testified in his deposition that he lied to Searcey about loaning his vehicle to Taylor and White because "Searcey had convinced me that my car was involved in the area and stuff like that." (Taylor's Ex. 104 [ECF 117-14] at 16.) He also claims that he named Taylor and White because Searcey had mentioned them before the recorded interview started. (*Id.* at 21.)

On February 25, 1989, Searcey took a voluntary statement from Charlotte Bishop in the office of her attorney, MariClaire Thomas. At the time of the Wilson homicide, Bishop was Taylor's roommate.[33] Bishop stated that on February 6, 1985,

---

[32] However, according to a transcript of Winslow's February 13, 1989, statement, Winslow said that he loaned his car to White, Taylor, and Cliff Shelden on the night of the homicide. (Taylor's Ex. 18 [ECF 114-14, GCS recorded statement, 2/13/89, Thomas Winslow] at 4-5.)

[33] The plaintiffs argue that Taylor and Bishop were evicted from their apartment on February 5, 1985, as evidenced by a Beatrice Police Department report. (*See* Taylor's Ex. 19 [ECF 114-15, BPD report, 2/4/85 [sic], Taylor & Bishop evicted].) While I have excluded the police report from consideration because it is not properly authenticated, it merely indicates that Taylor and Bishop's landlord contacted them on February 5, 1985, to ask them to leave. Other BPD reports, which I have also excluded as not properly authenticated, indicate that the apartment was rented to Bishop alone, and that the landlord caused Taylor and Darren Munstermann to be removed from the apartment on January 25, 1985, after Bishop complained to Legal Aid that they had beaten her up; Cliff Shelden was also living in the apartment

Taylor returned to their apartment acting nervous and admitted to Bishop that she may have been involved in the homicide of an elderly woman. Taylor further stated that she had to leave town. Bishop indicated that she was scared to come forward because Taylor threatened her life. Bishop stated she believed Taylor's threat because Taylor previously had caused Bishop to get second-degree burns by forcing her into a bathtub filled with scalding water. (DSF ¶ 34 (Ex. 2 [ECF 59-1], ¶ 15; Ex. 2B [ECF 59-2 at 3-9]; Ex. 2D [ECF 59-2 at 24-31, Partial transcript of Bishop statement taken on February 25, 1989]).)   A complete copy of the transcribed statement is in the record. (Taylor's Ex. 17 [ECF 114-13, GCS recorded statement, 2/25/89, Charlotte Bishop].) Bishop stated that "the night that this happened [Taylor] didn't come home at all.  She came home the next morning or . . . the next afternoon, and um she was just she was like she was terrified.  She was just acting real strange." (*Id*. at 6.) According to Bishop, Taylor said, "I think I killed somebody." (*Id.*)  Taylor did not provide any details.  "She just said I've got to get out of here.  I've got to get out of town." (*Id.* at 7.) Bishop also stated, "[s]he just told me to keep my mouth shut or something was gonna happen to me." (*Id.*)

In early March 1989, the investigation was at a point where a statement needed to be taken from Winslow. Smith was contacted by the Gage County Sheriff's Office to determine whether or not use immunity would be offered to induce Winslow to give a statement. At that time, Winslow was in custody in Lancaster County on separate felony charges. As Gage County Attorney, Smith contacted then Lancaster County Attorney Michael G. Heavican and consulted with deputies in that office as well as the Gage County Sheriff's Office and Winslow's attorney, John Stevens Berry, over the terms of any immunity argument that would be extended to Mr. Winslow. (DSF ¶ 35 (Ex. 1 [ECF 51-1], ¶¶ 11, 12).)

---

but was given until the end of the month to vacate the premises.  (*See* Taylor's Ex. 108 [ECF 118-4, BPD reports, 1/8-1/25/85, Taylor abusing neighbor] at 3.)

On March 13, 1989, Smith traveled to Lincoln, Nebraska, with Sheriff DeWitt to discuss the Wilson homicide with counsel for Winslow, John Stevens Berry. Smith advised Mr. Berry that Smith would agree to use immunity for Winslow for his truthful statement concerning the Wilson homicide. Mr. Berry indicated that Winslow, his client, would state that Taylor and White discussed committing a felony at Wilson's apartment. Winslow would state he wanted nothing to do with it and walked away. Winslow would also corroborate Lisa Podendorf's statement that a vehicle, matching the description of Winslow's car and having occupants Taylor and White, was seen parking next to the location where Wilson was found dead on February 5, 1985, the night of the homicide. This observation was made by Lisa Podendorf at 10:18 p.m. on February 5, 1985. He would also state that Taylor and White admitted to Winslow that they killed Wilson. Winslow could bracket the time of the homicide. The agreement would be void if Winslow failed to tell the truth or if he participated. The statement was to be videotaped, and his counsel would be present. All parties agreed to these conditions. (DSF ¶ 36 (Ex. 1 [ECF 51-1], ¶¶ 12, 13; Ex. 4 [ECF 62-3], ¶ 7; Ex. 4B [ECF 62-4 at 3-4, DeWitt reports dated March 20, 1989]).)

On March 14, 1989, Searcey finalized a sworn affidavit for an arrest warrant for Taylor and White prior to going to Lincoln for the use immunity statement with Winslow. The Gage County Attorney's Office prepared complaints and filed the sworn affidavits and complaints with the Gage County Court.[34]   The Honorable

---

[34] When an officer or deputy from law enforcement would come to the Gage County Attorney's Office indicating they needed or wanted warrants for arrest or for prosecution, Smith would require that they compile written reports of their investigation. Those reports were submitted to the Gage County Attorney's Office for a prosecutorial decision. When probable cause for an arrest warrant existed, the officer would draft an affidavit in support of the arrest warrant. In most cases, the Gage County Attorney's Office would review the affidavit and if it supported probable cause, a complaint would be prepared. If there was not enough evidence in the affidavit to show probable cause for the issuance of a warrant, the County

Steven B. Timm issued the warrants. (DSF ¶ 38 (Ex. 1 [ECF 51-1], ¶ 15; Ex. 2 [ECF 59-1], ¶ 17; Ex. 2F [ECF 59-2 at 41-49]).)[35]

On March 14, 1989, Smith, DeWitt, Searcey, and Harlan traveled to Lincoln for the use immunity statement of Winslow. Winslow was interviewed by Searcey in the presence of John Stevens Berry, Smith, DeWitt and Harlan. Harlan videotaped the interview. Winslow stated that on February 5, 1985, he was in his car with White, Taylor, and Beth Johnson, and Taylor and White mentioned robbing an old lady. Winslow admitted that he then drove to Wilson's apartment building and that all four of them went inside. Winslow also stated that Taylor and White pushed Wilson into the bedroom from which he heard a scream. Thereafter, he looked into the room where he saw them attacking Wilson. Winslow stated that he panicked and left with Johnson. (DSF ¶ 37 (Ex. 1 [ECF 51-1], ¶ 14; Ex. 1C [ECF 51-2 at 11, Smith's notes dated March 14, 1989]; Ex. 2 [ECF 59-1], ¶ 16; Ex. 2E [ECF 59-2 at 32-40, Searcey

_____

Attorney's Office would require that the officer or deputy gather additional evidence and redraft the affidavit before submission to the court. At no time would a prosecutor draft the affidavit to be presented to the court. The officer's job was to prepare the reports and the affidavits of their investigation. The County Attorney's Office in Gage County reviewed those reports and affidavits to determine whether to proceed with prosecution by seeking arrest warrants and filing complaints based on the investigative activities of law enforcement. If the County Judge found probable cause based on the affidavit submitted by the officer, then a complaint would be filed by the Gage County Attorney's Office and prosecution would proceed pursuant to Neb. Rev. Stat. § 23-1202. (DSF ¶ 27 (Ex. 1 [ECF 51-1], ¶¶ 7-8).)

[35] The plaintiffs claim Searcey's affidavit for the arrest warrants was materially false because he stated that "within 24 hours of the Wilson homicide's discovery . . . CI#1 [Podendorf] spoke to Ada JoAnn Taylor and Ada JoAnn Taylor told her that she knew why there were police cars at 212 North 6th Street apartment complex." (Ex. 2F [ECF 59-2 at 43], p. 3; Taylor's Ex. 112 [ECF 118-8] at 3.) As discussed previously, Podendorf told Searcey that her conversation with Taylor took place at about 7:30 a.m. on February 6, 1985, and Searcey stated in the affidavit that Wilson's body was not discovered until approximately 9:00 a.m. that morning.

36

report dated March 27, 1989]; Ex. 4B [ECF 62-4 at 3-4]; Ex. 6B [ECF 63-4 at 2-3, Harlan report dated March 20, 1989]).)

A transcript of Winslow's March 14, 1989, interview appears in the record. (Taylor's Ex. 21 [ECF 114-16, GCS recorded statement, 3/14/89, Thomas Winslow]; Dean's Ex. 14 [ECF 107-4, Gage County Sheriff's Office Supplementary Report dated March 14, 1989].)  Winslow stated that on the evening of February 5, 1985, he was at Charlotte Bishop's apartment along with Beth Johnson, Cliff Shelden, Joann Taylor, and Joseph White.  Initially, Winslow claimed that he left the apartment with Taylor and White at around 9:30 p.m. to go for a ride in his car with White driving, but that he got out of the car and returned to the apartment when White and Taylor starting discussing robbery because he "didn't want no part of it." (*Id.* at 4-5.)  Under questioning by Searcey, Winslow changed his story and admitted going to Wilson's apartment building:

| | |
|---|---|
| Searcey: | Okay Tom, I'm talking about the night when you were driving around with Lobo and JoAnn in your car, you were driving first, they wanted to borrow it, you were thinking about letting them use it and at a certain point of time while you were riding around with them you let Lobo drive the car, is that correct? |
| Winslow: | Yes it is. |
| Searcey: | During that time span after you left Beth off at Dole Floral apartment where where [sic] Charolette [sic] Bishop was living, did you have an ocassion [sic] to go and park anywhere near the apartment house where this incident occurred that you recall that same night? |
| . . . | |
| Winslow: | We could have I'm not for sure. |
| . . . | |
| Searcey: | Did you ever get out of your car in that area? |
| Winslow: | Not that I know of, I don't think so. |
| Searcey: | Are you having problems remembering or you know is it possible you'd rather not say? |

37

| | |
|---|---|
| Winslow: | I [sic] I'm having trouble remembering. |
| Searcey: | Okay, if you recall I'll renovate [sic] my question to you again. I've asked you this before and I told you why I asked you this. It was said that you were seen getting out of your car in the parking lot which is directly East of that apartment house is that true or false? |
| Winslow: | It's true. |
| . . . | |
| Searcey: | Did you ever go in that building with JoAnn or Lobo when you parked your car that night? |
| Winslow: | Did I, I went into the apartment building? |
| Searcey: | Did you go in there? |
| Winslow: | I did not go in there. |
| Searcey: | Did you happen to go to the area of the apartment of where this lady assaulted? |
| Winslow: | I don't know that for sure. I . . . |
| Searcey: | Where did you go when went into the building? |
| Winslow: | We went to an apartment. |
| Searcey: | And do you remember where that apartment was located in that building? |
| Winslow: | It was on the lower floor. |
| Searcey: | Did you make contact with anybody? |
| Winslow: | We knocked. |
| Searcey: | Did anybody come to the door? |
| Winslow: | Not that I can remember. |
| Searcey: | What happened then? |
| Winslow: | Then we left, and like I said (unintelligible) I left I went over to Charolettes [sic] along with them, they took my car for awhile and then they went and did it. |

(*Id.* at 9-10.)  After a 44-minute break during which Winslow met with his attorney, he changed his story again.  The exchange was as follows:

| | |
|---|---|
| Searcey: | Can you now step me through what you did and who you were with and where you went after you entered that apartment complex? |

| | |
|---|---|
| Winslow: | We went into the apartment building and we went into Helen Wilson's apartment. |
| . . . | |
| Searcey: | Okay, how did you get to Helen Wilsons [sic] apartment? Do you recall that? |
| Winslow: | No I don't. |
| Searcey: | Could you have had to go up some stairs? |
| Winslow: | Yea we could have. |
| Searcey: | Do you remember or is that something your letting me tell you? |
| Winslow: | I don't remember. |
| . . . | |
| Winslow: | I don't remember how we entered the apartment, I don't, but after we got into the apartment, . . . there was a little argument and then the lady started for the phone and Lobo pushed her out of the way of the phone, pushed her into the bedroom, JoAnn followed and at that time I heard the lady scream and I exited. |
| . . . | |
| Searcey: | Did you go alone? |
| Winslow: | Beth went along. |
| . . . | |
| Winslow: | We left. I panicked I got upset because when we went to the building he was just going to talk to the lady, and then they had mentioned earlier about an old lady and that they were going rob her and then I put two and two together about them must be going to rob her, after they pushed the lady into the bedroom I started panicking and left. |

(*Id.* at 11-14.)

Later on March 14, 1989, following the use immunity statement with Winslow wherein he changed his story, Searcey drafted a sworn addendum to the affidavit for arrest warrants for Taylor and White to correct some of the statements in the original affidavit showing the changes in Winslow's statement, as given by Winslow through his use immunity statement. The addendum was presented to the Gage County Court

39

before execution of the arrest warrants by law enforcement officers. After reviewing the addendum, the Court allowed the original warrants to stand. Smith filed Complaints against Taylor and White in the Gage County Court. (DSF ¶ 39 (Ex. 1 [ECF 51-1], ¶¶ 16-18; Ex. 1D [ECF 51-3, 51-4, 51-5, Case file of State v. Taylor, originally at Gage County Court Case No. CR 89-174]; Ex. 1E [ECF 53-1, 53-2, 54-1, 54-2, 54-3, 55-1, 55-2, Case file of State v. White, originally at Gage County Court Case No. CR 89-175]; Ex. 2 [ECF 59-1], ¶ 17; Ex. 2F [ECF 59-2 at 41-49]).) *See also* Taylor's Ex. 113 [ECF 118-9, Arrest affidavit addendum, White & Taylor, 3/14/89].)

On March 15, 1989, Taylor was arrested in North Carolina by the Buncombe County Sheriff's Department ("BCSD") on a fugitive warrant, and she made a statement to the officers. The GCSO had contacted the BCSD and requested that Taylor be arrested at or near the time of White's arrest to preclude the two of them from communicating with each other. Upon her arrest, Taylor was *Mirandized* and the BCSD officers took a statement. Present during her statement were Captain Mike Stevenson, BCSD; Lt. Charlie Calloway, BCSD; and Sgt. Howard Higgins, BCSD. In the statement, Taylor denied involvement with the homicide but did admit that she was present and that White and an unknown male raped and killed Wilson. (DSF ¶ 40 (Ex. 2 [ECF 59-1], ¶ 18; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2G [ECF 59-2 at 50-53, Taylor's statement and *Miranda* warning statement dated March 15, 1989]).)

In her statement to the BCSD officers, Taylor said that White asked her to "help him do something" and threatened to kill Taylor's daughter if Taylor refused. (Ex. 2G, p. 1 [ECF 59-2 at 50]; Taylor's Ex. 28 [ECF 114-23, North Carolina police report, 3/15/89, interview of Joann Taylor] at 1.) Taylor said that she could "visualize the outline of the house as it was on that day in February" when the homicide occurred, (*id.*), and she offered the following account of the crime.

> According to [Taylor's] statement, [White] was going over to do some yard work or trim this lady's trees. That was the explanation he gave her. Also with him was another guy but she didn't know his name. When they arrived at the house, according to [Taylor's] statement, they knocked on the door and when the lady came to the door [White] asked for a glass of tea which she offered to him. [Taylor] asked the lady if she could use the bathroom. The lady let her use the bathroom and at this time both [White] and the other guy walked in also. The lady asked both of them to leave. The best that [Taylor] can remember, [White] said why should I, in that he wasn't going to leave. Sometime at this point, [White] took the lady by the arm. According to [Taylor], the lady asked [White] to let her go but [White] shoved her down. [Taylor] said she struck a table that was in the livingroom.

(*Id.*) Taylor went on to state that White began having sex with Wilson while the other "kid" held her, that White began stabbing Wilson, that "the other guy that was with [White] raped her again" after she had been killed, and that Taylor "could see the blood and the wounds on the body." (*Id.,* pp.1-2.) Taylor said that she and the other individual walked outside, and about ten minutes later White came out and retrieved a bag of clothes from their car – which Taylor described as a "small" car that was "baby blue in color." (*Id.*, p. 2.) Taylor said that White then went back into Wilson's house, changed clothes, and then came back out. (*Id.*) She added that she thought White went to Wilson's house to rob her, and she noted that White did not have any money until after the attack on Wilson. (*Id.*) She also said that she thought that the attack occurred at dusk "or maybe 5:30 or 6:00 in the afternoon." (*Id.*) Taylor concluded her statement by saying that "[s]he can still shut her eyes and see the blood, the stab wounds, and each of them taking turns raping this lady." (*Id.*, p. 3.)

On March 15, 1989, Searcey, DeWitt, Deputy Price, and other officers flew to Alabama to arrest White. On that same date, White was arrested pursuant to the court-issued warrant served by DeWitt. (DSF ¶ 41 (Ex. 2 [ECF 59-1], ¶ 19; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2H [ECF 59-2 at 54-84, Transcript of White's March 16, 1989, interview dated March 18, 1989]; Ex. 3 [ECF 62-1], ¶ 6; Ex. 3B [ECF 62-2 at

10, Consultation note concerning White]; Ex. 4 [ECF 62-3], ¶ 8; Ex. 4C [ECF 62-4 at 5, DeWitt report dated March 19, 1989]).) *See also* Dean's Ex. 15 [ECF 107-5], Gage County Sheriff's Office Supplementary Report dated March 20, 1989].)

On March 16, 1989, Searcey questioned White in the presence of Price and BPD Sgt. Stevens. White denied any knowledge of the Wilson homicide. Following the interview, White waived extradition and returned to Nebraska with Price and another officer. (DSF ¶ 43 (Ex. 2 [ECF 59-1], ¶ 19; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2H [ECF 59-2 at 54-84]; Ex. 3 [ECF 62-1], ¶ 6; Ex. 3B [ECF 62-2 at 10]; Ex. 4 [ECF 62-3], ¶ 8, Ex. 4C [ECF 62-4 at 5]).)  Deputy Meints picked them up at the airport on March 16 and booked White into the Gage County Jail. (DSF ¶ 45 (Ex. 7 [ECF 63-5], ¶ 6; Ex. 7B [ECF 63-6 at 3]).)

A partial transcript of Searcey's interview of White appears in the record. (Ex. 2H [ECF 59-2 at 54-84]; Taylor's Ex. 27 [ECF 114-22, GCS recorded statement, 3/16/89, Joseph White].) At the outset of the interview, White received *Miranda* warnings and agreed to answer questions without the services of an attorney.  (*Id.*, pp. 1-2.)  During questioning, however, White asked to see a lawyer on three separate occasions.  His first request for counsel was preceded by the following exchange:

| | |
|---|---|
| Searcey: | Do you know where [Joann Taylor] is right now? |
| White: | No. |
| Searcey: | She's in custody too, for Murder I.  We've been talking to her.  I got a feeling that somebody ain't telling something right.  I don't know which one it is, but somebody is in a world of hurt. |
| White: | Yeah. |
| Searcey: | Don't you think? |
| White: | Yeah. |
| Searcey: | So which one is it? |
| White: | She's lying to you. |
| Searcey: | I got other witnesses that can verify what she said is true.  More than one.  You were in that apartment that night. |

42

| White: | No. |
|---|---|
| Searcey: | Only one thing, you lost something when you were in there, Joe. |
| White: | What? |
| Searcey: | Mr. Stevens, (unintelligible) |
| Stevens: | The other part of a five dollar bill. |
| Searcey: | You lost it, Joe.  It's got fingerprints on it. |
| White: | What five dollar bill? |
| Stevens: | It was lying on the floor. |
| Searcey: | You forgot to take everything out with you.  You made a mistake.  It looked good for a while, but you made a mistake. |
| White: | I don't know what you're talking about. |
| Searcey: | That's not what Joann is telling us. |
| White: | I want to see a lawyer. |

(*Id.*, p. 17.) Questioning continued, and White repeatedly denied any involvement in the Wilson homicide.  The following exchange then occurred:

| White: | [Tom Winslow] didn't have a car at the time I was there that I knew of. |
|---|---|
| Searcey: | Now that's a lie Joe.  YOu road [sic] around with him the same night that this happened in his car, okay.  You were seen by many people.  You were seen pulling in the alley of a parking lot by the apartment complex at 10:30 in the evening.  So I know that's not true, now how much other stuff have you told me that ain't true. |
| White: | Somebody has been lying to you because I have never ridden in a car with Tom Winslow. |
| Searcey: | You were all four seen in the car.  And you were all four seen getting out, and all four seen going into the apartment building.  And not only can we show you doing that, but we got the people involved in the damn thing telling us the same thing.  Admitting it. |
| White: | Well I tell you what, until I see a lawyer, I'm saying nothing else because apparently you are trying to prove me a liar when I'm not. |

43

(*Id.*, p. 24.)   After additional questioning White and Searcey had the following exchange:

| | |
|---|---|
| Searcey: | Would you take a polygraph test for us Joe?  To verify what you are telling us is the truth? |
| White: | Sure. |
| Searcey: | What if you fail?  What if? |
| White: | What if?   I'd say somethings [sic] wrong with your machine. |
| Searcey: | So everything you tell us is true and what everybody else does and the machines are all going to be wrong, is that what you are saying?  Huh? |
| White: | No what I'm saying is I am telling you the truth. |
| Searcey: | No no [sic] I think you are trying to fashion and you want to tell me what you want me to hear.  You're not telling me the truth at all. |
| White: | I am telling the truth. |
| Searcey: | No you haven't, no no.  Joe, there's to [sic] many [ . . . ] |
| White: | I want a lawyer. |

(*Id.* at 26.)  Stevens then asked White whether he would "volunteer to go back to Nebraska . . . to get [this] cleared up," and White agreed.  (*Id.*)  White also agreed to answer questions from Price, who asked White whether he understood the questions posed to him during the interview, the charge against him, and the "difference between right and wrong."  (*Id.* at 27.)

On March 16, 1989, Price prepared a consultation note on White based upon his presence in the interview. Price did not believe that White had a mental disorder, but that White was experiencing anxiety. Further, Price indicated that White knew right from wrong and exhibited normal behavior. This was the only interview Price

44

had or sat in on with respect to White.[36] (DSF ¶ 44 (Ex. 3 [ECF 62-1], ¶ 6; Ex. 3B [ECF 62-2 at 10]).)

On March 16, 1989, Searcey and DeWitt flew from Alabama to North Carolina to arrest Taylor.[37] Upon arrival, they learned that she had given a statement to the Buncombe County Sheriff's investigators. Searcey questioned her as well. She waived her rights under *Miranda* and gave a statement implicating White, Beth Johnson, and another male. She was unable to name the other male, but the physical description given matched that of Winslow.[38] Taylor admitted to being present at Wilson's apartment with White and another male. She remembered that the other male worked at the truck stop. She claimed that White would not allow her to leave and threatened her and her daughter. Taylor stated that both White and the other male raped Wilson. She indicated that White cleaned up in the bathroom, took money from Wilson's purse, scattered some things around the apartment, and then ripped a bill in half. She remembered another girl being there and agreed it might have been Beth

---

[36] Price's consultation note indicates, however, that he engaged in "intermittent conversation" with White during their flight from Alabama to Nebraska, and that Price made "clinical observation[s]" during their conversation that he used to form a conclusion that White was "free from any indication of gross psychopathology." (Ex. 3B [ECF 62-2 at 10].)

[37] It appears that Sgt. Stevens also made the trip and participated in questioning Taylor. (*See* Ex. 2I [ECF 59-3, Transcript of Taylor's March 16, 1989, statement dated April 6, 1989]; Taylor's Ex. 29 [ECF 114-24, GCS recorded statement, 3/16/89, Joann Taylor].)

[38] Taylor described the other male as being "[b]etween 5'6" and 5'8", average build, not real slender not real bulky, kind of average moderate build," and said she could not remember his face. (Ex. 2I [ECF 59-3 ], p. 3; Taylor's Ex. 29 [ECF 114-24] at 3.) She later added that he had hair a little darker than hers. (*Id.*, p. 6) The plaintiffs claim that Winslow "was around 6'2", blond wavy hair, and with a slightly stocky build." (Filing 103 at 27.) In support of this statement, however, the plaintiffs only make reference to an exhibit which appears to show photocopied "mug shots" of six individuals. (*See* Taylor's Ex. 114 [ECF 118-10 Photo line up, 3/17/89].)

Johnson. Taylor did not remember talking to anybody about it, but agreed that she may have told Lisa Podendorf something.  She recalled writing Cliff Shelden a letter. (DSF ¶ 46 (Ex. 2 [ECF 59-1], ¶ 20; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2I [ECF 59-3]; Ex. 4 [ECF 62-3], ¶ 9; Ex. 4D [ECF 62-4 at 6, DeWitt report dated March 19, 1989]).)

A transcript of Taylor's March 16, 1989, statement is included in the record. (Ex. 2I, [ECF 59-3]; Taylor's Ex. 29 [ECF 114-24].)  Taylor stated that she was present at the time of Helen Wilson's murder along with her boyfriend, Joseph White (whom she knew only as Lobo), and "another boy" whose name she did not remember.[39]  (Id., p. 3.)  The questioning began as follows:

> Searcey:   JoAnn, again the reason why we're visiting with you is in reference to the Helen Wilson Case which occurred February of 1985.  Do you have any knowledge of an incident which occurred in the 200 Block of North 6th Street an apartment building which may have involved an incident which occurred of a homicide of the lady whom is known as Helen Wilson?
>
> Taylor:   I have some recollection.
>
> Searcey:   And how do you have that knowledge?
>
> Taylor:   I was present at the time it happened.
>
> Searcey:   You were present at the time it happened?
>
> Taylor:   I was in the ho– in the room.
>
> Searcey:   And JoAnn can you tell me the approximate time and date that this may have occurred?
>
> Taylor:   It was to the best of my recollection it was between 5:30 and 7:00.
>
> Searcey:   Are you sure of the time at this time?

---

[39] Taylor said that the other male "was a friend of Lobo's" but that she had only seen him a couple of times.  (Ex. 2I [ECF 59-3 ], p. 5; Taylor's Ex. 29 [ECF 114-24] at 5.) Later in the interview, however, Taylor said following a break that she "hung with [sic] around with him pretty much[,] we were pretty good friends." (Id., p. 18.) She said that he worked at Marshall's Truck Stop and indicated that she would be able to identify him if shown a photograph.  (Id.)

> Taylor:     Not not [sic] completely correct. I remember partially being
> there but I have trouble with my memory I block bad bad
> [sic] things out, I always have, and it's hard to remember.

(*Id.*, p. 2.)  When asked to describe the location, Taylor said, "[t]he building that I can remember that I see is a light colored home. Like it was a one story house (unintelligible) in my memory." (*Id.*, p. 3.)   She also said that White was going to do yard work at Wilson's house.  (*Id.,* pp. 3-4.)

Sgt. Stevens interrupted at this point to ask Taylor if she "recall[ed] being in in [sic] Beatrice Nebraska through February 5 February 6 1986 [sic] ?"  (*Id.,* p. 4.) Taylor responded, "I don't remember it but the officers said that they could prove I was up there at the time. I don't remember it much of '85 at all." (*Id.*)  Stevens then tried to "refresh" Taylor's memory by suggesting to her that "this is February," and White "wouldn't be doing yard work in February would he?" (*Id.,* pp. 4-5.)  Taylor agreed. (*Id.,* p. 5.) Stevens and Searcey then continued questioning Taylor, and she described her recollection of the homicide.  She stated that the group drove to Wilson's house in a "light blue small car" that belonged to the other man who was with them.  (*Id.*)  As White spoke with Wilson on the front porch, Taylor asked Wilson for permission to use the restroom.  (*Id.,* p. 6.)  As Wilson showed Taylor to the restroom, White and his friend entered the house and blocked the door.  (*Id.*) They refused Wilson's orders to leave, and when Taylor tried to leave the house, White threatened her daughter's life and held a knife to her throat.  (*Id.,* pp. 6-7.) According to Taylor, White and his friend then began to struggle with Wilson.  (*Id.*, p. 7.)  She did not remember the struggle ever leaving "the front area of the house." (*Id.*)  She said that White and his friend then raped Wilson.  (*Id.*, pp. 7-8.)  Taylor was unable to remember what Wilson was wearing, and stated that "Officer Calloway tried to help me through that, him and another officer an [sic] couldn't figure it out." (*Id.*, p. 8.)

47

Searcey then said, "Now is it possible since you['re] having a rough time bringing this to your mind that you could be confused as to maybe the location [of] the residence, is that possible?" (*Id.*) Taylor replied, "Yeah with my personality disorder it's hard[,] my psychologist even in Beatrice said I would have trouble." (*Id.*) Stevens then asked Taylor specific questions about the location of the bathroom in the house and the furnishings in the living room. (*Id.*) After Taylor responded to these questions, Stevens asked whether she remembered seeing a bedroom. (*Id.*) Taylor said that she did, and she described the location of the bedroom in relation to the bathroom. (*Id.*, p. 9.) Stevens asked whether Taylor remembered "any kind of struggle or any kind of a fight going on in the bedroom," and Taylor responded negatively, repeating that the struggle occurred in the living room. (*Id.*)

Stevens asked Taylor whether she, White, or the other man were wounded during the struggle, and Taylor responded negatively. (*Id.*, p. 10.) Searcey then asked Taylor whether she had spoken with anyone about the homicide before, and Taylor responded, "No I had totally blocked Lobo out of my mind." (*Id.*) Searcey asked Taylor whether she was sure that she had not spoken about the crime with anyone, and Taylor responded that she was sure. (*Id.*)

Searcey then told Taylor, "I have some problems here so I want to kind of throw some things at you and give you something to think about here and see if maybe it doesn't jog your mind a little bit . . . ." (*Id.*, p. 11.) Searcey informed Taylor that two different people had told him that she (Taylor) had spoken with them about the homicide, and he asked Taylor again whether she remembered "anything about that right now." (*Id.*, p. 11.) Taylor replied that she did not remember talking to anyone. (*Id.*) Searcey then asked Taylor whether it was "possible that the residence may have been of a large type of complex," and Taylor replied that it was possible. (*Id.*)

Later during the interview, Searcey asked Taylor whether she knew Lisa Podendorf. (*Id.*, p. 13.) After Taylor responded affirmatively, Searcey asked Taylor

48

whether she talked to Podendorf about the homicide.  (*Id.*)  Taylor replied that she
could not remember.  (*Id.*)  The following exchange then occurred:

| | |
|---|---|
| Searcey: | I want you to think real hard about this because see you stated that your [sic] going to try and tell the truth as accurately as you know okay? |
| Taylor: | No verbal comment. |
| Searcey: | So I want you to real [sic] concentrate and think about it. Did you ever make any comments to her about maybe the police finding an old lady that might have died, that may have been killed by either yourself or [White]? |
| Taylor: | I'm not sure. |
| Searcey: | I want you to think about that a little bit, I need a yes or no to that okay.  Remember we want to get it out in black and white. |
| Taylor: | I can't remember. |
| Searcey: | Is it that you tried to forget about this? |
| Taylor: | I have problems, there's a lot in my childhood I can't . . . . |
| Searcey: | Okay, but there's probably some that you don't want to remember? |
| Taylor: | I don't want to remember [White], the man is dangerous. |
| Searcey: | Let's try and go back. |

(*Id.*, pp. 13-14.)  Stevens then interjected a line of questioning about whether Taylor
believed, at one time, that White was her father.  (*Id.*, p. 14.)  Taylor indicated that
she did believe that White was her father at one time – even though she was eighteen
years old and White was nineteen.  (*Id.*)  Searcey then returned to the subject of Lisa
Podendorf, and the following exchange occurred:

| | |
|---|---|
| Searcey: | . . . Lisa said that you made some specific comments about this particular woman possibly having been killed, is that correct? |
| Taylor: | I don't know. |
| Searcey: | Did you make any comments to her about anything about this woman or the area she might be? |
| Taylor: | I don't remember talking to anybody about it. |

| | |
|---|---|
| Searcey: | [Joann] how can you remember some things and then not the other things? |
| Taylor: | That's the way my mind is, it's fucked up literally, my psychologist will tell you. It comes and goes when it wants to. I can remember where I went to school and (unintelligible mumbling). |
| Searcey: | Did you ever make comments to Charlotte Mindenhall? |
| Taylor: | Not that I know of. |
| Searcey: | You realize that your [sic] talking about a real serious offense here right? |
| Taylor: | No verbal comment. |
| Searcey: | Okay. You also realize that you know you have claimed to have been there when this took place? |
| Taylor: | Because I was told I was there. |
| Searcey: | Who told you that? |
| Taylor: | The cops that picked me up last night told me I was there. |
| Searcey: | But you did admit the fact that you were there and you did see some particular certain things happen that you told us, am I right or wrong? You did see something happen didn't you? |
| Taylor: | No verbal comment. |
| Searcey: | Right? |
| Taylor: | Yes. |
| Searcey: | Okay so you weren't told that were you? |
| Taylor: | No. |

(*Id.*, pp. 15-16.)

The interview was stopped for a break. (*Id.*, p. 17.) After the break, Searcey asked Taylor again whether she might have discussed the homicide with Podendorf. (*Id.*, p. 20.) On this occasion, Taylor said, "It could have come up in conversation." (*Id.*, p. 21.) When Searcey asked her what would have come up, Taylor replied, "Just that I knew that they might find a[n] old lady . . . [t]hat was hurt . . . [p]retty bad." (*Id.*) Searcey asked if Taylor "maybe [made] another comment to [Podendorf] about this old woman," and Taylor replied, "[t]hat she might be dead." (*Id.*) In response to further questioning from Searcey, Taylor said that Podendorf asked her how she

knew about the incident, and Taylor then told Podendorf that she (Taylor) witnessed the incident and "knew the room" and the people involved.  (*Id.*)  Taylor also said that she "probably" spoke to Charlotte Bishop about the incident.  (*Id.*, pp. 22-23.)

Searcey asked Taylor to describe again the car that belonged to the man who was with her and White during the crime.  On this occasion Taylor described the car as "a medium, regular size car" with a green body and a brown roof.  (*Id.*, pp. 22-23; *see also id.*, p. 31.)

Stevens asked Taylor whether she wrote Cliff Shelden a letter from North Carolina that included "a little bit about what happened that night," and Taylor replied that she "could have," adding, "I remember writing him, but the contents of the letter I don't.  I wrote him a lot of times."  (*Id.*, p. 24.)  Stevens questioned Taylor further about Cliff Shelden and Charlotte Bishop, and Taylor explained that Cliff Shelden was her "man," and after Taylor caught Shelden with Charlotte, Taylor tried to hurt Charlotte with boiling water.  (*Id.*, pp. 25-26.)

Midway through the interview, Taylor was again asked to describe the location of the homicide:

| | |
|---|---|
| Searcey: | Okay let's go way back to the beginning and see if we can't remember a little more about the location of where this incident might have taken place okay? I think you can probably tell me that now. Do you recall where this particular residence, where this building may have been located? |
| Taylor: | I'm still drawing blank. |
| Searcey: | Do you recall anything around the area in this particular building that might help you out. |
| . . . | |
| Searcey: | Let's see if we can help you out a little bit. Can you recall what this building may have been built out of? |
| Taylor: | Red brick. |
| Searcey: | Red brick? |

| | |
|---|---|
| Taylor: | Brick. |
| Searcey: | Red brick. Do you recall was it a single unit or was there . . . |
| Taylor: | It was an apartment? |
| Searcey: | It was what? |
| Taylor: | An apartment building. |
| Searcey: | Do you recall anything else about that building you can tell me, was there five stories, six stories? |
| Taylor: | I can't remember how big it was. It was a four story. |
| Searcey: | But you not sure? |
| Taylor: | No. It wasn't a real real [sic] big apartment building it was, I hate going blank. |

(*Id.*, pp. 28-29.)   Taylor said that she and the others entered the building through a back door and went upstairs. (*Id.*, p. 29.)  She said that the group arrived at Wilson's apartment between 8:00 and 11:00, and left between midnight and 2:00. (*Id.*, p. 33.)

Taylor said that White took some of Wilson's money out of her purse. (*Id.*, p. 32.)  Searcey asked her whether she ever saw White do any tricks with money.  After Taylor indicated that she could not remember any, the following exchange occurred:

| | |
|---|---|
| Searcey: | Did you ever see anybody play games or pull a trick on anybody that might have to do with any money? |
| Taylor: | [White] played Liars Poker a lot. |
| Searcey: | Did you ever see him do anything else with any |
| Taylor: | He could do ma– he could do hand tricks with it. |
| Searcey: | Did you ever see him do anything that might result in the destruction of money? |
| Taylor: | Hmmhmm. |
| Searcey: | What did he do?  What would he do? |
| Taylor: | He would tear it up. |
| Searcey: | And why would he do that? |
| Taylor: | He liked doing it.  He thought it was funny, cute. |
| Searcey: | And what would he do when he'd do these this [sic] particular thing your . . . |
| Taylor: | He would just tear it in certain ways to make certain different pictures of . . . |

| Searcey: | And what would he do with that money after he tore it? |
|---|---|
| Taylor: | He would wad it up. |
| Searcey: | And where what [sic] would he do with it? |
| Taylor: | He'd pick it back up. |
| Searcey: | Would he throw it away? |
| Taylor: | All I know is he kept holding it in his hand. |
| . . . . | |
| Stevens: | [Joann], you seen him that night, you seen Lobo take a five dollar bill out of that purse that night? |
| Taylor: | Hmmhmm. |
| Stevens: | And you seen him throw it on the ground? |
| Taylor: | (unintelligible) |
| Stevens: | Remember. |
| Taylor: | Yeah. |
| Stevens: | What happened to the other half of that five dollar bill? |
| Taylor: | He stuck it in his pocket. |

(*Id.*, pp. 34-35.)

Taylor then agreed with Stevens that there was blood on the sheets and blood on the walls of the bedroom, and she said that the battle in the bedroom was "scary" and "gross." (*Id.*, pp. 37-38.) Also, after saying repeatedly that she, White, and another male had been the only ones in Wilson's apartment, she agreed with Searcey that "[t]here could have been" another female in their group. (*Id.*, p. 39.) Searcey asked, "Was there a Beth?" and Taylor agreed. (*Id.*)

Near the end of the interview, Searcey accused Taylor of "protecting somebody" and "playing a game" with the investigators. (*Id.*, p. 43.) Taylor denied this, said she was trying to protect her daughter's life, and began crying. (*Id.*) Stevens questioned Taylor about the persons who were present during the homicide, and the following exchange occurred:

| Taylor: | I don't remember being there. |
|---|---|
| Stevens: | You remember being there. |
| Taylor: | I remember being there, but it doesn't I don't remember. |

> Stevens:    You remember why, because [White] was.
> Taylor:     Damn I wish I was high.

(*Id.*, p. 45.)  She added later that she intended to "fracture" her own wrists after the interview because there was nothing else to do, she had "nothing to live for," and she would "die in Beatrice" if she were taken back there.  (*Id.*, pp. 50-51.)

On March 17, 1989, Taylor waived extradition, and Searcey and DeWitt transported her back to Beatrice where she was booked into jail. On March 17, 1989, Meints and Lamkin went to the airport to pick up Taylor and DeWitt and then transported Taylor back to the Gage County Sheriff's Office. At the GCSO, Meints fingerprinted her and took her photo as part of the booking process. (DSF ¶ 47 (Ex. 2 [ECF 59-1], ¶ 20; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2I [ECF 59-3]; Ex. 4 [ECF 62-3], ¶ 9;Ex. 4D [ECF 62-4 at 6]; Ex. 5 [ECF 63-1], ¶ 6; Ex. 7 [ECF 63-5], ¶ 7; Ex. 7C [ECF 63-6 at 4, Meints Report dated March 18, 1989]).)

On March 17, 1989, Searcey and Stevens took another statement of Taylor after she was *Mirandized*. Taylor viewed a photo lineup and identified Tom Winslow as the previously unidentified male in Wilson's apartment.[40] She then admitted that she knew it was Winslow all along, but that she was scared of him, as he had threatened her and her daughter's lives.[41] She stated that Winslow drove them to

---

[40] Her statement indicates that earlier in the day, Searcey and Stevens presented Taylor with a packet of six photos "for the purposes of attempting to identify the male subject" mentioned by Taylor in her previous statement. (Ex. 2J [ECF 60-1], Transcript of Taylor's statement dated March 17, 1989, p. 2; Taylor's Ex. 30 [ECF 114-25, GCS recorded statement, 3/17/89, Joann Taylor] at 2.) Taylor said that she identified the subject as Tom Winslow, and she said that seeing his photograph helped jog her memory.  (*Id.*, pp. 3, 6.)

[41] Taylor said that she did not fear White, but she was very much afraid of Winslow, and Winslow was the one who threatened her during the homicide.  (Ex.2J [ECF 60-1], pp. 5-6; Taylor's Ex. 30 [ECF 114-25] at 5-6.)

Wilson's apartment and that she went there with White, Winslow, and Beth Johnson. Per the arranged plan, Taylor asked to use the restroom and they forced their way into the apartment. Taylor stated that she was made to stay and watch the sexual assault by Winslow and White. She saw the struggle in the bedroom. She thought Wilson was dead at the time of the assault. She could not remember where the blood in the bedroom came from.[42] She stated that Beth Johnson did not participate. She also stated that the phone rang a couple of times and that once Winslow picked up and slammed down the receiver and then unplugged the phone. Taylor indicated that one of the males had a knife. She thought Wilson had a pillow on her face when they left. She stated that she saw White tear a $5 bill in half and throw one half on the floor. She stated that they all left together and then went to breakfast. Taylor remembered telling Lisa Podendorf about the incident. (DSF ¶ 48 (Ex. 2 [ECF 59-1], ¶ 21; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2J [ECF 60-1 at 1-15]).)

On March 17, 1989, after Taylor gave her statement, Searcey drafted an affidavit for an arrest warrant for Winslow and delivered it to Smith. On that same date, the Court issued the arrest warrant, and Meints accompanied Lamkin to Wymore,, Nebraska, where Winslow was arrested pursuant to the court-ordered warrant. Thereafter, Winslow was booked into the Gage County Jail. (DSF ¶ 49 (Ex. 2 [ECF 59-1], ¶ 22; Ex. 2E [ECF 59-2 at 32-40]; Ex. 5 [ECF 63-1], ¶ 5; Ex. 7 [ECF 63-5], ¶ 8; Ex. 7C [ECF 63-6 at 4]).)

On March 17, 1989, at the request of Taylor, Price was contacted by DeWitt to visit with Taylor due to her emotional distress. At the onset of the interview, Price informed her that he had been involved with the investigation of the Wilson homicide and that his interview with her was not confidential. Price also informed Taylor

---

[42]   Taylor said that there was blood across the bed and on the wall of the bedroom. After Stevens asked her "which one of the two people was hurt?" Taylor stated that "one of the guys['] nose was bleeding, but I don't remember which one." (Ex. 2J[ECF 60-1], p. 8; Taylor's Ex. 30 [ECF 114-25] at 8.)

that she was not his client but that the Gage County Sheriff's Office was his "client." Taylor agreed to this prior to the beginning of any consultation or clinical intervention.[43]  Price had counseled her many years prior. Taylor indicated to Price that her condition had significantly improved since then. She stated that she did not have any hallucinations or flashbacks. Price found that Taylor was alert, cooperative, verbally appropriate, and did not show any mood changes. Price found that Taylor understood the nature of the charges against her, her relationship to the charges, and her capacity to interact successfully with her attorney. Price found that Taylor was able to differentiate between right and wrong, and Price found there were no indications that she was legally incompetent or legally insane. Price believed that Taylor was in as good or better shape than he had ever seen her. The interview lasted approximately one hour and Taylor and Price did not discuss the facts of the case at all. That interview was the only interview Price had with Taylor.[44] (DSF ¶ 50 (Ex. 3 [ECF 62-1], ¶ 7; Ex. 3C [45] [ECF 62-2 at 11, Consultation note concerning Taylor]; Ex. 3L [ECF 62-2 at 47-68]).) According to Price's consultation note, Taylor expressed "considerable fear for her wellbeing from Mr. Winslow."  (Ex. 3C [ECF 62-2 at 11].)

On March 17, 1989, Winslow spoke to GCSO Dispatcher Kim Bryson and requested to talk to Searcey at approximately 11:15 p.m. Bryson indicated to Winslow at approximately 11:30 p.m. that she could not reach Searcey but that he would be

———————————

[43] Taylor denies Price told her that he was no longer her psychologist and that whatever she told him could be used against her. (Taylor's Ex. 140 [ECF 119-23 Deposition of Joann Taylor, 11/3/10] at 14.) According to Taylor, Price told her there was a good possibility that she would start remembering things in her dreams.  (*Id.*)

[44] Taylor testified that Price saw her 4 or 5 times while she was in the county jail.  (Taylor's Ex. 140 [ECF 119-23] at 15.) She also testified that Dr. Hychia, in association with Price, prescribed her Mellaril after matrons at the jail reported she was having nightmares. (*Id.* at 15-16.)

[45] Erroneously identified in the defendants' statement of facts as Exhibit 3D.

back in the morning. Winslow began telling Bryson that he needed to talk to Searcey because he had lied in his use immunity statement and that his conscience was getting to him.[46] Bryson interrupted him and advised that she would try to call Searcey again. Bryson did reach Searcey who agreed to proceed to the jail to talk with Winslow. Bryson advised Winslow that Searcey was on his way to speak with Winslow. Bryson reported that Winslow was beginning to cry. After Searcey received the call, he contacted Smith because he knew Winslow was represented by Mr. Berry. Searcey arrived at the jail at approximately 12:30 to 1:00 a.m. Before Winslow's statement was taken, Searcey indicated his awareness that Winslow was represented by counsel. Winslow waived his right to have counsel present during the statement, and after being advised of his rights, waived them and signed the *Miranda* form. Winslow proceeded to give Searcey a statement, which was videotaped. During the interview, Winslow again changed his story and indicated that he lied during the statement taken pursuant to the use immunity agreement. Winslow stated that he lied about his involvement in the Wilson homicide and returned to his original story that he was not involved at all in the homicide.[47] He stated that he had only loaned his car to White.

---

[46] According to Bryson, Winslow said, "[Y]a see I lied because Beth Johnson sent me a letter when I was in Lincoln after Deputy Searcey had talked to her. In her letter she said that she could not go to prison have leave [sic] her kids with no mother. So I lied about what I said in the statement." (Ex. 2K [ECF 60-1 at 16, Dispatcher Bryson's report dated March 17, 1989].)

[47] Winslow stated that on the night of the murder he, along with Beth Johnson, Joann Taylor, and Joseph White, attended a party on the third floor of the apartment building where Helen Wilson lived. Searcey asked if the party was held at Kathy Gonzalez's or Lobo's girlfriend's place and Winslow replied, "Yeah it was somebody like that." (Taylor's Ex. 75 [ECF 116-2, GCS recorded statement, Thomas Winslow, 3/18/89] at 3; Dean's Ex. 19 [ECF 109-3, Gage County Sheriff's Office Supplementary Report dated April 10, 1989] at 3.) Winslow stated that he left the party before the other three and walked home; they returned with his car at 3:00 or 4:00 in the morning and told him what had happened. (*Id.* at 3-4.) Sgt. Stevens reported on October 7, 1988, that he had "received additional information stating that there was a rumor that on the night of the homicide, 2-5-85, there had apparently been

When confronted about his numerous lies, Winslow shut down and asked to be returned to his cell. Searcey confirmed that Winslow willingly waived his right to counsel and requested to speak to Searcey without counsel present. Winslow indicated yes to both questions. (DSF ¶ 51 (Ex. 1 [ECF 51-1], ¶ 19; Ex. 2 [ECF 59-1], ¶ 23; Ex. 2K [ECF 60-1 at 16]).)

Thereafter, it was determined based on his statement that Winslow had violated the use immunity agreement. The Gage County Attorney's Office filed a complaint against Winslow for the crime of "first degree murder of Helen L. Wilson in the perpetration or attempt to perpetrate a sexual assault in the first degree." (DSF ¶ 52 (Ex. 1 [ECF 51-1], ¶ 19; Ex. 1F [ECF 55-3, 56-1, 56-2, 56-3, Case file of State v. Winslow, originally at Gage County Court Case No. CR 89-194]).)

On March 18, 1989, Searcey took a voluntary statement from Beth Robinson (Johnson), which did not lead to any helpful information. (DSF ¶ 53 (Ex. 2 [ECF 59-1], ¶ 24; Ex. 2L [ECF 60-1 at 17-22, Transcript of the Robinson statement taken on March 13, 1989]).) Robinson stated that on the evening of February 5, 1985, she was with Thomas Winslow, Joann Taylor, and Charlotte Bishop (Crumb) watching television at Bishop's apartment.  (Ex. 2L [ECF 60-1 at 18], p. 2 .)

---

a party at 212 N. 6th in Kathy Gonzalez's apartment." (Taylor's Ex. 22 [ECF 114-17, BPD report, 10/7/88, Stevens re Gonzalez party] at 1.)  The plaintiffs dispute there was a party in Kathy Gonzalez's apartment on the night of the murder and cite to a Beatrice Police Department report in which Gonzalez "denied the fact there was any party there that night but did admit that approx [sic] one week later she had a party at that apartment and called it a going away party as she was moving to Omaha." (Taylor's Ex. 23 [ECF 114-18, BPD report, 12/5/88, Stevens contact with Gonzalez].) They also cite to a October 17, 1985, statement that an individual named Garey Woodard gave to Sgt. Stevens in which he stated that he had "been in [the apartment building] once or twice before[,] partied with the girl that lived upstairs," and "was there shortly after [the murder] happened and moved her out." (Taylor's Ex. 10 [ECF 114-8, BPD recorded statement, 10/17/85, Garey Woodard] at 2.)  I have excluded this statement because the exhibit is not properly authenticated.

On March 18, 1989, Searcey and BPD Sgt. Stevens traveled to Del City, Oklahoma, to interview Mark Goodson. On March 19, 1989, Goodson gave a voluntary statement. Goodson stated that he was not involved and had no knowledge of the Wilson homicide until days later. Goodson stated that sometime in 1985, he called Taylor in North Carolina and that she admitted to him that she and White had murdered Wilson and that she was trying to cover it up by saying others did it. (DSF ¶ 54 (Ex. 2 [ECF 59-1], ¶ 25; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2M [ECF 60-1 at 23-34, *Miranda* warning form dated March 19, 1989, and Transcript of Goodson's interview dated March 19, 1989]; Ex. 2N [ECF 60-1 at 35, Sgt. Stevens report dated March 24, 1989]).)  Goodson stated he gave a taped statement at the Beatrice Police Department on March 2, 1985, in which he indicated that he called Taylor because he had heard she was "trying to frame [him]" for the Wilson murder; that Taylor said she and White had murdered Wilson and she "put the blame" on Goodson to try "to cover their tracks"; and that Taylor said they "did it" because "the old lady wouldn't give them money."  (Ex. 2M, pp. 2-3 [ECF 60-1 at 25-26].)

On March 21, 1989, Searcey was present when Price evaluated Deb Shelden at the request of her counsel. (DSF ¶ 55 (Ex. 2 [ECF 59-1], ¶ 26; Ex. 3E [ECF 62-2 at 16-17, Letter to Korslund re: Shelden dated June 16, 1989]).)

On March 21, 1989, Lincoln Police Officer Van Butsel interviewed Cynthia McMahon in Lincoln, Nebraska. She stated that Charlotte Bishop went by many names and that Bishop had told her she had known about the homicide since the night it happened and was scared. Bishop indicated to McMahon that Taylor lived with her at the time of the Wilson homicide and told her about it when Taylor returned home. Taylor also implicated Beth Johnson to Bishop. (DSF ¶ 56 (Ex. 2 [ECF 59-1], ¶ 27; Ex. 2O [ECF 60-1 at 36-38]).)

On March 22, 1989, Meints assisted Harlan and Searcey in transporting Taylor from the Gage County Jail to the hospital and back for the purpose of obtaining biogenetic samples for testing. Also on March 22, DeWitt assisted in transporting

Winslow to and from the Beatrice hospital for the purposes of obtaining biogenetic samples for testing. Winslow had spoken with his attorney, who gave consent for the samples to be taken. (DSF ¶ 57 (Ex. 2 [ECF 59-1], ¶ 28; Ex. 2E [ECF 59-2 at 32-40]; Ex. 4 [ECF 62-3], ¶ 10; Ex. 4E [ECF 62-4 at 7, DeWitt report dated March 22, 1989]; Ex. 6 [ECF 63-3], ¶ 6; Ex. 6C [ECF 63-4 at 4, Harlan report dated March 22, 1989]; Ex. 7 [ECF 63-5], ¶ 9; Ex. 7D [ECF 63-6 at 5, Meints Report dated March 22, 1989]).)

On or about March 22, 1989, Smith sent a memo to DeWitt which indicated further investigation was needed in this case.[48] DeWitt passed the information on to Searcey to handle. (DSF ¶ 58 (Ex. 1 [ECF 51-1], ¶20; Ex. 1G [ECF 57-1 at 1-2, Smith's letter dated March 22, 1989]).)

On March 24, 1989, Searcey took a voluntary statement from Deb Shelden with BPD Sgt. Stevens present. Shelden indicated that she had no knowledge of the Wilson homicide other than what was in the papers and in a letter received by her husband Cliff Shelden from Taylor. Shelden indicated that Taylor admitted in the letter that she and White killed Wilson. (DSF ¶ 59 (Ex. 2 [ECF 59-1], ¶ 27; Ex. 2P [ECF 60-1 at 39-43, Searcey report dated April 20, 1989]; Ex. 2Q [ECF 60-1 at 44-45, Sgt. Stevens report dated March 24, 1989]).)   Shelden's interview was not recorded, but Stevens and Searcey prepared separate reports.[49]   Stevens wrote in his

---

[48] In the memo Smith stated, "At this point, it is my understanding that all investigation in this matter will be coordinated with you."  (Ex. 1G, p. 1, [ECF 57-1 at 1].) Smith listed several steps that he understood would be taken by the GCSO, such as interviewing specific witnesses and confidential informants, making copies of videos and reports and forwarding them to Smith, and keeping record logs of prisoner statements.  (*Id.*, pp. 1-2.)

[49] In his affidavit, Searcey states that he "took a voluntary statement from Deb Shelden."  (Ex. 2, ¶ 29.)  However, his report concerning this interview states, "No statement was taken from Debra Shelden by Sargeant [sic] Stevens or this deputy at that time."  (Ex. 2P [ECF 60-1 at 40], p. 2; Taylor's Ex. 33 [ECF 114-27, GCS report,

report, which was prepared on the same date as the interview, that Deb remembered Clifford Shelden receiving a letter from Joann Taylor, and although Deb did not read the letter herself, Clifford read it and advised Deb that Taylor admitted to killing Wilson. (Ex. 2Q, p. 1 [ECF 60-1 at 44]; Taylor's Ex. 32 [ECF 114-26, BPD report, 3/24/89, Stevens interview of Deb Shelden] at 1.)  According to Stevens' report, Deb also said that the letter may have mentioned Joseph White, but she was not sure.  (*Id.*, p. 2.)  When asked why she did not provide this information to the police, she responded, "You know Joann, everything she ever said was a lie."  (*Id.*)  According to Searcey's report, which was prepared on April 20, 1989, Deb claimed that she "read the letter herself and that JoAnn Taylor had made a statement in that letter that Joseph Edgar White alias Lobo and . . . JoAnn Taylor were responsible for killing Helen Wilson."  (Ex. 2P [ECF 60-1 at 40],  p. 2; Taylor's Ex. 33 [ECF 114-27] at 2.)

On March 25, 1989, Searcey took a voluntary statement from Darren Munstermann. Munstermann indicated that at the time of the Wilson homicide he was residing with Taylor, Charlotte [Bishop], and Cliff Shelden. Munstermann indicated he had no knowledge of the homicide and that he was home alone that night. Further, Munstermann remembered talking with police on February 18, 1985, and had scratches on his arm that he might have received from Taylor. According to Munstermann, Taylor was a violent person and she left town shortly after the Wilson homicide. (DSF ¶ 60 (Ex. 2 [ECF 59-1], ¶ 30; Ex. 2E [ECF 59-2 at 32-40]; Ex. 2R [ECF 60-1 at 46-60, Interview transcript of Munstermann dated March 25, 1989]).) Sgt. Stevens also participated in the interview. (*See* Ex. 2R [ECF 60-1 at 46-60].)

Munstermann told Searcey and Stevens that on the night of the homicide he was home by himself, and that he went to bed around 11:00. (*Id.*, pp. 5-6.) He said that he saw Joann, Charlotte, and Cliff the next day, and he said that he did not remember any of them acting "unusual" or "strange" or "different." (*Id.*, pp. 6-7.) He then explained that shortly after the homicide, Taylor said that she wanted to move

---

4/20/89, Searcey interview of Deb Shelden] at 2.)

back to South Carolina, and she left town.  (*Id.*, p. 7.)  After Searcey twice asked whether Joann Taylor was in a hurry to leave town, Munstermann said, "Yeah, now that you say it, I'm kinda remembering now." (*Id.*)  Searcey asked, "Now wasn't she just a little ancy [sic] . . .?" and Munstermann replied, "Yeah, I think she was ancy, [sic] from, you know, what when [sic] that happened to when she left." (*Id.*)  Searcey asked, "So she was a tad bit nervous, would you say?" and Munstermann replied, "I, I cou, [sic] I would say she was just a little bit." (*Id.*)  Searcey added, "Really she wasn't acting normal.  Is that right, as you knew her.  Is that right or wrong?" (*Id.*)  Munstermann responded, "I'd say, you know, that'd be right." (*Id.*)  Searcey commented that it seemed that "a few things [were] coming back a little bit," and he then stopped the tape recording to give Munstermann time to "think" and "jog [his] mind." (*Id.*, p. 8.) When the interview resumed, Searcey asked Munstermann whether he had heard any comments from Joann Taylor about why she was leaving town, and Munstermann responded, "I don't think she told them exactly why, I think she just made up something then, you know made up an excuse to leave town." (*Id.*)  Searcey asked, "Do you think it could have been possibly because she was involved in this homicide, and she was wanting to get the hell out of town?" (*Id.*)  Munstermann agreed.  (*Id.*)

Later during the interview, the following exchange occurred between Searcey and Munstermann:

BS     Now like I told you in a brief discussion before we started interviewing you, your name has come up in this situation, OK, I made you aware of that, is that not correct?

A.     Yes

BS     And I believe I made you aware that, that come from some of the people that are lodged in jail at this time?

A.     Yes

[Q.]     If they was to make comments to me, Sgt Stevens about you having been involved in that.  What would be your reply?

A.     I would say that they were trying, you know, to work a deal or something to get their sentence, you know, down, there [sic] just

62

coming up with, pulling stuff out of the air, you know, people they knew, and trying to get everybody in on it

BS   So you think they may be fabricating?

A.    Yes

. . . .

BS   Tell you want I think, Jon [sic].  I'm gonna be right up front with you.  No doubt in my mind you know about this thing, no doubt in my mind you were there.  OK I think the reason why you were there might of [sic] been maybe not at your choice.  That's what I think, OK.  And I think things happened and it got clear out of hand, clear out of hand, there ain't much you can do about it, right, not a hell of a lot you can do because there's many people involved.  Am I right or wrong, got out of hand.  Your didn't go up there with that in mind, did you?

A.    I didn't go up there at all

BS   No, I think you were there, but what I'm saying is that I think it got out of hand, there wasn't much Jon [sic] could do about it.  Jon [sic] would like to help, but it's out of hand.  Too many other people took control of something and no matter what you can or nor [sic] matter what your [sic] saying, your [sic] being held back or whatever, or your [sic] threatened.  Your life means more to you than that doesn't it, doesn't it Jon [sic]?

A.    Yes it does, it does, nobody has threatened me, and nothing.  I came in here on my own.

BS   We understand that

A.    To help you guys out, and well I have to say, well I didn't have anything to do with it, I wasn't there, I didn't have any knowledge of it until I saw the paper last week.

BS   That's not what people are telling us, Jon [sic].  OK.  What I'm saying to you is I think it's time to clean.  It's time to clean, you can't carry it around with you all the time.  It's been four long years.  Four long years, you can't carry that around all your life.  It'll tear you up Jon [sic].  It will do a number on you.

A.    I know it would, that's why I just let, if something, if I was in on it, I would say something, because I have, I do have a conscience about myself, you know, some people don't have it, they would hold back stuff like that, but I'm not that kind of person to hold back anything, you know, anything to do with that.

63

(*Id.* pp., 10, 12-13.)  Munstermann then agreed to take a polygraph test, testify, and provide samples of blood, hair, and saliva "for investigative purposes."  (*Id.*, p. 13.)

On or about March 28, 1989, Smith sent DeWitt a memo wherein Smith conveyed information received from BPD Sgt. Stevens and asked that GCSO follow up on it. DeWitt passed the information on to Searcey to handle. (DSF ¶ 61 (Ex. 1 [ECF 51-1], ¶ 21; Ex. 1H [ECF 57-1 at 3, Smith's memo dated March 28, 1989]).)

On or about March 29, 1989, Smith sent DeWitt a memo from Smith wherein Smith indicated that GCSO needed to look for all statements made by Beth Winslow (Johnson) since 1985 and that Smith had been informed that a piece of evidence in the Wilson homicide (a bloody bra) was missing, and GCSO needed to confirm that information. (DSF ¶ 62 (Ex. 1 [ECF 51-1], ¶22; Ex. 1I [ECF 57-1 at 4, Smith's memo dated March 29, 1989]).)

On March 30, 1989, BPD Sgt. Stevens took a statement from Wilbur Brown, Lisa Podendorf's father-in-law. (Ex. 2 [ECF 59-1], ¶ 31; Ex. 2S [ECF 60-1 at 61-62, Wilbur Brown statement transcript with Sgt. Stevens dated March 30, 1989].)  Later on March 30, 1989, Searcey also took a voluntary statement from him. Wilbur Brown confirmed Lisa Podendorf's statements. (DSF ¶ 63 (Ex. 2 [ECF 59-1], ¶¶ 31, 32; Ex. 2S [ECF 60-1 at 61-62]; Ex. 2T [ECF 60-1 at 63-68, Wilbur Brown statement transcript dated March 30, 1989]).)  Brown said that according to Lisa, Joann Taylor watched Wilson's murder, revealed this fact to Lisa, and threatened to kill Lisa if she made a statement about it.  (Ex. 2S [ECF 60-1 at 61], p. 1.)  Many of Searcey's questions to Brown were about his interview with Sergeant Stevens.  Searcey asked Brown, "Did [Stevens] make any comments about myself Officer Searcey?" and Brown replied, "Yeah he did he said Officer Searcey kept all the information to himself, he would not give me none of it." (*Id.*, p. 4.)  Brown added, "Officer Stevens did say that if he'd of had one statement that I guess my daughter-in-law gave that you could of had that murder solved in three days after it happened, but I guess according to him he did not get that one information." (*Id.*, p. 6.)

On March 30, 1989, Searcey took a voluntary statement from Lawrence Brown, husband of Lisa Podendorf. Brown verified Lisa Podendorf's statements that Taylor had admitted to her involvement in the Wilson homicide. Brown also verified that Podendorf did not come forward with the information because she was scared of Taylor, as Taylor had threatened her. (DSF ¶ 64 (Ex. 2 [ECF 59-1], ¶ 33; Ex. 2U [ECF 60-1 at 69-76, Lawrence Brown statement transcript dated March 30, 1989]).)

On March 30, 1989, Searcey took a voluntary statement of Margaret Brown, Wilbur Brown's daughter-in-law. Margaret Brown confirmed Lisa Podendorf's statements. (DSF ¶ 65 (Ex. 2 [ECF 59-1], ¶ 34; Ex. 2V [ECF 60-2 at 1-5, Margaret Brown statement transcript dated March 30, 1989]).)

On March 31, 1989, Wilbur Brown was interviewed at the GCSO with DeWitt present. BPD Capt. Elvin Waltke conducted the interview. (DSF ¶ 66 (Ex. 2 [ECF 59-1], ¶ 35; Ex. 2W [ECF 60-2 at 6-16, Wilbur Brown interview transcript dated March 31, 1989]).) In the recorded interview, Brown eventually repeated his statement that Joann Taylor told Lisa Podendorf that she (Taylor) was in the apartment when Wilson was killed, and that Lisa relayed this information to Brown. (Ex. 2W [ECF 60-2 at 15], p. 10.) Before the recording began, however, Brown denied that Lisa told him anything about the matter; Brown stated that he "was trying to protect [his] daughter-in-law" because he "was scared it would get her in trouble." (*Id.*, pp. 1-2, 4.) He said that Taylor told Lisa "if she said anything, she would kill her." (*Id.*, p. 2.) Brown also repeated his statement that on March 30, 1989, Stevens told him that Searcey "kept all the information to himself." (*Id.*, p. 6.) Brown also said, however, that when Searcey initially spoke with Lisa about the case, Searcey told her not to tell anybody what she knew. (*Id.*, p. 4.) According to Sgt. Stevens, Sheriff DeWitt subsequently informed Chief Luckeroth that Stevens was to stay out of the Wilson case because he was "muddying the waters." (Taylor's Ex. 91 [ECF 117-1 at 109-110].)

On or about April 4, 1989, Smith sent DeWitt a memo requesting that Searcey have Wilson's blood retyped. Also on April 4, 1989, Smith sent a letter with enclosed amended complaints to counsels for Winslow, White, and Taylor. (DSF ¶ 67 (Ex. 1 [ECF 51-1], ¶¶ 23, 24; Ex. 1J [ECF 57-1 at 5, Smith's memo dated April 4, 1989]; Ex. 1K [ECF 57-1 at 6, Smith's letter dated April 4, 1989]).)

On April 10, 1989, Searcey took a statement from Cindy Reiber after she was *Mirandized*. Reiber had not spoken with Searcey prior to the interview. She was previously married to Winslow. She stated that Winslow had not told her much but that he drove White, Taylor, and Beth Johnson to a party and that Taylor told him about the homicide. Winslow told Reiber that Taylor admitted to him she and White killed Wilson.[50] Winslow also told Reiber that Taylor had threatened him if he told anyone.[51] She had also talked to Lisa Podendorf about her conversation with Taylor.[52] Reiber stated that Cliff Shelden told her Winslow was involved in the Wilson homicide. (DSF ¶ 68 (Ex. 2 [ECF 59-1], ¶ 36; Ex. 2P [ECF 60-1 at 39-43]; Ex. 2X [ECF 60-2 at 17-31]).)

---

[50] Reiber stated that after Tom Winslow got out of jail in Lancaster County "a month ago," he said that Joann Taylor told him that she and White murdered Wilson. (Ex. 2X [ECF 60-2 at 19-20, 23, Reiber statement transcript dated April 10, 1989], pp. 3-4.)  Reiber also said that she was married to Tom Winslow for approximately two years beginning on January 9, 1987, and that Winslow never said anything about the Wilson homicide before.  (*Id.*, pp., 7-8.)

[51] Reiber said that Winslow did not come forward about the Wilson homicide because Joann Taylor threatened to "bring his name right in the middle of it" and "drag him down with her."  (Ex. 2X [ECF 60-2 at 23, 30], pp. 7, 14.)

[52] Reiber said that Lisa Podendorf also told her that Joann Taylor claimed to have murdered Wilson.  (Ex. 2X [ECF 60-2 at 26], p. 10.)  Reiber explained that the murder "was the big talk about that time," and she and Lisa were both suspicious of Joann after the murder because "she had just up and took off and she hadn't been seen since then."  (*Id.*)

On April 12, 1989, Searcey took a voluntary statement from Cliff Shelden with Deputy Lamkin present.[53] Cliff Shelden stated that on the night of the Wilson homicide, he was in the hospital.  He further stated that three to four months after the Wilson homicide, he received a letter from Taylor wherein she admitted that she (Taylor), White, and Winslow had killed Wilson. In the letter, Taylor stated that she took some money from Wilson's residence. Cliff Shelden stated that Winslow told him the details of the homicide and that Taylor also participated in the sexual assault of Wilson. Winslow told Shelden that they got scared because the phone kept ringing; so, Winslow disconnected it. Winslow also stated that he found some money in the apartment and told Shelden that his wife, Deb Shelden, was also at Wilson's apartment that night. Cliff Shelden stated that Winslow indicated White had pushed Deb Shelden and that she had hit her head; that Taylor threatened Deb Shelden if she told anyone; and that White put a pillow over Wilson's face. (DSF ¶ 69 (Ex. 2 [ECF 59-1], ¶ 37; Ex. 2P [ECF 60-1 at 39-43]; Ex. 2Y [ECF 60-2 at 32-52, Cliff Shelden statement transcript dated April 12, 1989]; Ex. 5 [ECF 63-1], ¶ 8).)

---

[53] Clifford Shelden on two prior occasions had told Det. Tim Domgard of the Lincoln Police Department that he had knowledge of the Wilson murder. On November 22, 1988, while being interviewed concerning an assault investigation, Shelden indicated that he thought Joseph White and Mark Goodson were responsible. (Taylor's Ex. 25 [ECF 114-20, LPD report, 12/1/88, Domgard interview of Clifford Shelden].)  In another statement on December 15, 1988, Shelden named White, Goodson, and Taylor. (Taylor's Ex. 26 [ECF 114-21, LPD report, 12/15/88, Domgard second interview of Cliff Shelden]; Dean's Ex. 13 [ECF 107-3, Lincoln Police Department Supplementary Report dated December 15, 1988].)  Shelden also stated that he had received a letter from Taylor, postmarked from Indiana, in which Taylor stated that she and White had needed to get out of town and that they had "come into quite some money." (*Id.*) Det. Domgard's reports apparently were forwarded to the Beatrice Police and received on January 25, 1989.  (Taylor's Ex. 24 [ECF 114-19, BPD report, 1/25/89, Stevens receipt of Domgard reports on C Shelden]; Taylor's Ex. 118 [ECF 119-1, BPD report, 1/25/89, Stevens receipt of Domgard reports on C. Shelden].)

Searcey and Lamkin reported that contact was made with Cliff Shelden at Lancaster County Corrections in Lincoln, Nebraska, at around 1:30 p.m. on April 12, 1989.  However, Shelden's recorded statement did not begin until around 5:00 p.m. (Taylor's Ex. 116 [ECF 118-12, GCS report, 4/12/89, Lamkin on Cliff Shelden interview].)  Shelden said he first learned about Wilson's murder a week or two after it happened when he got out of the hospital. (Ex. 2Y [ECF 60-2 at 36], p. 5 ;Taylor's Ex. 117 [ECF 118-13, GCS recorded statement, Clifford Shelden, 4/12/89] at 5.) The following questions were then asked and answered:

| | |
|---|---|
| Searcey: | Clifford if you were made known of the homicide by some way or means approximately a week or two after it occurred, how were you made known of the homicide? |
| Shelden: | Well I got a letter from ah JoAnn Taylor explaining or telling me of this homicide this murder, but then . . . . |
| Searcey: | When did you get that letter from JoAnn Taylor? |
| Shelden: | Umm (long pause) well . . . . |
| Searcey: | Could it have been several months after the homicide? |
| Shelden: | Three or four months. (pause) Yeah three or four months after. |
| Searcey: | Are you pretty sure about that? |
| Shelden: | Yeah. |

(*Id.* at 5-6.)  Shelden said that Taylor's letter was mailed from Indiana.  (*Id.* at 6.) When asked what Joann told him, Shelden said "she told me that her, Tom Winslow and Joseph Edgar White was responsible for the death of Helen Wilson." (*Id.*) Shelden said that Taylor stated in the letter that said she, Winslow, and White broke into Wilson's apartment, took her money, and then sexually assaulted and murdered her. (*Id.*)  Between $800 and $1,800 supposedly was taken from Wilson's purse or some kind of container they found by rummaging through the apartment. (*Id.* at 6-7.)

Shelden said that Winslow told him that the three of them forced their way into Wilson's apartment; that after struggling with Wilson in her bedroom, Taylor and White dragged her into the living room where Wilson was wrestled to the floor and a pillow was put over her face; that White tore Wilson's clothes off; that Taylor held

68

Wilson's wrists by kneeling on them, and then started caressing Wilson and kissing her breasts and lips; that after White completed his assault, Winslow had oral sex with Wilson; and after that, White had anal sex with Wilson. (*Id.* at 8-10.) Searcey asked if Winslow said anything about what happened to Wilson's underpants, and Shelden said they used them to tie Wilson's wrists, or maybe they used a bandana from White's back pocket. (*Id.* at 18.) Searcey asked Shelden if Winslow made a comment about a phone. Shelden said the phone rang anywhere from 5 to 10 times, and they just stopped what they were doing until the other party hung up. When asked by Searcey, "Was that the only thing they had to do with the phone?" Shelden added that White "disconnected the phone from the phone itself." (*Id.* at 11.) Searcey also asked Shelden about the building's lights:

| | |
|---|---|
| Searcey: | When they left did anything unusual take place, did he say anything about maybe doing something to aid them in leaving or anything like that to the building or anything? |
| Shelden: | They had ah Tom Winslow's car waiting in the parking lot. |
| Searcey: | Did he make any comment to you about anyone maybe having done something to any parts of the apartment the complex itself, do you recall? |
| Shelden: | Um ah. |
| Searcey: | Did Mr. Winslow make any comment as to the fact that the building had lights in it or anything? |
| Shelden: | Oh yeah I remember it was lit up it was always heavily lighted. |
| Searcey: | Did he make any comment as to the fact that them lights were on when they left? |
| Shelden: | Ah no ah I think when they left I think he told me that ah the lights in her apartment were off, but the ones out in the hall in the building stayed on. |
| Searcey: | But you don't know for sure? |
| Shelden: | No. |

(*Id.* at 12.)

Clifford Shelden said he did not believe Winslow when he said Deb Shelden was involved in the homicide because Winslow "lies about everything." (*Id.* at 13.) Shelden said that according to Winslow, Deb struck a mirror when she was pushed by White and she received a cut on her head. (*Id.* at 13-14.) He agreed with Searcey that Winslow said the cut "was bleeding quite a bit." (*Id.* at 14.)

On April 13, 1989, Searcey took a statement from Deb Shelden at the Lincoln Police Department in Lincoln, Nebraska, after she was *Mirandized*.[54] Shelden stated that on February 5, 1985, she went with Winslow to the apartment of Kathy Bartek and James Dean. She then left the apartment with White, Winslow, and Taylor. Shelden stated that Taylor asked Winslow to drive to an address because she wanted to see someone there. They proceeded to the apartment complex where Wilson lived.[55] Shelden stated that she knew it was where Wilson lived. Wilson was her great-aunt, and her mom had told her where Wilson lived. Shelden indicated that she had no knowledge that they were going to Wilson's apartment before the homicide.

---

[54] Searcey and Lamkin began interviewing Deb Shelden at approximately 3:00 p.m., but did not begin recording her statement until after 7:00 p.m. (Taylor's Ex. 33 [ECF 114-27, GCS report, 4/20/89, Searcey interview of Deb Shelden] at 3; Ex. 2Z, p. 1 [ECF 60-2 at 53]; Taylor's Ex. 48 [ECF 115-6, GCS recorded statement, Debra Shelden, 4/13/89] at 1.)

[55] Deb Shelden said that on the night of the Wilson homicide, she was in her apartment with Charlotte Crumb when Tom Winslow came by and asked if she (Deb) would go with him to see Clifford Shelden at the hospital. (Ex. 2Z [ECF 60-2 at 55-57, *Miranda* warning form dated April 13, 1989, and Transcript of Deb Shelden's interview dated April 13, 1989], pp. 3-5.) Deb said that she and Tom Winslow then left the apartment and drove to Kathy Bartek's apartment. (*Id.*, p. 4.) Upon their arrival at Kathy Bartek's apartment, Deb Shelden and Tom Winslow asked Joann Taylor and Joseph White if they were ready to go see Clifford. (*Id.*, p. 5.) The four then left Kathy Bartek's apartment at 7:30 p.m., but instead of going to the hospital, they went straight to Helen Wilson's apartment. (*Id.*, p. 5-7.) Deb said that she sat alone in the back seat of Winslow's car, while Winslow, Taylor, and White all sat in the front seat. (*Id.*, p. 6.)

She further stated that Taylor went straight to Wilson's door and knocked. Wilson opened the door, recognized Shelden and said "hi" to her before Winslow and Taylor pushed their way into the apartment with Taylor demanding money. Shelden further stated that Winslow and White helped force Wilson into the bedroom. Shelden indicated that she told them to stop, but White shoved her and she fell to floor, hitting her head on the bed and causing it to bleed in back.[56] Taylor, Winslow, and White

---

[56] Searcey asked these questions related to the head injury:

| | |
|---|---|
| Searcey: | But you have no recollection as to where you may have fell to? |
| Shelden: | No. No. |
| Searcey: | Do you recall being in any specific place in that bedroom after you fell? |
| Shelden: | Um I was behind the bed. Back bed headboard. |
| Searcey: | You were behind the headboard? |
| Shelden: | The foot of the bed. |
| Searcey: | Where was where was JoAnn Taylor, Joseph White, and Mr. Winslow at this time? |
| Shelden: | They were taking her her [sic] to the livingroom. They were in the livingroom. They were taking they almost had her there to the livingroom. |
| Searcey: | Did you at any time ever get in near the bed?  The top part of the bed? |
| Shelden: | Um yes. Uh close to. Almost to the top. |
| Searcey: | Could you of at anytime ever been anywhere on what would be the the [sic] bed itself, the mattress or anything that you recall? |
| Shelden: | Prob-  um yes I would say so. Because she was down by the side of the bed there. |
| Searcey: | So is it, am I to understand that you could have been on the bed? |
| Shelden: | Prob-yes. |
| Searcey: | Do you recall having been on the bed? |
| Shelden: | No. |

(Ex. 2Z [ECF 60-2 at 65-66], pp. 13-14 ; Taylor's Ex. 48 [ECF 115-6] at 13-14.)

carried Wilson to the living room and Wilson was resisting and screaming. Shelden stated that they were threatening and demanding money with White's hand at Wilson's throat. Taylor put a pillow over Wilson's face with White's hand remaining at Wilson's throat. Winslow was holding Wilson's legs and pulled them apart and then White raped her while Taylor demanded money and threatened worse while holding the pillow over Wilson's face. Shelden stated that after White was done, he traded positions with Winslow and held Wilson's feet. She was not sure what Winslow did, and she did not see Taylor do anything sexual with Wilson. After the rape, Taylor, Winslow, and White looked for money. Shelden stated that Taylor said she found money in Wilson's bedroom, but saw nothing in her hands. When asked why she did not just run away, Shelden stated she was scared and Winslow had threatened her. (DSF ¶ 70 (Ex. 2 [ECF 59-1], ¶ 38; Ex. 2P [ECF 60-1 at 39-43]; Ex. 2Z [ECF 60-2 at 53-79]; Ex. 5 [ECF 63-1], ¶ 8).)

On April 14, 1989, at approximately 9:43 a.m., Deb Shelden signed a "waiver form" allowing the investigators to obtain blood, hair, and saliva samples from her. (Taylor's Ex. 33 [ECF 114-27, GCS report, 4/20/89, Searcey interview of Deb Shelden] at 5.)  Searcey and Lamkin then transported Deb Shelden to the Beatrice Community Hospital, where the samples were collected.  (*Id.*)

On April 14, 1989, Searcey and Lamkin interviewed Deb Shelden at the GCSO after she was *Mirandized*. The purpose of the interview was to go over the interview of April 13, 1989, asking basically the same questions to ensure that Shelden's answers and statements were true and accurate to the best of her knowledge. Shelden indicated that she understood the purpose of the interview and proceeded to reveal the same facts and added that she remembered James Dean was present that night as well.[57] According to Shelden, Dean did not do anything sexual with Wilson and

---

[57] Deb Shelden stated that Dean was at Bartek's apartment when she (Deb) arrived with Winslow, and that Dean left with the rest of them for Wilson's apartment.  Deb said that Dean sat in the back seat of the car with her. (Ex. 2AA

simply stood there watching and then may have left with them. (DSF ¶ 71 (Ex. 2 [ECF 59-1], ¶ 39; Ex. 2AA [ECF 61-1]; Ex. 5 [ECF 63-1], ¶ 9).)  When asked why she did not remember Dean's presence before, Deb Shelden said she guessed she "was blocking it." (Ex. 2AA [ECF 61-1], p. 31.)  She also said that there was no one else in Wilson's apartment, and she was sure that Kathy Bartek did not come with the group to Wilson's apartment because Kathy had two children at home.  (*Id.*, pp. 49-50.)

During the April 14 interview with Deb Shelden, Searcey also revisited Deb's claim that the group drove to Wilson's apartment at 7:00 p.m. on the night of the homicide:

| Searcey: | I believe you stated you left your apartment at approximately seven or a little after . . . . |
|---|---|
| Shelden: | Yes. |
| Searcey: | Is that correct? |
| Shelden: | Yes. |
| Searcey: | And you were over at the Dean and the Kathy Bartak [sic] residence for sometime . . . |
| Shelden: | Yes. |
| Searcey: | Approximately an hour is that correct or longer? |
| Shelden: | Yes, that I know of it was an hour. |
| Searcey: | Can you give me the approximate time to the best of your knowledge and I want you to think about this answer before you give it, that you may have arrived to the apartment complex where Helen Wilson lived? |
| Shelden: | I cannot, I don't know the time we left or not. |
| Searcey: | Can you give me a span of time that you may have arrived there? |
| Shelden: | I cannot, I don't know. |

---

[ECF 61-1, Shelden interview transcript dated April 14, 1989], pp. 6, 11-12; Taylor's Ex. 49 [ECF 115-7, GCS recorded statement, Debra Shelden, 4/14/89] at 6, 11-12.) (Note: Taylor's Ex. 49 is missing pages 53-54.  *See* filing 128-1 at 13.)

| | |
|---|---|
| Searcey: | Can you tell me the approximate time you may have left there? |
| Shelden: | I would say we left . . . Kathy's at I would say probably eight-thirty or quarter till [sic] because I told them that it was about time to go because their [sic] going to quit visiting pretty soon. |
| Searcey: | But you really have no knowledge of what time it was at anytime? |
| Shelden: | I didn't . . . |
| Searcey: | Are you a person who pays attention to time? |
| Shelden: | No not to [sic] much.  I mean you know if I have to go somewhere then I'll make sure I know what time it is. |
| Searcey: | But normally you don't pay attention to what time it is? |
| Shelden: | I don't watch it all the time no. |
| Searcey: | You basically just go and do what you want to do and if it's during the night and it's late at night when ever you get tired that's when you stop doing what ever your [sic] doing, is that correct? |
| Shelden: | Yes. |
| Searcey: | And you don't pay any attention to what time it is? |
| Shelden: | No. |

(*Id.*, pp. 56-57.)

On April 13 or 14, 1989, after interviewing Deb Shelden, Searcy drafted an affidavit for an arrest warrant for Dean and forwarded it to Smith.[58] On April 14, 1989, the Court issued a warrant for Dean's arrest. On April 14, 1989, DeWitt, Searcey, and Lamkin arrested Dean pursuant to the arrest warrant issued by the court. Dean was given his *Miranda* rights and booked into the Gage County Jail.[59] (DSF ¶

---

[58] In the affidavit for the arrest warrant, Searcey cited only his last conversation with Deb Shelden, on April 14, 1989.  (Ex. 2BB [ECF 61-2 at 1-2, Affidavit for Arrest Warrant dated April 14, 1989], p. 1; Taylor's Ex. 121 [ECF 119-4 Arrest affidavit, James Dean, 4/14/89] at 1.)

[59] Dean states in an affidavit that he was arrested in Lincoln and driven by Searcey and Lamkin to the Beatrice jail. He claims that during the trip both officers

72 (Ex. 2 [ECF 59-1], ¶ 40; Ex. 2P [ECF 60-1 at 39-43]; Ex. 2BB [ECF 61-2 at 1-2]; Ex. 5 [ECF 63-1], ¶ 14).)

On April 14, 1989, based upon the investigation of the Wilson homicide, Smith filed complaints against Deb Shelden and James Dean in the Gage County Court charging that they did "aid, abet, procure or cause another to kill Helen Wilson in the perpetration of or attempt to perpetrate any sexual assault in the first degree, robbery, kidnapping or burglary." (DSF ¶ 73 (Ex. 1 [ECF 51-1], ¶ 25; Ex. 1L [ECF 57-2, Case file of State v. Shelden, originally at Gage County Court Case No. CR 89-254]; Ex. 1M [ECF 57-3, 57-4, Case file of State v. Dean, originally at Gage County Court Case No. CR 89-255]).)  Deb Shelden was arraigned on April 14 at 4:50 p.m. and was appointed counsel.[60] (Ex. 1L [ECF 57-2], p. 3; Taylor's Ex. 119 [ECF 119-2, Arraignment of Debra Shelden, 4/14/89.  *See also* Taylor's Ex. 43 [ECF 115-3, Billing record, Paul Korslund].)

On April 15, 1989, Dean was transported to Beatrice Hospital to have biogenetic samples taken for testing. (DSF ¶ 74 (Ex. 2 [ECF 59-1], ¶ 41; Ex. 2P [ECF 60-1 at 39-43]).) Testing indicated Dean's blood type was O negative. (Taylor's Ex. 123 [ECF 119-6, GCS report, 4/15/89, Dean blood test results].)

On April 15, 1989, Kathy Bartek arrived at the GCSO asking for information about her boyfriend, James Dean. DeWitt advised her that he was in custody and had been arrested for the Wilson homicide. DeWitt contacted Searcey and Lamkin to

---

repeatedly told him that murder was a capital offense and that he could get the death penalty if he did not cooperate. (Dean's Ex. 16 [ECF 109-1, Affidavit of James Dean], ¶ 18; Taylor's Ex. 146 [ECF 121-5, Affidavit of James Dean], ¶ 18). Dean claims that Searcey questioned him in the sheriff's office after he asked for a lawyer. (*Id.*)

[60] Shelden's April 14 statement was taken prior to her arraignment, beginning at about 3:00 p.m. (Ex. 2AA [ECF 61-1]; Taylor's Ex. 49 [ECF 115-7].)

interview Bartek because she was claiming that Dean could not have been involved with the Wilson homicide since he was in Lincoln, Nebraska, with her at the time of the homicide. During the interview, Kathy Bartek admitted that she was living in Beatrice at the time of the homicide. She also admitted that she and Dean were in Beatrice in the early evening hours of February 5, 1985. She further stated that Taylor, Winslow, and White had come to her residence at approximately eight or eight-thirty in the evening. They spent some time in her residence and later left in Winslow's vehicle, and Winslow was driving. Bartek was then advised that the deputies would like to interview her again at a later date and take a formal statement from her. (DSF ¶ 75 (Ex. 2 [ECF 59-1], ¶ 42; Ex. 2P [ECF 60-1 at 39-43]).)

Dean testified during a deposition taken in connection with the criminal cases that he was interviewed by Searcey and Lamkin for over two hours on April 16, 1989, during which time he denied having any knowledge of the Wilson homicide. (Dean's Ex. 18 [ECF 108-1, Transcript of Deposition of James Dean, July 17, 1989] at 27.) Dean now claims that Sheriff DeWitt and County Attorney Smith were also present during that interview (Dean's Ex. 16 [ECF 109-1], ¶ 19; Taylor's Ex. 146 [ECF 121-5] ¶ 19.) Dean also claims that he requested the presence of an attorney as many as five times, that one of the defendants told him that he did not need a lawyer, and that he needed to tell them what happened. (*Id.*) Dean further states, "I repeatedly told [Searcey and Lamkin] I did not know anything about [the crime] and did not participate in it. . . . I cannot recall exactly what all the questions were. I can say that I continually told the deputies questioning me that I did not have any part in this crime." (*Id.*) Dean also claims that DeWitt, Searcey, and Lamkin took turns questioning him for about three hours on April 17, 1989. (*Id.*, ¶ 20.) Dean says that "they told me that there had been a murder-rape of Mrs. Wilson, and that Deb Shelden and others were involved. They told me that Deb Shelden, Joann Taylor and Kathy Gonzalez said I was at the scene and was involved." (*Id.*) Dean was arraigned on April 17, 1989, at 3:45 p.m., and was appointed counsel at that time. (Ex. 1M [ECF 57-3], p. 7.)

76

On April 19, 1989, Smith sent a letter to Shelden's attorney, Paul Korslund, wherein he withdrew a plea offer due to "potential jurisdictional issues." A revised offer was made to Mr. Korslund. Smith continued to request that Shelden take a polygraph, testify truthfully, and cooperate with the State in any and all cases involving the Wilson homicide. (DSF ¶ 76 (Ex. 1 [ECF 51-1], ¶ 26; Ex. 1N [ECF 58-1 at 1, Smith's letter dated April 19, 1989]).)  According to Smith's letter, "on April 18, 1989, the State had made an offer of a manslaughter charge for [Shelden's] plea of guilty and total cooperation and testimony . . . ." (Ex. 1N [ECF 58-1 at 1]; Taylor's Ex. 50 [ECF 115-8, Correspondence from R. Smith to P. Korslund, 4/14/89 [sic], Shelden plea].)  Smith stated that the offer was being withdrawn because "after having researched this issue, I find that there would be some very severe problems with the upholding of a manslaughter plea because of the jurisdictional matters contained in Section 29-110." (*Id.*)  The revised offer required a plea to a charge of aiding and abetting second-degree murder.  (*Id.*)

On April 24, 1989, Price consulted with Deb Shelden at the request of her attorney, Paul Korslund, who was present during the evaluation at the Gage County Sheriff's Office. Although Shelden had been seen in Price's office prior to 1985, Price had not met Shelden prior to the Wilson homicide investigation. Price advised Shelden that there was no confidentiality involved in the evaluation and that a copy would be submitted to her attorney and to the Court. Price also advised her that he was involved in consultation with the GCSO, the BPD, and the Gage County Attorney in the investigation of the Wilson homicide and that he had assisted in transporting a subject involved in the case from Alabama. Shelden acknowledged her willingness to participate, waived her rights to confidentiality, and acknowledged that she was aware of Price's prior involvement in the case in the presence of her attorney. The purpose of Price's evaluation on April 24, 1989, was to determine her competency to have given a statement to the GCSO; to participate in hearings related to the case with respect to her waiver of a preliminary hearing; to make statements to the GCSO; to enter a plea in the district court; and to understand the nature of the charges against her, her position with respect to the charges, and her ability to assist

her attorney in her defense. Based upon the evaluation, Price found Shelden to be within the normal range of intellectual function. Price also found that she met the criteria to be found competent to stand trial and to enter into agreements and contracts knowingly and willingly. The interview lasted approximately one and one-half hours. Price and Shelden did not discuss the actual details of the Wilson homicide, but did discuss the differences between first-degree and second-degree murder. At that time, Price was not that familiar with the details, as he did not need to know, and did not want to know, them. Price noted during his deposition that, like Taylor, Shelden expressed fear for her well-being from Winslow. (DSF ¶¶ 76 (second),[61] 77 (Ex. 3 [ECF 62-1], ¶ 8; Ex. 3E [ECF 62-2 at 16-17]; Ex. 3L [ECF 62-2 at 61-62]).)

On April 24, 1989, a plea agreement was reached between the State and Shelden, through her counsel, Paul Korslund. Shelden, Korslund, and Smith signed the plea agreement. (DSF ¶ 77 (second) (Ex. 1 [ECF 51-1], ¶ 27; Ex. 1O [ECF 58-1 at 2-3, Plea agreement for Shelden on April 24, 1989 and the Amended plea agreement April 26, 1989]).) Shelden agreed to "testify truthfully in any and all cases and give total cooperation to the State of Nebraska regarding the homicide of Helen L. Wilson." (Ex. 1O [ECF 58-1 at 2], p. 2; Taylor's Ex. 120 [ECF 119-3, Debra Shelden plea agreement, 4/26/89].) For its part, the State pledged to "file an amended information charging aid[ing] and abetting for the Second Degree Murder of Helen L. Wilson" and to "recommend the minimum sentence of 10 years" if Deb Shelden complied with the terms of the agreement. (*Id.*) On April 26, 1989, Smith, Shelden, and Shelden's attorney initialed an amended plea agreement stating that Shelden would also plead guilty to the amended information. (*Id.*, p. 3.)

On April 26, 1989, pursuant to the plea agreement, Smith filed an amended information charging that Deb Shelden "aid[ed], abet[ted], procure[d] or cause[d] another to cause the death of Helen Wilson intentionally, but without premeditation."

---

[61] The defendants' statement of facts contains two each of paragraph numbers 76 and 77.

(Ex. 1L (ECF 57-2 at 15].)  That same day, Shelden entered a guilty plea which was accepted by the court.  (*Id.* at 20-22.)  District Judge William B. Rist made a specific finding that "the defendant has voluntarily, knowingly and intelligently entered her plea of guilty to the charge contained in the amended Information."  (*Id.* at 22.)

On April 28, 1989, Harlan transported Taylor to and from Omaha to see Dr. Gutnik for an evaluation. Harlan gave to Dr. Gutnik a sealed envelope from DeWitt which included a letter from Taylor's attorney and the videotaped interview of Taylor. During the transport, Taylor did not talk very much, but did talk about her boyfriend and marriage. (DSF ¶ 79 (Ex. 6 [ECF 63-3], ¶ 7; Ex. 6D [ECF 63-4 at 5, Harlan report dated April 30, 1989]).)  The evaluation was ordered by the court, on a motion filed by Taylor's attorney, Lyle Koenig, to determine whether Taylor was competent to stand trial and whether she was sane at the time of her alleged acts on or about February 6, 1985.  (Ex. 1D [ECF 51-3 at 43-44].)  The court's order specified that the escorting deputy was not to be in the room during the examination. (*Id.*)

A psychiatric diagnostic evaluation of Taylor was issued by Bruce D. Gutnik, M.D., on April 30, 1989.  Dr. Gutnik's report states in part:

> Ms. Taylor was evaluated by me on April 28, 1989 in my office. The evaluation lasted approximately three hours. In addition, a large volume of records were provided to me by Mr. Koenig. . . .  In addition, I viewed a video tape of Ada JoAnn Taylor giving a statement to police officers in Ashville, North Carolina on March 16, 1989.
> . . .
> Ms. Taylor is charged with the first degree murder of Helen Wilson, a 68 year old female in Beatrice, Nebraska. This crime occurred on February 5th or 6th, 1985. Ms. Taylor states that "in my head and in my heart I know I wasn't there." She reports that she was seeing Cliff Sheldon [sic] at the time. She knows two other men possibly involved. One is Tom Winslow with whom she went to high school and the other is Joe White also known as Lobo, who is a biker and who she returned from Los Angeles with. Ms. Taylor states that Cliff Sheldon [sic] and his

wife have been arrested for the crime and states that Cliff has implicated her and Joe White. She states that Joe White knows nothing of the crime either.

Ms. Taylor indicates that she does not know where she was on February 5th and 6th of 1985. She says that she confessed to the police after they said that Joe White told them she was there. Ms. Taylor recalls leaving Beatrice with a carnival in 1984 and does not believed [sic] she returned. She reported that she was frightened by either Tom or Joe. She stated that she is "real confused."

Ms. Taylor indicates that her prior confession was "a lie" and she states that this is the first time that she has ever lied to a police officer in her life. . . . She indicated to me that she was convinced by the police Joe White had said she was there. She indicated that three different people were interviewing her at the time of her confession and she stated that "my attention span is low." She believed the people who told her she was there. She stated that "if Lobo said it, I'll go along with the bullshit." She states that she was taught "cops don't lie" therefore she believed them when they told her Lobo said she was there. She doesn't know why she went along with their story. She states she didn't realize she was incriminating herself in a murder when she stated that she was present at the murder. She was quite firm in reconfirming to me that she was not present at the time of the crime. She did not think it possible that she could have been there and not recall it. . . .

. . .

[I]n my opinion, Ms. Taylor does indeed suffer from a serious psychiatric disorder, namely Borderline Personality Disorder. This Disorder can at times result in psychotic breaks from reality in which the individual is not able to distinguish what is real and what is not. Under such circumstances, Borderline Personality Disordered patients may well become psychotic and may well experience hallucinations and delusions. It appears from Ms. Taylor's history that she certainly had psychotic episodes in her past. Most notably is the delusion, and hallucination, of having a twin sister. It should be noted that people suffering from Boderline Personality Disorder are not at all times psychotic and frequently are in good touch with reality.

In my opinion, with reasonable medical certainty, Ms. Taylor is at this time competent to stand trial. She understands the legal process and the charges against her. She understands the consequences to her if

she is found guilty. She understands and expresses a desire to work for her own defense. . . .

In her evaluation with me, she denied being present at the time of the crime. She could not adequately explain to me how she knew details of the crime in the interviews she had given to police officers previously. In order for me to determine if she were able to determine right or wrong at the time of the alleged crime, I would have to get information from her about the recollections of the crime, and her mental status at the time of the crime. Since she denied to me being present at the time of the crime, I was unable to establish her then present mental status, assuming she were there. As such, I was not able to determine any information that would imply that she was psychotic or insane at the time of the alleged crime.

(Taylor's Ex. 107 [ECF 118-3, Joann Taylor evaluation, Dr. Gutnik, 4/28/89] at 1, 6, 12-13.)[62]

On April 29, 1989, Harlan assisted in transporting Dean to Lincoln, Nebraska, for a polygraph test. Following the test, Harlan assisted in transporting Dean back to the Gage County Jail. (DSF ¶ 80 (Ex. 6 [ECF 63-3], ¶ 8; Ex. 6E [ECF 63-4 at 6, Harlan report dated April 29, 1989].)[63]

_____

[62] Taylor's Ex. 107 does not appear to contain Dr. Gutnik's complete report. I note that Judge Rist authorized that certain portions of the report be excised prior to its disclosure to the State. (*See* Ex. 1D [ECF 51-4 at 32].)

[63] On or about April 26, 1989, Smith received a copy of a letter from Dean's attorney, Richard Schmeling, to Paul Jacobson with respect to Schmeling's request that Dean submit to a polygraph test. Dean signed a polygraph examination agreement on April 29, 1989, and Mr. Jacobson performed a polygraph test. (DSF ¶ 78 (Ex. 1 [ECF 51-1], ¶ 28; Ex. 1P [ECF 58-1 at 4-7, Schmeling's letter and the signed polygraph examination agreement dated April 26, 1989, and April 29, 1989 respectively]).) Schmeling stated in his letter to Jacobson that "I requested that such an examination be done and Richard Smith, the Gage County Attorney, agreed to arrange it." (Ex. 1P[ECF 58-1 at 4], p. 1.) Schmeling states in an affidavit that Smith suggested the polygraph exam to him on April 25, 1989, "because of the conflict between statements made by Deb Shelden and Dean." (Dean's Ex. 17 [ECF 109-2,

On or about April 30, 1989, Smith received a copy of the polygraph report on Dean from Mr. Jacobson. According to the polygraph report, deception was indicated. (DSF ¶ 81 (Ex. 1 [ECF 51-1], ¶ 29; Ex. 1Q [ECF 58-1 at 8-15, Polygraph report for Dean received on or about April 30, 1989]).)  In the report Jacobson concluded:

> At the start of this report, I told how I knew that Jimmie would probably be tough to run and he was.  Some charts are so matter-of-fact and easy to read, there is not the slightest doubt. Not quite that easy with Jimmie, although I definitely feel he is not telling the complete truth. I visited with him a few minutes after the test was over, all the while he was telling me that he had been truthful, but seemingly not all that upset that I had told him he did not look good. I asked him if he had considered pleading to something less at this stage than murder 1, for which he said he is afraid that he might go to the electric chair or face life inprisonment [sic]. He said that he had not considered a plea at this stage because he was innocent, of everything, including even being at the apartment. I am fully convinced that he has knowledge he is not sharing and will not change his story until he is backed in to a corner. I again reminded Jimmie that no matter what he told me or law enforcement, he had to level with his counsel. I know that no prosecutor or defense attorney wants some innocent person falsely accused and I feel I have failed a bit in not getting more out of Jimmie than I did. However, at this stage, much is based on only what has been said by Debra Shelden, whose statement leaves much to be desired. I really can't see why she would be putting a false accusation on Jimmie unless she was trying to cover up for someone else, it appears more likely that she was not wanting to tell on Jimmie.

(Ex.1Q [ECF 58-1 at 13], p. 6; Taylor's Ex. 124 [ECF 119-7, Polygraph report for James Dean, 4/29/89] at 6.)

Dean claims that "[s]ometime after the polygraph test, but before I agreed to 'confess,' Searcey and Lamkin took me first to Helen Wilson's apartment and then to Marshall's Truck Stop." (Dean's Ex. 16 [ECF 109-1], ¶ 23; Taylor's Ex. 146 [ECF

---

Affidavit of Richard L. Schmeling], ¶ 16.)

121-5] ¶ 23.)  Dean says, "I was informed that my lawyer knew about this trip and agreed to it."  (*Id.*)  Dean's attorney states that he was not made aware of the trip. (Dean's Ex. 17 [ECF 109-2], ¶ 21.)

Dean also contends that "the law enforcement officers of Gage County talked to me outside of [my attorney's] presence on numerous occasions. I cannot be specific as to how many, but it seemed like it was almost on a daily basis that they would come and talk to me, either taking me out of my cell or coming into my cell. During these conversations, I was repeatedly advised that if I did not cooperate I would get the electric chair."(Dean's Ex. 16 [ECF 109-1], ¶ 25; Taylor's Ex. 146 [ECF 121-5] ¶ 25.)  Dean says these statements were made by DeWitt, Searcey, Lamkin, and Smith. (Taylor's Ex. 122 [ECF 119-5, Deposition of James Dean, 9/16/10] at 17.)

On May 2, 1989, at the request of Dean's counsel, Richard Schmeling, Smith, and DeWitt, Price consulted with James Dean. Prior to interviewing Dean, it was made clear that there would be no confidentiality. Price explained that his role was as a psychologist for the State and the Gage County Sheriff's Office. Dean's attorney agreed to these terms. Dean was *Mirandized* in the presence of his attorney. At the time of the initial contact, Price was informed that Dean had previously denied any involvement in the Wilson homicide and that Dean's attorney and the Gage County Attorney had come to an agreement that Dean would complete a polygraph examination and that if he was found to be deceptive, the parties would discuss a plea agreement. The polygraph indicated that Dean was being deceptive. Dean continued to maintain that he was not in the apartment or involved in the homicide. Dean was informed of Price's prior involvement in the Wilson homicide investigation including other evaluations and consultations. After Dean was confronted with the polygraph results as well as the testimony that led to his arrest, he continued to deny being in Wilson's apartment, but he began to show that he was doubting the veracity of his own denials. Dean continued to believe that he did not participate in any act of violence. It was Price's opinion that Dean responds negatively and emotionally to violence and was overwhelmed by the violence he witnessed. It was Price's opinion

that Dean is not a particularly violent person, that Dean is repulsed by "ultra" violence, that Dean witnessed "ultra" violence while in Wilson's apartment, and that the degree of violence that he witnessed overwhelmed him emotionally and he repressed the memory. Based upon Dean's history as reported to Price, the extreme violence he had experienced throughout his life, the fact that he had failed a polygraph, Price's overall impression of Dean through Price's interview of him, and by years of training and experience working as a police psychologist, it was Price's opinion that Dean was present at the Wilson homicide and his memories of it had been repressed. (DSF ¶¶ 82-85 (Ex. 3 [ECF 62-1], ¶¶ 10, 16; Ex. 3G [ECF 62-2 at 21, Letter to Smith re: Dean dated June 28, 1989]).)

Price's consultation report states that as the session progressed, Dean "began to realize that the polygraph was revealing at least at the subconscious level his awareness that he was present in the apartment but could not reconcile his being present with the conscious belief that he was not there." (Ex. 3F [ECF 62-2 at 19, Consultation note concerning Dean], p. 2.)[64] The report also states that the group had "a rather extended discussion" with Dean that caused Dean to be "'developed' to the scenario that it was likely that Mr. Dean was present in the apartment, [and] per his testimony and the testimony of an eye witness he was not actively involved in any act of violence." (*Id.*) Price indicated that Dean needed "continuing supportive therapy" to help him recall the memories that, according to Price, Dean repressed. (*Id.*) Dean "was agreeable" to receive this therapy, and Dean's attorney agreed that the therapy could proceed without counsel being present. (*Id.*)[65]

---

[64] Although not referenced in the defendants' statement of facts, Price's consultation note of the May 2, 1989, interview with Dean appears as Exhibit 3F (filing 62-2 at 18-20). This exhibit is authenticated in paragraph 10 of Price's affidavit (filing 62-1).

[65] According to Dean, he had three or four additional sessions with Price, and Price again told him that he (Price) believed that Dean was involved in the homicide but repressed his memory of it. (Taylor's Ex. 122 [ECF 119-5] at 20-21; Taylor's Ex. 146 [ECF 121-5, Affidavit of James Dean ], ¶ 24; Dean's Ex. 16 [ECF 109-1], ¶ 24.)

Dean says that his attorney was present the second time he spoke with Price,[66] as were DeWitt and Searcey. (Dean's Ex. 16 [ECF 109-1], ¶ 24; Taylor's Ex. 146 [ECF 121-5], ¶ 24.) During this meeting, according to Dean, he was shown a number of crime-scene photographs, including views of Helen Wilson's body. He says he "felt very sorry for her" and "began to cry, to my recollection." (*Id.*) Dean further states: "During this interview, Dr. Price advised that he thought I had witnessed the crime and that it was so gruesome that I had actually repressed the memory. I continued to deny that I had anything to do with the crime." (*Id.*)

Dean also says that "[d]uring the afternoon of May 1, 1989, DeWitt, Schmeling, Searcey, Price and Smith and myself viewed a video of the crime scene which showed graphic images of Helen Wilson and the crime scene." (*Id.*) Richard Schmeling, who was Dean's attorney, recalls "that Dean's viewing of the crime scene videotape occurred on May 8, 1989, immediately before police questioned Dean on the record." (Dean's Ex. 17[ECF 109-2], ¶ 49.) Schmeling states: "I was present for this viewing and recall that Dean was very emotionally affected by this videotape. Dean leaned his head onto my shoulder, and crying, exclaimed, 'Oh, that poor lady, that poor lady!' After seeing the videotape (and calming down), Dean proceeded to give a statement disclosing additional details." (*Id.*) However, during a deposition on July 17, 1989, taken in connection with the criminal cases, Dean and Schmeling both stated that the video was not viewed until May 17, 1989, when Dean entered his plea. (Dean's Ex. 18 [ECF 108-1] at 215-16.)

---

Dean claims that he did not know he was talking to a sheriff's deputy until about the third time he spoke to Price. (Taylor's Ex. 146, ¶ 24; Dean's Ex. 16, ¶ 24.)

[66] Dean's attorney, Richard Schmeling, states, "I was not present for any of the additional sessions Price had with Dean, although Dean told me what occurred during those sessions." (Dean's Ex. 17 [ECF 109-2], ¶ 23.)

On May 8, 1989, as part of a plea agreement, Dean gave a recorded statement.[67] Present during the statement were Dean's counsel, Schmeling, and Smith with DeWitt interviewing and Harlan videotaping. After being *Mirandized*, Dean indicated that he was recalling that he was present during the Wilson homicide and that other people were there too. Dean named Taylor, Winslow, White, and Deb Shelden as other persons present at the Wilson homicide. After the factual statement was taken, Smith made clear on the record that Dean had not been threatened or promised anything outside of a plea agreement to which Dean agreed. (DSF ¶ 86 (Ex. 4 [ECF 62-3], ¶17; Ex. 4F [ECF 62-4 at 8-15, Dean statement and *Miranda* dated May 8, 1989]).)

During his statement Dean was asked how he and the others gained access to Mrs. Wilson's apartment.  He answered, "I can't remember. I remember somebody knocking on the door and we went in, that is about as far as I am right now." (Ex. 4F [ECF 62-4 at 11], p. 3; Taylor's Ex. 58 [ECF 115-10] GCS recorded statement, James Dean, 5/8/89] at 3.) Dean could not remember why they went to the apartment but added, "Maybe later on I can remember that stuff."  (*Id.*)  He denied touching Helen Wilson and did not remember "at this time" seeing anyone else touch her.  (*Id.*) When asked if anyone else was with them, Dean answered not that he remembered "at this point." (*Id.*, p. 5.) The question was asked again:

| | |
|---|---|
| DeWitt: | Okay and the people that you named being there with you was JoAnn Taylor, Tom Winslow, Lobo or Joseph White, Deb Shelden and yourself? |
| Dean: | To the best of my knowledge yes. |
| DeWitt: | And there was no one else there with you? |
| Dean: | Not that I remember. |
| DeWitt: | You are not protecting anyone else? |
| Dean: | No not that I remember like I said. |
| Smith: | Could there have been someone else there? |

---

[67] Smith states in his affidavit that the recorded statement was taken on May 8 "in preparation to reach a plea agreement reached between Dean, through his attorney, and the State[.]" (Ex. 4 [ECF 62-3], ¶17.)

Dean:          There could have been.

(*Id.*, p. 6.)  Smith also asked Dean why he was no longer denying any involvement
in the crime:

Smith:         James this is a very important question. Prior to this time
               we've asked you about this and you can ask our other law
               enforcement officials, you denied that you were there. Can
               you tell me now why you were saying that you were there?
Dean:          Well I, I feel that I remember it in my sleep. I obviously
               had some kind of a subconscious block or something I
               don't know what it was for sure and I couldn't remember
               and I thought I was telling the truth naturally and I said I
               was not there.[68]

(*Id.*, p. 4.)

On May 8, 1989, following the statement that day, DeWitt delivered Dean his
dinner. At that time, Dean confided in DeWitt that he felt better now that he had told
the truth about the Wilson homicide. Dean stated he had to get it off his mind. Dean
also indicated that he held out so long because he was afraid someone would hurt him
if he told the truth. DeWitt assured him he would remain safe in the custody of the
Gage County Jail. Dean was teary-eyed and stated he felt relieved that he finally
admitted his presence at the Wilson homicide. (DSF ¶ 87 (Ex. 4 [ECF 62-3], ¶18; Ex.
4G [ECF 62-4 at 16, DeWitt report dated May 8, 1989]).)

On May 10, 1989, Searcey and Lamkin interviewed Dean at the GCSO. Dean
was *Mirandized* and the interview was conducted in the presence of Dean's counsel,
Richard Schmeling. During the interview, Dean admitted that he was present at the

---

[68] Dean says he took Price's advice to "relax, lay on my bed and try to picture
some part of that day that happened or something that went on or a door, oh, a room,
anything that would help." (Dean's Ex. 18 [ECF 108-1] at 213.)  He also says "that's
basically the extent of what [Price] told me."  (*Id.* at 232.)

time of the Wilson homicide and that Winslow, White, Taylor, and Deb Shelden came to his residence before the homicide and asked him to join them. They asked him to go somewhere with him, but did not give him any specifics that he could remember. He stated that Winslow drove him, White, Taylor, and Shelden to the apartment building where Wilson lived. Dean thought they stopped there to visit White's girlfriend in the building, Kathy Gonzalez. He stated that they all went to an apartment, that someone knocked, and that Wilson answered the door. He stated that Taylor, White, and Winslow grabbed Wilson and went into the apartment. Dean stated that he and Shelden also entered the apartment. He stated that one of them slapped Wilson. He stated that Shelden asked Wilson if she was alright. He stated that Wilson struggled and that they went into another room. Dean's recall was better than the May 8, 1989, interview, but still fragmented. (DSF ¶ 88 (Ex. 2 [ECF 59-1], ¶43; Ex. 2CC [ECF 61-2 at 3-37, Searcey report dated May 10, 1989, *Miranda* warning form dated May 10, 1989, and Transcript of Dean's interview dated May 10, 1989]; Ex. 5 [ECF 63-1], ¶11).)[69]

---

[69] According to the defendants, "Dean admitted that he witnessed the sexual assault upon Wilson. He stated that he was not sure when they left whether she was alive because he had left and come back several times." (Filing 50 at 33, ¶ 88.) The written transcript of Dean's May 10 interview does not support these statements. The transcript shows Dean initially stated that "[w]e went in and JoAnn Taylor and Tom Winslow and Joseph White grabbed the lady . . . . I guess that's about the extent of it you know that I remember." (Ex. 2CC [ECF 61-2 at 19], p. 16; Taylor's Ex. 59 [ECF 115-11, GCS recorded statement, James Dean, 5/10/89] at 16.) He continued, stating that "[to] the best of my memory, I remember Tom grabbed one of her arms, okay that' [sic] about it, that's all I remember. I remember the other two having their hands on her, but as to remember how they did it I can't." (*Id.*) When asked whether he "observe[d] anyone to assault this older lady in any way shape or form," Dean replied, "I don't recall nothing at all." (*Id.*, p. 18.) After further questioning, though, he "remember[ed] one of them reaching around and slapping this lady." (*Id.*) Searcey later asked, "Would you say this person was being violently mistreated?" Dean replied, "I would say yea. I can't remember you know like I said I got this all a dream you know and I'm just telling you bits and pieces of what I can tell you like you guys wanted to know, you know." (*Id.*, p. 29.) When Dean could not recall what

On May 11, 1989, pursuant to the plea agreement with Deb Shelden, she was given a polygraph examination by Paul Jacobson. Harlan transported Shelden for a polygraph test and then returned her to the GCSO. Jacobson indicated that her test "look[ed] good." On or about May 15, 1989, Smith received the polygraph report wherein Mr. Jacobson reported no deception was indicated. (DSF ¶ 89 (Ex. 1 [ECF 51-1], ¶ 30; Ex. 6 [ECF 63-3], ¶ 10; Ex. 6F [ECF 63-4 at 7, Harlan report dated May 11, 1989]).)  Jacobson's report to the county attorney reads as follows:

> This report will supplement the phone call following the interview and polygraph examination of DEBRA KAY SHELDEN as to information she had regarding the murder of her great aunt, HELEN WILSON.
>
> Although Debbie was nervous, she had a far different attitude than did JAMES LEROY DEAN. From the very start she appeared to be truthful and at no time, did I see anything in her demeanor to indicate that she wanted to do anything other than tell the truth as nearly as she could recall.
>
> Debbie said that she is actually relieved to get the whole story out and that at no time did she ever go to her aunt's address with any idea that harm would come to her and of course, originally, the whole idea was to go visit her husband who was in the hospital and according to Debbie she did not realize she was being used. She feels bad that from what has been said in the news etc. that it appears that she was a part of the plan to rob her aunt which she says she was not except that she was apparently used as a means to get in to her aunt's place of residence.
>
> She said at the time the robbery or whatever started and her aunt was assaulted she tried to help and later she really could not believe what was happening. She also told me that she more or less tried to block it out of her mind. In the fields of psychology and psychiatry, this is known as repression and or suppression. Sometimes the event is so traumatic to either a witness or victim, that many of the details,

---

transpired during the hour and one-half that he estimated they were in the apartment, Searcey asked whether he left the apartment building. Dean responded, "I don't remember. I don't remember if I left with them or by myself or, I don't remember. I really don't." (*Id.*, p. 17.)  His memory did not improve. (*See id.*, pp. 26-28.)

sometimes the entire episode is blocked out, depending upon how traumatic the event might be. This is mother nature's way of defending us or our psyche to lessen that trauma. I doubt very much that this is what happened in reality to Debbie as she told me that she made a conscious effort not to try to think about what had happened. In addition she had an actual physical fear of what might happen to her if she did tell anyone and that is still present as she is afraid that the major perpetrators will find some means to get to her, which of course, has been compounded by what some members of her family, primarily [her] step-father[,] had told her.

As you already know, that fear is also a  very real threat to Jimmie Dean.

If there is actual repression present, the best way to get recall is to start at the beginning of the episode. Until the Nebraska Supreme Court took it's [sic] action, a good deal of hypnotism was used by law enforcement to reach in to the subliminal.

It seems to me that the statement taken by Deputy Searcey and Lamkin was an outstanding product of trying to recreate what happened. The problem is that you don't want to put something in to someone's mind as a power of suggestion, but at the same time, it is often necessary to give some bit of information to trigger that power of recall.

Debbie told me that even though she had not originally told the truth, she tried to be as truthful as possible as she could recall when she gave the statement to Deputy Searcey or "Sorcey" as she calls him. She pointed out that it happened four years ago and as she hears different parts of what happened, a good deal of what had happened had been recalled by her. In other words, she can remember better what happened, but there are some things she can not be absolutely certain about, but that the whole picture of what happened is clear enough to her.

Actually, I found no major differences in what she told me from the statement she had given on April 14.

I realized that the purpose of the examination was to determine if she was being truthful as to her overall story and as to whether or not she was with holding information or trying to protect some one else who might have been at the scene.

I told Debbie to tell me as closely as she could recall what had happened in the sequence as much as possible, and also told her that this was a chance to help her aunt even though it could not restore life, it

could help in seeing that justice was being done, a chance to help herself in showing that she was being truthful or untruthful and that even though she knew she would have to pay in some way for what had happened, that she could in the end help her small daughter by getting this situation resolved truthfully and correctly.

She told me that she had a great deal of trust in her attorney and that if there were differences, it was not intentional.

I tried not to interrupt her except for on occasion to ask for more detailed clarification on some particular part of her story.

Debbie told me of her background and said that her father is supposed to be a full blooded Cherokee and that there is also some Cherokee blood in her mother's lineage. She had been to the Indian Center here in Lincoln and had been told that if she could validate what she had been told she would be 3/4 Indian or enough so that she could possibly be eligible for tribal funds.

Although Debbie may have been somewhat neglected in her early childhood as to schooling etc., I found her to be basically intelligent. She may not do too well on an I.Q. test primarily because of deprivation as to cultural background, but she reads a lot better than some college grads I have had and was a fine responder on the galvo stimulus test, which is a good indication of how alert the person is. It seemed to me that she was mentally fit for a valid examination. She is quite heavy and that poses a problem as to getting a good cuff wrap for the heart and blood pressure measurement, so I wrapped her forearm rather than the upper arm so that obesity would not be such a problem. I think that she is a far better person, morally, than it would appear her husband has been or his associates. She was raised by the foster parents and said she has had a total of 5 boyfriends in her life, two of whom she married. Her first husband was a Richard Hartman and she was 6 months pregnant when they married. After the baby . . . was born, he left her with a note saying he wanted a divorce. The child is now 12 and Debbie said she was placed in a foster home and has no idea as to where she is.

She and Clifford Shelden were married April 8, 1985 and have a daughter . . . born December 19, 1986 for which she shows a great amount of affection. She was living with the same people who are now caring for the child, and Debbie had been working for a cleaning service here in Lincoln. She hopes to attend school of some type if and when she is sentenced and wants to improve her education as well as a chance

for a better job. Debbie says she has been faithful to Clifford, loves him, and has aspirations of continuing their marriage. In Clifford's case, might be awhile.

As to the highlights:

1. Her story goes along with what all has been said in the past and JoAnne [sic] had visited with both Tom and Jim in the bathroom, talking first to Jim and then took Tom in to the bathroom. She was not privy to that conversation and really did not know how long that took, but maybe an hour.

2. Debbie still thought they were headed for the hospital, but JoAnne [sic] said she wanted to stop and see someone first. Tom did the driving, with the same people in the car as she had already named.

3. JoAnne [sic] had knocked on the aunt's door and had asked if some person was there to which the aunt had said "No" and had also spoken to Debra.

4. She said that JoAnne [sic] had made the first contact at the door with Lo Bo [sic] on one side and Tom and the other side of JoAnne [sic], but she could not say for certain who stood on which side. The first 3 had entered, then Jim and Deb last.

5. The first three had more or less pushed there way in and once inside JoAnne [sic] had demanded money. Helen Wilson seemed to panic and told JoAnne [sic] she did not have any money and did not know JoAnne [sic]. JoAnne [sic] had said words to the effect that, "I know you got it and I'm going to get it".

6. Debra said that JoAnne [sic] held Helen Wilson's hands behind her back, and forced her further in to the living room and began to threaten Helen.

7. The three, JoAnne [sic], Tom and Lo Bo [sic] had pushed Helen in to the bedroom and Debbie said that she could see Helen on the floor or on her knees and that Lo Bo [sic] was holding Helen with his arm around her neck. JoAnne [sic] was telling Helen to tell us where the money is and no more harm is going to come to you or words to that effect.

8. She said that Helen was screaming and protesting, but not too loudly. It was at this time, that Deb tried to help her aunt and was pushed or shoved back as she tried to help and it was

92

then that she was momentarily stunned as her head hit a portion of the bed.

9.  She was alert enough to see the three carrying her aunt from the bedroom. JoAnne [sic] was carrying her by the arms, Lo Bo [sic] was carrying her aunt by her waist or middle of her body and Tom was carrying Helen by her feet.

10.  Helen had been wearing a night gown when she had answered the door and once they had Helen on the floor, JoAnne [sic] was holding a pillow above Helen's face, but not against her face, Lo Bo [sic] was a straddle [sic] of Helen and was holding what she thought was a pocket knife to her Aunt's throat, while JoAnne [sic] was demanding that Helen tell where the money was. Helen was on her back during this time.

11.  It was somewhat earlier that Jimmie left the apartment, and came back a few minutes later. Jim was back in time to see all this happening.

12.  Helen was kicking and screaming and moving her head around. JoAnne [sic] came down on Helen's face with the pillow and Lo Bo [sic] had one hand on Helen's chest or breast and unzipped his pants and started to have intercourse with Helen while Tom was holding Helen's feet.

13.  Debbie said that she almost blacked out and could not really believe what was happening and still can not remember all exactly what was said. She said that James or Jimmie was watching the entire episode and was very nervous moving back and forth, but did not take any part in the assault.

14.  After Lo Bo [sic] had finished. Tom took over and had his face down by Helen's vagina and she said that he then moved his face up on Helen and had his head up by her breast, but she did not know if Tom had intercourse with Helen.

15.  Debbie said that some parts of this are blurry to her, but that Helen ended up face down on the floor and that during this episode Helen's night gown had been pushed up above her waist. Helen had been doing a lot of protesting, kicking and screaming from the time she was carried from the bed room and also struggling and moving as much as possible on the floor.

16.  She said that although Helen had been struggling, when she ended up on her stomach, she had not been moving

93

around or saying anything. I asked her why she had not helped her aunt more or done something and she said she was scared and also Tom had told her not to move or interfere or the same thing would happen to Debbie.

17.   Tom, JoAnne [sic] and Joseph or Lo Bo [sic] started to look for the money with JoAnne [sic] going in to the bedroom. It was during this time that Jimmie had told them some places that they might look.

18.  Debbie said that she saw JoAnne [sic] put something in a pocket and then say, "I got what I came for and I'm ready to go".

The same people who had come in the car then left together and took Debbie home. She said that she was certain there were no other people in the apartment during the time this took place and she was not trying to protect anyone.

I did not want to spend too much time with her as we had covered the basic details and I did not want to exhaust her to the point that she would not be able to be tested for valid results. She was permitted to use the bathroom and also drank a can of Diet Pepsi.

Earlier, Debbie wanted me to know that she was no friend of JoAnne [sic] and that Tom was a friend of Clifford's and that she really did not know Lo Bo [sic].

JoAnne [sic] and Clifford had a thing going before, Clifford and Debra got together and that Clifford eventually shucked out as JoAnne [sic] had cut him with a knife. JoAnne [sic] must be some sort of Amazon and seemed to dominate people. She seems to think her husband has been faithful to her and I asked her where and how Clifford got the venereal disease since she said she had never had it. There had been some spats during their marriage and she said that sometime during that time, Clifford caught the infection off a toilet seat. Ever the trusting wife and naive in a lot of ways.

I thoroughly reviewed with Debra the polygraph procedure and also reviewed the questions twice with her. I had taken her pulse during the pre-test interview and also just prior to the examination and it was 106, which is pretty high. However, Debra is very heavy, which in itself might cause some elevation and in addition, she was in an entirely new setting.

94

The questions were asked as follows:

[C]hart one:

1.      Are you 29 years of age?  Ans. No.
2.      Are you 30 years of age?  Ans. Yes.
3.      Do you understand all of the questions for this test?  Ans. Yes.
4.      Do you intend to lie to me on this test?  Ans. No.
5.      Do you ever drink Pepsi?  Ans. Yes.
6.      Is there anything that happened that night that you are trying to hide from me?  Ans. No.
7.      Was anyone there at the scene or at that apartment other than what you have explained?  Ans. No.
8.      Do you actually feel bad about what happened to your aunt?  Ans. Yes.

Chart one was completed at 3:26 pm and even though it appeared to me that she was trying to be truthful in the pre-test interview, her chart was much more stable than I expected. I could not see anything indicative of deception and about the only response of any significance was to question 6. She told me that she had not been truthful when she was first contacted and that she had been trying as hard as she can to remember everything that happened that night, and wants the real truth to be known. Her cardio tracing instead of going up or raising during the test which is common in the deceptive went steadily the other way and her pulse was 114. That showed that she was alert, but a 10% increase, could be evident, even in a truthful subject if they are capable of being tested and her percentage of increase from the pre-test did not even reach that 10%.

Chart two:

1.      Do you have brown eyes?  Ans. Yes.
2.      Is your middle name Kay?  Ans. Yes.
3.      Have you told your attorney any deliberate lies about what happened?  Ans. No.
        [she told me earlier that she trusted her attorney and if there was anything different than what she was now telling, it was just because she might have thought of something else, but no way was she trying to lie to her attorney]
4.      Did you try to hurt Helen Wilson at any time?  Ans. No.

95

[at times during the pre-test she gets a bit emotional as to what happened and there is no doubt in my mind that as she says, she feels bad that she had not done more to help her aunt at the time and a little guilty because they used her to gain entrance, but as she said she was scared to say anything later because she felt these were bad people who would or could do the same thing to her]

5. Did you ever see Jimmie Dean take an active part in hurting Helen Wilson in any way other than what you have told me?  Ans. No.
   [this of course meant that she had not seen him struggle with or hold Helen or harm her, but no doubt knew that a robbery or theft of money was planned at the time they had the conversation in the bath room and had also told the other three where to look for the money]

6. Were you born in 1958? Ans. Yes.

7. Do you intend to tell the complete truth in court if you are asked to testify?  Ans. Yes.

8. Will you tell the same story as you have told me today? Ans. Yes.

9. Have you deliberately lied to me at any time today?  Ans. No.

10. Is what you have told me, the complete truth as nearly as you can recall?  Ans. Yes.

Chart two was completed at 3:31 pm and again I could not see deception. There was some response to question 4 which I have already explained. There was also some response to question 7. I asked her what she thought about on that question. Debbie said that she wants the whole truth to be told, but that she is afraid that if she testifies against the main people primarily, JoAnne [sic], Lo Bo [sic] and Tom, they might hurt her in some way. I told her not to worry about that, although that is easy to say when she already knows what she saw them do in the past.

(Ex. 1R [ECF 58-1 at 16-22, Polygraph report for Shelden received on or about May 15, 1989].)[70]

---

[70] Although not referenced in the defendants' statement of facts, this exhibit is authenticated in paragraph 30 of Smith's affidavit (filing 51-1).

On May 17, 1989, Searcey took another statement from Dean at the GCSO. Dean was *Mirandized* and the interview was conducted in the presence of Dean's counsel, Richard Schmeling, and DeWitt. Dean stated that on February 5, 1985, he rode in a car driven by Winslow with White, Taylor, and Deb Shelden to Wilson's apartment building. He stated that they all went inside Wilson's apartment. He admitted that he witnessed Winslow, White, and Taylor sexually assault Wilson.[71] He stated that he was not sure if Wilson was alive at the time they left. Dean added that he remembered seeing another person at the scene of the crime and gave a physical description but couldn't remember a gender or a name. (DSF ¶ 90 (Ex. 2 [ECF 59-1], ¶ 44; Ex. 2DD [ECF 61-2 at 38-47]; Ex. 5 [ECF 63-1], ¶ 12).) Dean thought the other person was a woman, and he said he had "an idea" who she was, but he did not want "to put a wrong name in there" and cause problems for the officers. (Ex. 2DD [ECF 61-2 at 40-42], pp. 3-5; Taylor's Ex. 60 [ECF 115-12] at 3-5.) He described this person as having shoulder-length light brown hair and a medium to heavy build. (*Id.*, p. 8.) He added that the person was wearing a white shirt and tennis shoes "that had grey backs to [them]." (*Id.*)

On May 17, 1989, Dean entered a plea of guilty to an amended information charging him with aiding and abetting second-degree murder. (Ex. 1M [ECF 57-3], pp. 30-33; Dean's Ex. 22 [ECF 110-2, Bill of Exceptions to Plea Hearing and Sentencing Hearing, State of Nebraska v. James L. Dean, District Court of Gage County, Nebraska].) In consideration of the reduced charge, Dean agreed to give "total cooperation" to the investigation of the Wilson homicide, and to testify truthfully at the trials of others involved in the crime. (Taylor's Ex. 125 [ECF 119-8, James Dean plea agreement, 5/17/89].) Before accepting the guilty plea, Judge Rist engaged in a colloquy with Dean and, among other things, "asked defendant if he had

---

[71] Dean said that he left Wilson's apartment for ten minutes and when he came back, he watched Joseph White and Tom Winslow taking turns sexually assaulting Wilson while Joann Taylor licked Wilson's chest and held her arms down. (Ex. 2DD [ECF 61-2 at 42-43, Dean's interview dated May 17, 1989], pp. 5-6; Taylor's Ex. 60 [ECF 115-12, GCS recorded statement, James Dean, 5/17/89] at 5-6.)

been induced, persuaded or influenced to enter his plea of guilty by reason of any threats made against him or any promises made to him on the part of any person or persons whomsoever, and defendant responded in the negative." (Ex. 1M [ECF 57-3 at 31].)   County Attorney Smith "outlined facts he expected to prove in the event cause went to trial and defendant [was] given opportunity to respond thereto." (*Id.*) The court found that Dean had "voluntarily, knowingly and intelligently entered his plea of guilty to the charge contained in the amended Information." (*Id.* at 32.)

A transcript of Dean's plea hearing is in the record.  (Dean's Ex. 22 [ECF 110-2 at 1-35].)  It shows that immediately prior to the court's acceptance of the guilty plea, the following inquiries were made:

> THE COURT: All right. What would the nature of the evidence be, Mr. Smith, if this matter went to trial?
>
> MR. SMITH:  Please the Court, your Honor, Debra K. Sheldon [sic] if called to testify, she would indicate that on the evening hours of February 5, 1985, she along with the defendant standing before the Court today, James L. Dean, along with several other individuals went to the location of Apartment Number 4, 212 North Sixth Street, Beatrice, Gage County, Nebraska.
>
> We would also advise the Court that Deputy Burdette Searcey, if called to testify, he would indicate that Mr. Dean after being mirandized has admitted the same to him. Both individuals, both Mr. Dean's statement and Ms. Sheldon's [sic] testimony would be that the apartment was rented by Helen L. Wilson, a 68-year-old white female, and that Deputy Searcey would testify she was found at approximately 9:15 a.m. on 2-6-85, and that she was dead. Ms. Sheldon [sic] would testify that entry was gained to the apartment with Mr. Dean and several other individuals by force. The door was knocked on, Mrs. Wilson responded by opening the door. The door was then pushed back forcibly sending Mrs. Wilson into the apartment. Mr. Dean has also advised the deputy that at that point Mrs. Wilson was struck by one of the other individuals, and almost went to the floor at that point.
>
> Ms. Sheldon's [sic] testimony would further go on that the door was shut, she observed the homicide of Helen Wilson. Mr. Dean has

98

also stated to Deputy Searcey that he observed the homicide of Helen Wilson. They both observed -- in both their statements she would testify and the deputy would testify that Mr. Dean had indicated they observed a sexual assault being committed upon Helen Wilson prior to and during the homicide. Mrs. Wilson was attempting to struggle and resist. However, she was being forcibly held at the time, and that she was also -- the sexual assault was very violent in nature.

Dr. Porterfield, if called to testify, would indicate he was the Gage County coroner's physician in the death of Helen Wilson on February 6, 1985. He did an autopsy on Mrs. Wilson's body. He determined that she had been sexually assaulted, had severe trauma about her body. She had died from suffocation.

Ms. Sheldon [sic] would testify that she observed one of the other individuals place a pillow over Mrs. Wilson's face, and at some point the struggling stopped from underneath the pillow and the individual was deceased.

Debra Sheldon [sic] also would indicate that the reason they went to that location was that they were looking for money. After the death money was also sought, and it was believed by her that one of the other individuals indicated they had found money. She indicates in her statement that the defendant Mr. Dean was suggesting places to look for the money at that time to see if it can be recovered.

Debra Sheldon [sic] and Mr. Dean would indicate entry was forcibly gained to the apartment. Mr. Dean was told by one of the other participants to shut up about what had occurred, and that all these events did take place in Gage County, Nebraska on or about the date of February 6, 1985.

Mr. Dean's statement, along with Ms. Sheldon's [sic] statement, would indicate they entered probably the very late evening hours of February 5, and left during the early morning hours of February 6.

THE COURT: Does the evidence reflect Mr. Dean participated in an active manner with respect to the entrance or any part of the history of the events you outlined?

MR. SMITH: It's my understanding concerning the robbery situation he was giving advice on where to look for the material possibly; also that he, along with the other individuals when the door was forced, he followed in right immediately thereafter.

99

THE COURT: All right. Mr. Dean, you've heard an outline of the kind of evidence that the county attorney would have offered in a trial against you. Is there anything about that you want to tell me?

THE DEFENDANT: No, sir.

THE COURT: Mr. Schmeling, anything that you want to tell me?

MR. SCHMELING: I think the summary that's been recited by the county attorney fairly well sets forth the facts.

THE COURT. Did you participate in the events that the county attorney has outlined, Mr. Dean?

THE DEFENDANT: Yes.

THE COURT: Is there anything you want to add, Mr. Schmeling?

MR. SCHMELING: No.

THE COURT: All right. Again now, Mr. Dean, you understand that if I accept this plea of guilty, you're giving up your right to a jury trial and any defenses that you might raise at this trial with respect to this charge. If I accept the plea I will enter a judgment of conviction against you on the charge. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any question you want to ask your attorney about that in any regard?

THE DEFENDANT: No, sir.

THE COURT: All right. The Court finds that your plea of guilty is made freely and voluntarily, that it should be received.

(*Id.* at 28-32.)

On May 18, 1989, Searcey requested from the BPD a photo of Kathy Gonzalez for identification purposes. (DSF ¶ 91 (Ex. 2 [ECF 59-1], ¶ 45); Taylor's Ex. 126 [ECF 119-9, BPD report, 5/18/89, Searcey given mug shot of Gonzalez].)

On May 22, 1989, Searcey witnessed the *Miranda* rights waiver for Deb Shelden. Because she was not willing to waive her right to an attorney and give a statement without one, no statement was taken. (DSF ¶ 92 (Ex. 2 [ECF 59-1], ¶45; Ex. 2EE [ECF 61-3 at 1, *Miranda* warning form for Shelden dated May 22, 1989]).)

On May 22, 1989, Dean's attorney, Richard Schmeling, filed a motion with the District Court of Gage County requesting that arrangements be made for a psychiatrist or licensed clinical psychologist to provide therapy to Dean while in county jail. (Ex. 1M [ECF 57-3 at 25].)  In his supporting affidavit, Mr. Schmeling stated:

> That when affiant initially interviewed James L. Dean, Dean had no recollection of being at the scene of the crime where Helen Wilson was murdered and was sexually assaulted; that another person arrested at the same time as James L. Dean, Debbie Shelden, had given a statement indicating that James L. Dean was at the scene of the crime and had observed what had happened; that affiant was informed by County Attorney Richard T. Smith and Paul Korslund attorney for Debbie Shelden that initially she had no memory of being at the scene of the crime and observing what occurred but that upon working with Wayne Price, a licensed clinical psychologist employed by Gage County, Nebraska, Debbie Shelden's memory of events regarding the crime began to return to her and she gradually has remembered all of the events on the night in question; that Wayne Price, with the consent of the Defendant and his counsel, conducted a counseling session with James L. Dean, following which James L. Dean began to have fragmentary recollection of being in the apartment of Helen Wilson at the time of the murder; that as time has passed James L. Dean has had additional recollections but has still not fully remembered all of the details of the period of the night of February 5, 1985, and the morning of February 6, 1985;
>
> That affiant is informed by Wayne Price and verily believes that the reason for the loss of memory on the part of James L. Dean was that the events he witnessed regarding the murder of Helen Wilson were so horrible that he repressed all memory of the events from his conscious memory; that contributing to this is the fact that James L. Dean has been the victim of physical abuse as a child and as an adult and was abused by one of the persons who murdered Helen Wilson so that he was in fear of that person; that Price believes that James L. Dean will eventually be able to remember more of the events during the time period in question and that working with a therapist will be of assistance in helping him to recall these events and deal with the feelings of guilt and remorse generated when he remembers these events;

That the Defendant James L. Dean has entered into a plea agreement regarding his case, one of the terms and conditions of which is that "The defendant agrees to testify truthfully in any and all cases and give total cooperation to the state of Nebraska regarding the homicide of Helen L. Wilson."

That Defendant wishes to fulfill this condition of his plea agreement and affiant has been told by James L. Dean that he desires to be able to work with a therapist other than Wayne Price regarding attempts to regain memory and to deal with problems arising as a result of the restoration of his memory regarding the events of the Helen L. Wilson murder; that Wayne Price is under contract to the Gage County Sheriff's Department and is under a duty to disclose to law enforcement authorities facts and details he learns while interviewing James L. Dean and others involved in the case; that the Defendant is entitled to work with a therapist who is not employed by the State and who will be able to maintain the confidentiality of the contents of counseling sessions and not reveal confidential information given to him by James L. Dean which is unrelated to the Helen L. Wilson murder;

That Dr. George Hachiya of Lincoln, Nebraska, is a psychiatrist and travels to Beatrice, Nebraska, from time to time to see patients; that Dr. George Hachiya is an experienced psychiatrist and would be a fit and suitable person to serve as the therapist for James L. Dean;

That it is the opinion of affiant that the services of a therapist are necessary in order for affiant to properly represent James L. Dean, especially concerning the matter of his sentencing.

(*Id.* at 26-27.)  The motion was granted on June 16, 1989, with William R. Stone, Jr., Ph.D., a licensed clinical psychologist of Gateway Mental Health Clinic in Lincoln, Nebraska, being appointed to conduct the therapy. (*Id.* at 34-35.)  The court's order directed Dr. Stone not to employ hypnosis or hypnotic techniques during the course of therapy.  (*Id.*)

On May 24, 1989, Searcey took another statement from Dean at the GCSO. Dean was *Mirandized* and the interview was conducted in the presence of Dean's counsel, Richard Schmeling, and DeWitt. Dean proceeded to reveal the same facts as he had previously, but added that he remembered Kathy Gonzalez was present in the

apartment that night as well, and she was injured in the apartment.[72] Dean stated that he saw Winslow with material around Wilson's neck. Dean stated White had threatened him to keep him from coming forward. He further added that the reason they went to Wilson's apartment was because White and Taylor wanted money. He stated that on the drive to Wilson's apartment building, they discussed robbing somebody. (DSF ¶ 93 (Ex. 2 [ECF 59-1], ¶ 47; Ex. 2FF [ECF 61-3 at 2-11]).) Dean also reported that when he left the apartment, he "went and shut the lights off," adding, "I don't remember you know exactly, but I . . . think I did go shut the lights off because when we come out the lights were off." (Ex. 2FF [ECF 61-3 at 4], p. 3; Taylor's Ex. 61 [ECF 115-13] at 3.) Dean said the group left Wilson's apartment and drove to Marshall's Truck Stop for breakfast, and Tom Winslow and Deb Shelden argued about money along the way.  (*Id.*, p. 8.)

On May 24, 1989, Searcey and Lamkin interviewed Deb Shelden in the presence of her attorney, Paul Korslund. After being *Mirandized*, Shelden proceeded to reveal the same facts as she had previously, but added that she remembered Kathy Gonzalez to be present that night as well. She stated that Gonzalez got a bloody nose, but that Shelden did not see her after that. She further stated that Dean had left and returned to the apartment when Gonzalez was leaving it. Shelden stated she did not know Gonzalez and had forgotten about her until she had a nightmare. She ultimately identified Gonzalez from a photo after asking to see it at the Gage County Jail. She received no information about the person in the photo when she looked at it, yet identified her as Kathy Gonzalez, another person on the scene of the Wilson homicide. (DSF ¶ 94 (Ex. 2 [ECF 59-1], ¶ 48; Ex. 2GG [ECF 61-3 at 12-38, *Miranda* warning form dated May 24, 1989, Transcript of Shelden's interview dated May 24, 1989]).)

---

[72] Dean said he did not see Gonzalez get injured, but she "hollered from the bathroom I have been injuried [sic] or something." (Ex. 2FF [ECF 61-3 at 8, Transcript of Dean's interview dated May 24, 1989], p. 7; Taylor's Ex. 61 [ECF 115-13, GCS recorded statement, James Dean, 5/24/89] at 7.) (Note: Pages 8-10 of Taylor's Ex. 61 appear to involve a different interview.  *See* filing 128-1 at 13.)

In her statement Deb Shelden said that Kathy Gonzalez's nose was bleeding "a lot, quite a bit" when she came out of the bedroom of Wilson's apartment. (Ex. 2GG [ECF 61-3 at 17],[73] p. 5; Taylor's Ex. 127 [ECF 119-10, GCS recorded statement, Debra Shelden, 5/24/89][74] at 5.) When asked why she had not mentioned Gonzalez's presence before, Shelden said, "I didn't remember her at first, but I've been thinking about the case and everything, and I had a nightmare, and I remembered her." (*Id.*, p. 11.) She explained that a few days before the interview, she told the sheriff that she "had decided in [her] mind that there was another person," and she asked Searcey to show her a picture. (*Id.*, p. 12.) She said that she had described the person to Searcey as a "heavy set" woman with "dishwater blond hair" who was wearing blue jeans, a white jacket, and grey topped tennis shoes on the night of the homicide. (*Id.*, pp. 11-13.)

On May 25, 1989, Searcey, Lamkin, and DeWitt traveled to Denver, Colorado, to arrest Kathy Gonzalez pursuant to an arrest warrant issued by the Court. Upon her arrest, Gonzalez stated that she had "been worried about this for 4 years." Gonzalez was *Mirandized* and gave a short statement while in Denver. (DSF ¶ 95 (Ex. 2 [ECF 59-1], ¶ 49; Ex. 2HH [ECF 61-3 at 39-41, Searcey report dated May 31, 1989]; Ex. 4 [ECF 62-3], ¶ 23; Ex. 5 [ECF 63-1], ¶ 15; Ex. 5B [ECF 63-2 at 2-3, Lamkin report dated May 25, 1989]; Ex. 5C [ECF 63-2 at 4, *Miranda* Rights Statement signed by Gonzales on May 25, 1989]).) *See also* Taylor's Ex. 128 [ECF 119-11, Arrest affidavit & warrant for Kathleen Gonzalez, 5/25/89]; Taylor's Ex. 129 [ECF 119-12, GCS report, 5/25/89, Lamkin on Gonzalez arrest].) Also on May 25, 1989, Smith filed a Complaint against Gonzalez charging that she did "aid, abet, procure or cause another to kill Helen Wilson in the perpetration of or attempt to perpetrate any sexual assault in the first degree, kidnapping or burglary." (DSF ¶ 96 (Ex. 1 [ECF 51-1], ¶

---

[73] It appears that pages 14-26 of Defendants' Exhibit 2GG [ECF 61-3 at 26-38] do not belong in this document. *See* filing 128-1 at 17.

[74] It appears that pages 2 and 14 are missing from Taylor's Exhibit 127. *See* filing 128-1 at 17.

31; Ex. 1S [ECF 58-2, Case file of State v. Gonzalez, originally at Gage County Court Case No. CR 89-383]).)

On May 26, 1989, Gonzalez was transported back to Beatrice by Searcey, Lamkin, and DeWitt where Meints met them at the airport to assist in transporting Gonzalez. Subsequently, Meints, Searcey, and Lamkin took Gonzalez to the hospital for the purpose of obtaining biogenetic samples for testing after she was again *Mirandized*. Gonzalez was then taken to the Gage County Jail where Meints booked her into jail. (DSF ¶ 97 (Ex. 2 [ECF 59-1], ¶ 50; Ex. 2II [ECF 61-3 at 42, *Miranda* warning form for Gonzales dated May 26, 1989]; Ex. 4 [ECF 62-3], ¶ 23; Ex. 5 [ECF 63-1], ¶ 16; Ex. 7 [ECF 63-5], ¶ 10; Ex. 7E [ECF 63-6 at 6, Meints Report dated March 26, 1989]).) That afternoon Searcey was informed by a lab technician at the hospital that Gonzalez's blood was type B positive. (Ex. 2HH [ECF 61-3 at 39-40], pp. 1-2; Taylor's Ex. 130 [ECF 119-13, GCS report, 5/26/89, Searcey on Gonzalez arrest].)[75]

On May 26, 1989, at the request of Gonzalez and DeWitt, Price consulted with Gonzalez.[76] She had been arrested in Denver and expressed no recall of her being

---

[75] Kathleen Gonzalez states that at some point DeWitt, Searcey, and Smith "said that they had gotten my blood type back and that it matched the B positive blood that was in the apartment." (Taylor's Ex. 109 [ECF 118-5, Deposition of Kathleen Gonzalez, 9/15/10 at 19.) She claims that when she said it was not possible, "Jerry DeWitt called me a damn liar and he was getting tired of it and they knew for a fact that – because they did all these tests, that it was 100 percent mine." (*Id.*) She says that she "asked if they had done DNA. And they said yes." (*Id.*) Gonzalez maintains that she eventually decided to sign a plea agreement because "[t]hey had a blood type that they said was 100 percent mine and it was in her apartment, and he – Dick Smith said that on that alone he could win at trial and he was going to push for the death penalty in all this." (*Id.* at 12.)

[76] Mark Meints was also present and asked questions. (*See* Ex. 3I [ECF 62-2 at 24-44, Transcript of Gonzalez interview on May 26, 1989]; Taylor's Ex. 133 [ECF 119-16, GCS, recorded statement, Kathleen Gonzalez, 5/26/89 (Note: Taylor's

involved in the incidents and was confused as to why she could not recall it. Prior to talking with Gonzalez, Price advised her that he was representing the State of Nebraska and the Gage County Sheriff's Office and read her a *Miranda* warning which she signed indicating she understood it. Further, she acknowledged at the end of the interview that she was promised nothing, and was not coerced or threatened in any way. Gonzalez expressed confusion as to why she was believed to have been involved in the Wilson homicide and was seeking help to recall this. She asked Price if he would hypnotize her to help refresh her memory. Price denied the request and indicated to her that there are legal ramifications to hypnotizing witnesses and suspects which could affect the admissibility of her testimony. During the course of the interview, Price confronted her with having another witness who was charged in the crime place her at the scene of the Wilson homicide. Gonzalez continued to deny any involvement, expressed a great deal of frustration, yet remained quite calm throughout the course of the interview. Gonzalez asked Price how she could refresh her memory, and Price encouraged her to relax, take her time, and not try to force memories. Price indicated to Gonzalez that she would remember better when she was relaxed. He also told her that memories could occur in dreams, as this was the most relaxed state she could achieve. Price's overall impression was that Gonzalez did not have any major mental disorder, that she was competent and sane, and that she had the capacity for recall. (DSF ¶ 98 [Ex. 3 [ECF 62-1], ¶¶ 12, 13; Ex. 3H [ECF 62-2 at 22-23, Consultation note concerning Gonzalez]; Ex. 3I [ECF 62-2 at 24-44]; Ex. 3J [ECF 62-2 at 45, *Miranda* Rights given and signed by Gonzalez dated May 26, 1989]; Ex. 3K [ECF 62-2 at 46, Letter to Smith re: deposition dated August 31, 1989]; Ex. 7 [ECF 63-5], ¶ 10; Ex. 7E [ECF 63-6 at 6]); Taylor's Ex. 134 [ECF 119-17, Report of Dr. Wayne Price, 5/26/89, interrogation of Kathleen Gonzalez].)

---

Exhibit 133 is missing page 20. *See* filing 128-1 at 18).) It appears Don Sass was appointed as Gonzalez's counsel on May 26, 1989, but did not meet with her until May 30. (Ex. 1S [ECF 58-2], p. 9; Taylor's Ex. 131 [ECF 119-14, Arraignment of Kathleen Gonzalez, 5/26/89]; Taylor's Ex. 132 [ECF 119-15, Fee affidavit, Donald Sass].)

Gonzalez told Price that she knew Joseph White and had met Joann Taylor when she was living in Beatrice.  (Ex. 3I [ECF 62-2 at 28], p. 5; Taylor's Ex. 133 [ECF 119-16] at 5.)  Gonzalez explained that White lived with her for about a week, but she kicked him out of her apartment "because he refused to take a bath."  (*Id.*, p. 7.)  She said that she did not know Helen Wilson and did not associate with others who lived in the apartment building.  (*Id.*, p. 8.)  Gonzalez said that she heard about Wilson's death "the next day" while she was at work, and she saw that "cop cars" were still at her apartment building when she got home.  (*Id.*, p. 7.)  She also said that she was at home during the murder, and she had been doing laundry and watching a movie that evening, but she did not hear anything.  (*Id.*, p. 8.) Price asked Gonzalez whether she "ever had any memory problems before," and Gonzalez responded negatively.  (*Id.*)  Price asked, "How about something really terribly frightening like something that really had an impact emotionally . . . ?" and again Gonzalez responded negatively, adding, "the worst things that ever happened I can remember."  (*Id.*)  Price asked, "Do you think it is a possibility that you might have been there and just have a complete blank?"  (*Id.*, p. 9.)  Gonzalez replied that if that were possible, she would like to find out.  (*Id.*)  She asked Price whether he hypnotized people, and Price responded that he could not do that because "the courts have been up and down on whether it could be [admissible]."  (*Id.*)  He added, however, that sometimes traumatic things "[w]ill come back to you in some ways often in dreams in little bits and pieces will come to you like pieces of a jig saw puzzle that don't make a lot of sense and after a few dreams or even a few days enough pieces will come together [and you will] start having some recall."  (*Id.*, p.10.) Gonzalez asked, "What happens if I don't remember?"  (*Id.*)  Price responded, "Then it's up to a court to decide . . . ."  (*Id.*) Gonzalez denied being involved, and she said she even remembers the movie she watched on the night of the homicide.  (*Id.*, p. 11.)

Price then told Gonzalez that if she were "there and not participating" it would be "a very different situation" than if she were "there participating," and he asked her whether there was "a chance that [Joseph White] would implicate you if he thought he could get off by doing it?"  (*Id.*, pp. 11-12.)  Gonzalez agreed that White was the

107

sort of person who "would implicate somebody else to get out of something." (*Id.*, p. 12.) She said, "I don't know what to say . . . I thought about this and I realize what kind of situation I'm in and I don't know how to prove anything because I don't know what to say." (*Id.*, p. 14.) Gonzalez said she knew that she could not have hurt Wilson, but when she was arrested she "figured it would be easier to deal with all of this back [in Nebraska]." (*Id.*, pp. 14-15.) She added, "[W]hat they said made sense[,] maybe I blocked it out I don't know." (*Id.*, p. 15.) Price said, "rest for a bit if you're willing and I'm willing to work with you on it you know." (*Id.*) Gonzalez said, "I want to know." (*Id.*) The following exchange then occurred:

| | |
|---|---|
| Meints: | You do have a few of the parts[,] I mean you remember somethings [sic] that they asked you about though, right? |
| Gonzalez: | What do you mean? |
| Meints: | The you know the la– yesterday when they interviewed you . . . |
| Gonzalez: | Yeah. |
| Meints: | You remembered a few of the things. |
| Gonzalez: | No. |
| Meints: | I mean like the . . . |
| Gonzalez: | They got kind of upset with me because all I could say is I don't know what to tell you. |

(*Id.*, p. 15.)

Price told Gonzalez that they would talk from time to time and "see what comes back." (*Id.*, p. 17.) He said, "But the important thing is the odds are at this time it looks like you were in but did in fact block it. With two people pinpointing you in the event of [sic] each other, a good chance. And if you can help you out by remembering it will help you. . . . We don't want you held responsible for anything you didn't do and you know I have no idea what uh [White] or Joann and Winslow are going to say about you." (*Id.*, p. 18.) Gonzalez said, "I don't even know who this Winslow is," and Price responded, "You apparently don't want to." (*Id.*) He added, "[I]f I had seen what took place I would have blanked it too." (*Id.*, p. 19.) Gonzalez asked whether remembering would "trigger anything," and Price responded that it

would give her a "sense of relief." (*Id.*)  Price added, "But we'll work with you, we're not out to railroad you in anyway okay?" (*Id.*)  Gonzalez observed that there must be a lot of evidence against her even though she did not think she was present in Wilson's apartment. (*Id.*, p. 20.)

On May 27, 1989, Lamkin took major case hand and fingerprints from Gonzalez. (DSF ¶ 99 (Ex. 5 [ECF 63-1], ¶17; Ex. 5D [ECF 63-2 at 5, Lamkin report dated May 27, 1989]).)

On June 7, 1989, Searcey interviewed Dean at the GCSO after being *Mirandized*. Also present were his attorney, Richard Schmeling, and DeWitt. Dean repeated many of the same things as previously but added that he remembered a discussion in Winslow's car prior to arriving at Wilson's apartment building. He stated that Wilson's name was mentioned in connection with the idea of robbing somebody for money. (DSF ¶ 100 (Ex. 2 [ECF 59-1], ¶ 51; Ex. 2JJ [ECF 61-3 at 43-45, Transcript of Dean's interview dated June 7, 1989]).)  Dean said that he recalled Joann Taylor mentioning the name Wilson while Taylor, Dean, Tom Winslow, Joseph White, and Deb Shelden were driving around in Winslow's car. (Ex. 2JJ [ECF 61-3 at 44], p. 2; Taylor's Ex. 62 [ECF 115-14, GCS recorded statement, James Dean, 6/7/89] at 2.) Earlier, the group had been talking about robbing someone. (*Id.*)  He said that the group went to Wilson's apartment building, and the lights were off as they entered. (*Id.*)  According to Dean, a person wearing a white shirt suddenly appeared in the hall in front of them. (*Id.*)  This person was Kathy Gonzalez, and Dean said that Gonzalez joined in as the rest of the group entered Wilson's apartment. (*Id.*, pp. 2-3.)

On June 13, 1989, Dr. Reena Roy mailed Searcey a lab report which included an analysis of Gonzalez's blood. (Taylor's Ex. 141 [ECF 119-24, NSP lab report, 6/13/89, serology report on Kathleen Gonzalez].)  It appears from the report that one of the genetic markers in Gonzalez's blood (Gc 2-1) differed from one of the genetic markers that Roy identified in the type B blood that was found at the scene of

Wilson's homicide (Gc 1).  (*Compare* Taylor's Ex. 141 [ECF 119-24] *with* Taylor's Ex. 90 [ECF 116-9].)   However, Dr. Roy testified on September 8, 1989, in a deposition taken in connection with Joseph White's trial, that Kathy Gonzalez "cannot be excluded as the donor of Blood Group B in many of the bloodstains that I found." (Taylor's Ex. 42 [ECF 115-2, Excerpts from White trial deposition of Dr. Reena Roy, re blood evidence] at 8.) While noting that "her Gc-2-1 did not match with the Gc-1s that I found," Dr. Roy explained that if "there are two people's blood mixed, she certainly cannot be excluded, because ESD, PGM, ADA, AK, Gc, and Tf, none of those can be excluded." (*Id.*) At White's trial, it was stipulated that blood found at the crime scene was "similar to that of Kathy Gonzalez." (Taylor's Ex. 41 [ECF 115-1, Joseph White trial stipulation, re blood & semen evidence] at 3.)

On June 16, 1989, Price had a second interview with Deb Shelden which was again requested by her attorney. A question had come up that her recall seemed to be somewhat fragmented. In other words, she did not recall everything all at once or in a logical pattern. Her attorney wanted confirmation as to whether or not this reflected an illness or something else. He also wanted to know why she was recalling in a fragmented fashion. The purpose of the interview was to determine the pattern of recall. Shelden described how she was remembering events as she would see things occurring, but would not hear what was happening. In Price's opinion, that is not particularly unusual when one is traumatized. It did not affect the veracity or validity of her recall. Price had indicated to Shelden that if she could relax she would have better recall. Price told her that she might recall more in dreams. This would not be unusual because dreaming is a more relaxed state; however, an individual's pattern of recall is highly variable. Price's conclusions were sent in a report/letter to Shelden's attorney on that same date. (DSF ¶¶ 101, 102 (Ex. 3 [ECF 62-1], ¶ 9; Ex. 3L [ECF 62-2 at 47-68])).)

This meeting and the meeting on April 24, 1989, were the only contacts Price had with Deb Shelden. Based upon Price's consultation with Shelden, her history, the manner in which she was recalling memories of the event, the fact that she passed a

polygraph, and his training and experience as a police psychologist, it was Price's opinion that Shelden was accurately recalling memories rather than making up a false version of the events, and that she was present during the Wilson homicide. (DSF ¶ 103 (Ex. 3 [ECF 62-1], ¶¶ 9, 17; Ex. 3D [ECF 62-2 at 12-15, Consultation note concerning Shelden]; Ex. 3L[77] [ECF 62-2 at 62-65]).)

On June 16, 1989, pursuant to an agreement between the County Attorney's Office and Gonzalez's attorney, Gonzalez was given a polygraph examination by Paul Jacobson. On June 19, 1989, Paul Jacobson issued a polygraph report that found deception. (DSF ¶ 104 (Ex. 1 [ECF 51-1], ¶ 32; Ex 1T [ECF 58-3 at 1-7, Polygraph examination for Gonzalez dated June 19, 1989]).)  Jacobson stated in his report:

> After the test was completed and the attachments were removed, I told Kathy that she did not look very good and was not nearly as calm as she thought, at least according to the chart.  I also knew that she was a bit unlike Jimmy Dean, that she was not going to admit anything at this stage until there was something more to convince her that she was in a corner.  I told her that irregardless, she had to level with her attorney as there was no way he was going to be able to defend her without knowing the full truth.
> . . .
> You are probably playing a waiting game with Kathy.  When she finds out about the blood test and that she is in the big leagues, it might be a whole different story.

(Ex. 1T  [ECF 58-3 at 6], p. 6; Taylor's Ex. 135 [ECF 119-18, Polygraph report for Kathleen Gonzalez, 6/16/89] at 6.)

On June 23, 1989, Lamkin interviewed Dean. After Dean was *Mirandized*, his statement was taken in the presence of his counsel, Richard Schmeling. (DSF ¶ 105 (Ex. 5 [ECF 63-1], ¶ 18; Ex. 5E [ECF 63-2 at 6-13, Dean interview transcript dated June 23, 1989]).)  Dean said that he recalled that when he, Tom Winslow, Joann

---

[77] The defendants' statement of facts erroneously references Exhibit 3F.

Taylor, Joseph White, and Deb Shelden were driving in Tom Winslow's car on the night of the homicide, Wilson's name came up during the course of a conversation. (Ex. 5E [ECF 63-2 at 7], p. 2; Taylor's Ex. 63 [ECF 115-15, GCS recorded statement, James Dean, 6/23/89] at 2.)  He also said he wanted "to make sure we specify that . . . the lights [in the hallway of Wilson's apartment building] were off when we entered the door."  (*Id.*, p. 5.)  He described leaving Wilson's apartment as she was being assaulted and returning in time to overhear Kathy Gonzalez, who was in Wilson's bathroom, say that she had been injured.[78]  (*Id.*)

On June 26, 1989, DeWitt was a witness for the State in a hearing held on Taylor's Motion to Suppress. (DSF ¶ 106 (Ex. 4 [ECF 62-3], ¶ 26; See Ex. 1D [ECF 51-3, 51-4, 51-5]).)

On June 28, 1989, Price drafted and sent a letter to Smith enclosing a copy of the notes relating to Price's consultation with James Dean. Price specifically noted that no psychological testing was done with Dean, and that no relaxation or hypnotic techniques nor hypnosis were used on Dean at any time that Price had contact with Dean. Price also noted that he had conveyed to Dean the knowledge that hypnosis should not and could not be used on him due to its questionable effect on the capacity of one to be used as a witness in a criminal case to which Dean indicated he understood. (DSF ¶ 107 (Ex. 3 [ECF 62-1], ¶ 11, Ex. 3G [ECF 62-2 at 21]; Ex. 3H [ECF 62-2 at 22-23]).)

On July 16, 1989, Lamkin transported James Dean to the GCSO for the purpose of taking his statement. Dean was *Mirandized* and his statement was taken in the presence of Dean's counsel, Richard Schmeling. Dean provided more new

---

[78] The defendants' statement of facts indicates that "[n]ew information from Dean was that Kathy Gonzalez was injured in Wilson's apartment on the night of Wilson's death." (Filing 50, p. 38, ¶ 105.) However, Dean had already provided this information to Searcey on May 24, 1989.  (*See id.*, p. 34, ¶ 93.)

information. Dean stated that prior to the Wilson homicide, Taylor, White, Winslow, and Cliff Shelden, while at Kathy Bartek's residence, devised a plan to rob someone because they needed money. Dean was not present during the conversation at first, but went in later. The plan was to rob Wilson that night, and they were discussing everyone's jobs for the robbery. At that time, Dean learned that Kathy Gonzalez would be there. During the Wilson homicide, Dean stated he saw Gonzalez there, heard something break in the bedroom, and then Gonzalez was injured. She washed up in the bathroom. (DSF ¶ 108 (Ex. 5 [ECF 63-1], ¶ 19; Ex. 5F [ECF 63-2 at 14-38, Dean interview transcript dated July 16, 1989]).)

In his July 16 statement, Dean said that he, Joann Taylor, Joseph White, Tom Winslow, and Cliff Shelden had a conversation about a week before the homicide, and the group talked about stealing money from an "old lady." (Ex. 5F [ECF 63-2 at 15], p. 2; Taylor's Ex. 64 [ECF 116-1, GCS recorded statement, James Dean, 7/16/89] at 2.) On the night of the homicide, Joann Taylor told Dean and Tom Winslow that nobody would be home at Wilson's house, and that they should "hit it." (*Id.*, p. 6.) Taylor, Winslow, Dean, White, and Deb Shelden then left in Winslow's car, and the group eventually made its way to Wilson's apartment. (*Id.*, pp. 9-10.) On the way to the apartment, Dean learned that Kathy Gonzalez would also participate in the crime. (*Id.*, pp. 10-11.) As in his previous statement, Dean described leaving Wilson's apartment and returning to hear Kathy Gonzalez stating that she had been hurt. (*Id.*, pp. 16-17.) He added, however, that he heard something break in the bedroom before he left the apartment, and at one point he saw Gonzalez in the bathroom holding a bloody rag to her chin. (*Id.*, pp. 17, 23.) When he was asked whether he knew where Gonzalez was when she became injured, he said that he did not want to speculate, adding, "I don't want to do anything that's gonna harm this testimony." (*Id.*, p. 23.) Dean also said that he knew "for a fact" that White "tore a five dollar bill in half," though he only "heard it rip." (*Id.*, p. 21.) According to Dean, White had "a stack of money in his hand" that was two or three inches thick. (*Id.*)

On July 17, 1989, Dean's deposition was taken at the Gage County Jail. Present were Smith, Richard Schmeling (counsel for Dean), Toney Redman (counsel for White), John Stevens Berry (counsel for Winslow), and Lyle Koenig (counsel for Taylor). (DSF ¶ 109 (Ex. 4 [ECF 62-3], ¶ 26).) Dean's attorney, Richard Schmeling, states that "[d]uring the deposition, Dean came across as unorganized and not entirely coherent." (Dean's Ex. 17 [ECF 109-2], ¶ 57.) He says that "[a]fter the deposition concluded, County Attorney Smith told me that Dean had better come across as a more believable witness at White's upcoming trial." (*Id.*) Schmeling "believe[s] that Dean was essentially so brainwashed at that point that he was willing to say anything that might [sic] prosecutors might have suggested." (*Id.*)

On July 18, 1989, Searcey interviewed Cliff Shelden again. He stated that his wife, Deb Shelden, had recently told him that she was present in Wilson's apartment but had not said anything because she had been threatened to keep quiet. He stated that he had not known that anyone was planning anything.[79] (DSF ¶ 110 (Ex. 2 [ECF 59-1], ¶ 52; Ex. 2KK [ECF 61-3 at 46-53]).) Cliff Shelden said that his wife, Deb, had never discussed her involvement in the Wilson homicide until she wrote him a letter sometime "within the last several months" stating that "according to Tom . . .

---

[79] The defendants' statement of facts adds that "approximately one week before Wilson's homicide, [Cliff Shelden] was at a party at Dean's house when conversations took place in Dean's bathroom between various people, not including him." (Filing 50, p. 39, ¶ 110.) Actually, Cliff Shelden only conceded this was a possibility. Searcey asked him, "Do you recall having been in a household when numerous people or different people went into a bathroom to have discussions about anything?" (Ex. 2KK [ECF 61-3 at 50, Transcript of Cliff Shelden's interview dated July 18, 1989], p. 5.) Shelden replied, "I was there, but I didn't hear no . . . ." (*Id.*) Searcey interrupted to say, "So you remember a few days ahead of this homicide having been in the Bartak [sic] /Dean residence and seeing people go into the bathroom and having possibly some discussions." (*Id.*) Shelden replied, "Possibly yeah." (*Id.*) Searcey later revisited the topic by asking, "So your [sic] saying that you could have been, you may have been in the household at the time there was discussion?" (*Id.*, p. 7.) Shelden replied, "Right." (*Id.*)

Winslow's statement . . . she was there," and that Deb "was forced and basically threatened" to go to Wilson's apartment. (*Id.* at 6-7.) (Ex. 2KK [ECF 61-3 at 51-52], pp. 6-7.) Cliff Shelden told Searcey that he had never heard of Kathy Gonzalez. (*Id.*, p. 4.)

On August 3, 1989, Judge William B. Rist denied Taylor's motion to suppress the statements she gave to Lt. Calloway on March 15, 1989, and to Searcey and Stevens on March 16 and 17, 1989. In each instance it was determined that "no force, fear, oppression, or coercion were used against defendant with respect to said statement, nor any promise made directly or indirectly by any person in authority that such statement would result in any advantage or benefit to defendant." (Ex. 1D [ECF 51-4 at 62-67].)

On August 10, 1989, Searcey was present when Taylor's attorney, Lyle Koenig, interviewed Deb Shelden. Shelden repeated many of the same facts as in previous statements. She stated that the first time she had talked about the night of Wilson's homicide was to Searcey. She stated that she had read only part of the letter that Taylor sent to her husband, Cliff Shelden. She stated that she saw Dean on April 14, 1989, and told him that Lamkin and Searcey wanted to talk to him. (DSF ¶ 111 (Ex. 2 [ECF 59-1], ¶ 53; Ex. 2LL [ECF 61-4 at 1-32, Transcript of Deb Shelden's interview dated August 10, 1989]).) Deb Shelden said that she, Winslow, Taylor, White, and Dean drove around Wilson's apartment building several times until they saw the lights at the apartment building flash on and off. (Ex. 2LL [ECF 61-4 at 8-9], pp. 8-9.) She later came to believe that Kathy Gonzalez was the one flashing the lights. (*Id.*, p. 9.) She described the group's attempt to rob Wilson, though she claimed that she had "blocked" out some of the incident. (*E.g.*, *id.*, p. 14.) She said that during a struggle, Wilson kicked Kathy Gonzalez, Kathy's nose started bleeding, and Kathy ran out of the apartment. (*Id.*, p. 15.) Deb Shelden also said that she tried to pull White off of Wilson, but White knocked her back, causing her to hit her head and lose consciousness. (*Id.*, p. 16.) She awoke to see White and Winslow sexually

115

assaulting Wilson, and Taylor was holding a pillow over Wilson's head. (*Id.*, pp. 16-21.)

On or about August 21, 1989, Searcey received a letter from Dean's counsel, Richard Schmeling, stating that Dean had remembered seeing Cliff Shelden standing in the doorway somewhere. Schmeling indicated that he had told DeWitt, who had elected not to take a statement.[80] During Searcey's independent investigation, he had confirmed that Cliff Shelden was, in fact, in the hospital the night of the homicide so that he could not have been there. Further, Dean stated that he recognized Cliff Shelden because he has red hair; however, Winslow also has red hair.[81] No statement was necessary in this instance [in Searcey's opinion]. (DSF ¶ 112 (Ex. 2 [ECF 59-1], ¶ 54; Ex. 2MM [ECF 61-4 at 33]).)

On August 23, 1989, Searcy assisted DeWitt in transporting Taylor to the courthouse for a hearing. During transport, DeWitt accidentally pulled some of Taylor's hair and immediately apologized. (DSF ¶ 113 (Ex. 2 [ECF 59-1], ¶ 55; Ex. 2NN [ECF 61-4 at 34, Searcey report dated August 23, 1989]; Ex. 4 [ECF 62-4], ¶ 27; Ex. 4H [ECF 62-4 at 17, DeWitt report dated August 23, 1989]).)

---

[80] Schmeling stated in his letter: "I told Sheriff DeWitt about this and he elected not to take a statement. He thought the recollection was too fragmentary at this time to try to record. He also thought that the vision of Cliff Shelden resulted from the group having gone to the hospital that evening to see Cliff. When I got back to Lincoln I checked Debbie Shelden's videotaped statement and although the people talked about going to the hospital to see Cliff Shelden, they never actually went there the night of the Wilson murder. Thus, the recollection James has had can not be accounted for in that way. James says the recollection of seeing Cliff at some time is very vivid and he is sure it was Cliff because Cliff has red hair and is the only one in the group they ran around with who has the redish hair." (Ex. 2MM [ECF 61-4 at 33, Letter from Schmeling dated August 21, 1989]; Taylor's Ex. 136 [ECF 119-19, Correspondence from R. Schmeling to B. Searcey, 8/21/89].)

[81] As noted earlier, the plaintiffs claim Winslow has blonde hair.

On August 25, 1989, Taylor received a 6-hour psychiatric evaluation from William S. Logan, M.D., at the request of the State. Dr. Logan states in his report that Taylor provided the following account of the crime:

> The patient returned to Beatrice, Nebraska in late 1984 with Joe White also known as Lobo and Mark Goodson also known as Snake. . . . The patient regularly associated with a group that included Lobo, Kathy Gonzales, James Dean, Kathy Bartek (James Dean's wife) and Tom Winslow. . . . At the time Tom Winslow was going with a girl named Beth Johnson. Lobo briefly lived with Linda Griffith and later established a relationship with Kathy Gonzales [sic]. The patient also associated with Cliff and Debbie Shelden. . . . The patient had briefly lived with Lobo and Kathy Gonzales [sic] but left when they began fighting. The patient began a relationship with Darren Munsterman [sic]. Together she and Darren lived with Clifford Shelden, and Charlotte Mindenhall. Debbie Shelden had not yet married Clifford although they saw each other frequently.
>
> The patient remembered the day of the offense was February 5, 1985. . . .
>
> Later that day the patient recalled riding in a car that belonged to Tom Winslow. She described the car as green with a brown top. The patient explained that she was high and "in a mood to stay wasted for a while." Tom and Lobo began talking about a way they could obtain more drugs. Both mentioned a Mrs. Wilson. However, the patient had never met her. The two described they knew where they could get drugs from an old lady. The patient understood they were planning to rob her. . . .
>
> At approximately 7:30 that evening Tom Winslow dropped off Lobo and the patient while he went to pick up James Dean. After a half hour Tom returned with James Dean and Deb Shelden. The group continued to ride around and "get high." The patient explained that Tom had pot. Tom and Lobo again discussed robbing the old woman. When the patient indicated her reluctance to participate Tom stated he knew where her little girl was. The patient stated that Tom threatened to harm her or the girl if she did not go along with "whatever the [sic] did." . . .
>
> While cruising Beatrice the group pulled up to a three-story apartment house. The patient stated she did not recall where the apartment house was located. When informed this was the same

117

apartment house Lobo lived with Kathy Gonzales [sic] the patient explained that she had only entered this building previously from the back stairs. On this occasion, however, they entered the building through a front hall. She recalled Mrs. Wilson' s apartment was on the first floor and her door was on the left. . . .The patient, Tom, Lobo, Debbie, and James Dean went to the door of Mrs. Wilson. The patient explained that Mrs. Wilson was Debbie Shelden's great aunt. The patient was the first to knock on the door and asked to use the restroom. The patient recalled when Mrs. Wilson answered the door she did not look startled to see them and said "hi, Deb." The patient recalled that she took a step back. The next thing she knew all of them were inside the apartment.

At that point Lobo said something to Mrs. Wilson but the patient did not hear her reply. She then saw Lobo slap Mrs. Wilson. The patient stated "stop it you're hurting her." Lobo replied that Mrs. Wilson knew why he was doing it and that she should stay out of it. . . .

At that point she witnessed Tom and Lobo began pushing Mrs. Wilson towards the bedroom. . . . She described that James Dean was walking around like he was in a daze and was standing in the doorway of the bedroom.

At that point Mrs. Wilson was knocked to the floor. Debbie went into the bedroom to tell them to leave her alone. The patient recalls that Debbie was hit in the head and was bleeding from the back of the head toward the crown. At that point the hitting stopped and Lobo, holding Mrs. Wilson brought her back into the living room. Tom followed him like a shadow. At that point Kathy Gonzales [sic] entered the apartment. The patient described that Debbie Shelden was still in the bedroom lying on the floor in a semiconscious state.

At that point the patient asked to leave. She recalled that Debbie went and stood by the door. . . . The patient was aware of a telephone ringing that was located on a side table in the living room. The first time the phone rang Mrs. Wilson was in the bedroom, no one answered the phone. The second time someone picked up the phone and hung it up quickly. The patient estimated that Tom and Lobo continued to argue with Mrs. Wilson in the living room for a half hour. She described that they were still hitting her, had tightened their grip on her arm, and were jerking her around. . . .

At that point Mrs. Wilson was placed on the floor. The patient was still standing close to the couch. The patient stated she never the touched the old lady or anyone else. An exception was when she tried to pull Lobo's arm away from the old woman as he was taking her back into the living room. At that point Lobo reached out, grabbed her arm, and pushed her away. The patient recalls saying "leave her alone, what has she done to you?" On the floor the patient noticed that the woman's hands were behind her. Tom spread the woman's legs apart while Lobo proceeded to vaginally rape her. . . . The patient could recall Kathy Gonzales [sic] being in the bedroom and seeing blood on the walls and the bedspread. . . .

After Lobo was done he held up his pants and exchanged places with Tom. . . . The patient could see the woman wiggling and struggling. She noted the woman was moving her head back and forth and hollering. However, she noted the woman could not get her hands from behind her back. At that point Tom put his face by the woman's vagina. Tom next lifted up the woman's legs and proceeding to have anal sex with her. . . .

. . .

The patient next described that Tom, Lobo and Jim began to look around the apartment. Jim was ordering Tom and Lobo to look in various places such as under the lamp, in her dresser, under her dresser, and under the bed. The patient recalled that Jim walked into the kitchen. The patient stated she did not see the woman's purse. She described that Deb was still by the door while Kathy Gonzales [sic] was in the bathroom possibly trying to clean up. The patient heard Kathy Gonzales [sic] would "catch us later." The patient admitted at this point that she had received copies of the various witness statements from her attorney to help her memory. The patient could next see the group moving toward the door. . . . The patient could then see the door open and stated she was one of the last ones to leave. As she was leaving she looked at the lady. She described the look in the woman's eyes as "help me." . . . She stated that nothing was over her face and it was starting to pale. . . . When the group left Kathy Gonzales [sic] was still in the apartment. . . .

The patient did not remember precisely what she did after leaving the apartment but does recall returning to her own apartment. When she entered Charlotte Mendenhall [sic] noticed that she looked pale. . . . The

119

> patient recalls knowing a girl named Lisa Pudendorf [sic] but does not
> ever remember discussing the incident with her.  The patient described
> that she hates her as she "pissed me off."  Earlier, when the patient was
> high and Lisa was drinking, the patient tried to break Lisa's arm.

(Taylor's Ex. 106 [ECF 118-2, Joann Taylor evaluation, Dr. Logan, 8/25/89] at 12-16.)

On August 30, 1989, Searcey interviewed Taylor at the GCSO in the presence of Richard Smith, Lyle Koenig, Joe Murray (co-counsel for Taylor), Jerry Shelton (deputy county attorney), and Kent Harlan. Harlan videotaped the statement. Taylor repeated many of the same things that she had stated previously. She added that on the night of Wilson's homicide they were all "partying" and "getting high." She claimed that she was threatened into going with [White] and Winslow to Dean's house. She admitted that she knocked on Wilson's door and asked to use the restroom and that Wilson said "hi" to Deb Shelden. She claimed that she was "so high" when they entered Wilson's apartment. She claimed that she, Shelden, and Dean just watched White and Winslow attack Wilson. She admitted to holding a pillow over Wilson's face when Winslow and White sexually assaulted Wilson. She denied having any sexual activity with Wilson. She admitted having a conversation about going to Wilson's place for money. She admitted that she, White, and Winslow hunted for money in Wilson's apartment with Dean giving them ideas for places to look. She remembered that all but Gonzalez left together because Gonzalez was in the bathroom at the time and said she would catch up later. She stated that they all left in Winslow's car. She admitted that she did talk to Lisa Podendorf the next day and told Podendorf that she and White were responsible for Wilson's death. She stated that Wilson's face was not covered when she left Wilson's apartment. (DSF ¶ 114 (Ex. 2 [ECF 59-1], ¶ 56; Ex. 2OO [ECF 61-4 at 35-57, Transcript of Taylor's interview dated August 30, 1989]).)

During the August 30 interview, Taylor said that on February 5, 1985, she was "getting high partying" with Joseph White and Tom Winslow, adding that they were

"smoking pot which was laced with . . . angel dust . . . snorting cocaine, popping yellow jackets, popping purple monster, and drinking beer heavily on top of all of it." (Ex. 2OO [ECF 61-4 at 36-37], pp. 2-3; Taylor's Ex. 82 [ECF 116-3, GCS recorded statement, Joann Taylor, 8/30/89] at 2-3.) She and White then began to argue about whether to get more drugs, and White threatened to hurt Taylor or her daughter if she did not come along with him. (*Id.*, p. 3.) White, Taylor, and Winslow then picked up James Dean and Deb Shelden, and eventually the group ended up at Wilson's apartment. (*Id.*, p. 4-5.) According to Taylor, White began to argue with Wilson, slapped her, and pushed her toward her bedroom. (*Id.*, p. 6.) Deb Shelden tried to help Wilson, but White shoved her, and Deb hit her head. (*Id.*, p. 7.) Taylor said that she too tried to help Wilson, but White "belted" her and dislocated her jaw. (*Id.*) She added that her jaw had been dislocated before, so she "just popped it back in." (*Id.*) She described watching White and Winslow rape Wilson, trying again to intervene, and having flashbacks of her own rape. (*Id.*, p. 8.) Taylor said that at some point, Kathy Gonzalez came into Wilson's apartment and "was walking around kind of just checking things out." (*Id.*, p. 9.) Taylor added that she believed that Gonzalez had blood on her and may have been hit. (*Id.*, pp. 9-10.) Taylor denied putting a pillow over Wilson's face or licking her body. (*Id.*, p. 11.)

During this interview, Taylor mumbled to herself, "Come on Jo you can do it you've got to," when trying to describe details about the apartment. (*Id.*, p. 11.) When Smith confronted her with James Dean's and Deb Shelden's statements that Taylor participated in the assault upon Wilson, Taylor cried and said, "I know what I remember. I can't force myself to do any better." (*Id.*) She then said, "Fuck it. You can't keep bringing this back, I can't take it your [sic] torturing me . . . . And I will not go through this torture. My mental health is at stake for it." (*Id.*, p. 12.) Smith reminded Taylor that her plea agreement required her to testify truthfully, and he indicated that he would "ask for a polygraph." (*Id.*) Taylor replied that she was "doing the fuckin [sic] best I can," and said, "We'll go through with this but in the fuckin [sic] morning you'll have a fuckin [sic] corpse in your jail." (*Id.*)

Taylor was asked about statements she made to Charlotte Bishop (Mindenhall /Crumb) and Lisa Podendorf shortly after the murder:

| | |
|---|---|
| Smith: | You didn't tell [Charlotte] anything about the homicide? |
| Taylor: | Not that I remember no. I don't remember saying anything in particular to her. It's possible, now don't get me wrong it's possible I could have because I was as high as I was, but I don't remember it. |
| Smith: | Okay. If I told you that Charolette Mindenhall told me that you indicated that you were there and that you and Lobo killed the lady would that be true or false? |
| Taylor: | It would be possible, but I can't say one way or the other you know for definetly [sic] sure. |
| Smith: | If I told you that Lisa Podendorf told me approximately the same thing with some more details. Would that be true or false? |
| Taylor: | Like I say it's possible. With me as high as I stayed in those days, the only thing I wasn't doing is shooting up in those days. |

(*Id.*, p. 15.)

After a break in the interview, Taylor said, "I think it might be better if you start asking me some questions that might help bring it back better."  (*Id.*, p. 15.) Searcey asked a few questions to which Taylor made no verbal response.  She then admitted it "was possible" that she held a pillow while she was "up by [Wilson's] head" but she did not remember "having had ahold of a pillow." (*Id.*, p. 16.)  When Taylor denied touching Wilson, this exchange followed:

| | |
|---|---|
| Searcey: | Now you realize that this is your voluntary statement. You realize that we have statements on tape that have implicated you in having had some involvement. |
| Taylor: | Yeah. |
| Searcey: | Now you understand that? Are you telling the County Attorney and myself the truth at this point? |

122

| | |
|---|---|
| Taylor: | To the best of my recollection. You got to realize I've been back there in that cell for 165 days I have racked my brain my nerves are shot. |
| Searcey: | Okay JoAnn let me say this to you. After the incident happened, do you recall having talked to Lisa Podendorf, isn't that correct, you told me that already. Is that not correct? |
| Taylor: | Yes. |
| Searcey: | Okay when I asked you if you made any specific comments to her, you give me some answers. Is that correct? |
| Taylor: | No verbal comment. |
| Searcey: | And did you not admit to me in North Carolina that you may have been involved in possibly killing an older woman? |
| Taylor: | Yeah it's possible. |
| Searcey: | Did you admit that to me? |
| Taylor: | No verbal comment. |
| Searcey: | JoAnn |
| Taylor: | What's my presence doing there then? |
| Searcey: | And didn't you also tell a witness whom I took a statement from that you and Joseph White basically were the ones responsible for Helen Wilson's death? |
| Taylor: | I possibly could have. |
| Searcey: | It's either yes or no JoAnn did you or did you not. |
| Taylor: | I'm not sure |
| Searcey: | Remember JoAnn this is the truth okay. This is the truth. |
| Taylor: | I know ya all are gonna screw it around. |
| Searcey: | No one's gonna screw it around. What we are asking you to do is to be . . . |
| Taylor: | I know just tell them they'll screw it around. |
| Searcey: | Is to be, we are asking you to be truthful and tell us everything you know. Remember this is your plea agreement. |
| Taylor: | I . . . . . |
| Searcey: | With the County Attorney okay? |
| Taylor: | And he's gonna turn it around and use it against me I'm no fool and I'm not his fucker either. |

. . .

123

Searcey:      JoAnn listen, this is your opportunity to tell your story. I'm not gonna set [sic] here and plea [sic] with you because quite frankly this is your opportunity. We have a case, you have attempted to make an agreement with your council [sic] with the County Attorney. Now do you want to talk about it now and tell us the truth and the whole truth or would you like to just discontinue this statement at this time? It's your choice, remember it's your choice.

(*Id.*, pp. 16-18.)

When Taylor did not respond, Smith said, "Before we go on, I presume the council's [sic] advised her that I have to make a recommendation to a certain number of years." (*Id.*, p. 18.) Taylor's counsel responded that "[w]e've advised her now she said that she wants to say something." (*Id.*) Taylor said that she was scared, she cried, and she said, "They'll get to [my daughter]. I know they will." (*Id.*) Taylor then agreed with Searcey that she did hold a pillow over Wilson's face. (*Id.*, pp. 18-19.) She continued to deny having any "physical activity" with Wilson, exclaimed, "I'm not gay," and threatened to give James Dean a "nice kicking" after Smith indicated that Dean was the person who accused her of having contact with Wilson. (*Id.*, p. 19.) Taylor began to cry, and another break was taken because she was "having a little problem with composure." (*Id.*, p. 20.) After the break, Taylor admitted that she discussed a plan to rob Wilson with the "other people involved," watched the lights go on and off in Wilson's building while the group was driving around, searched for money in Wilson's apartment, and told Lisa Podendorf on the following morning that she and White were responsible for Wilson's death. (*Id.*, pp. 20-22.)

On August 30, 1989, a woman called the GCSO and indicated that her husband, Ladd Wilhelm, might have information pertinent to the Wilson homicide investigation. DeWitt sent Lamkin to the Diagnostics and Evaluation Center within the Nebraska Department of Corrections to interview him. Afterwards, Lamkin indicated that the statements were too inconsistent to trust and stated he asked Wilhelm to submit to a polygraph examination. No further action was taken with

124

respect to Wilhelm. (DSF ¶ 115 (Ex. 4 [ECF 62-3], ¶ 28; Ex. 5 [ECF 63-1], ¶ 20; Ex. 5G [ECF 63-2 at 39-41, Lamkin report dated August 30, 1989]).)

On August 31, 1989, Price sent a letter to Smith informing him of Price's availability for a deposition. Price noted that since he would be discussing Taylor, Shelden, and Dean, he felt it was imperative that counsel for these individuals be present at the deposition to protect their legal interests and to satisfy Price's ethical standards. (DSF ¶ 116 (Ex. 3 [ECF 62-1], ¶ 14; Ex. 3K [ECF 62-2 at 46]).)

On September 1, 1989, Taylor was again seen by Dr. Logan, who reported that Taylor now admitted placing a pillow over Helen Wilson's face during the sexual assault, but that she denied suffocating her.  The report states:

> The patient was briefly interviewed about these events a second time on Friday, September 1, 1989, shortly before a court hearing in which she entered a guilty plea to second degree murder. The patient stated that Lobo knew Mrs. Wilson previously. Lobo talked of leaving town. The patient was unsure whether the robbery was planned or just happened. Tom and Lobo began to talk of getting money. At the time the three of them were riding in a car in [sic] route to Kathy Bartek's house. When the patient indicated she only wanted to go home and calm down, she was threatened by Lobo. The patient was next threatened by Thomas Whitlow [sic] who said he knew specifically where her daughter was. He continued that if he was not able to get her he knew someone who could. . . .
>
> There was further discussion of the robbery at Kathy Bartek's house in the bathroom. The first conversation was between Lobo, Tom and the patient. The patient indicated that she wanted to go home again at that point. The second conversation took place between Lobo and Tom a short time later. Finally, Lobo talked to James Dean. . . .
>
> When the group arrived at the victim's apartment the patient knocked on the door. She stepped back as Mrs. Wilson answered the door and said hi to Deb, her great niece. The group then forced their way into the apartment. Lobo yelled at Mrs. Wilson and slapped her open handed. The patient stated she told Lobo to mellow out because no one would talk to him if he was yelling. Then Tom and Lobo began shoving

125

her around. The patient described the group wound up in the bedroom. The patient recalled she was by the victim[']s head while Lobo had the victim down on the floor and was struggling with her. At that point Debbie Shelden entered the room. Debbie Shelden then hit her head. The patient knew she was struck but could not see the blow. At that point Kathy Gonzales [sic] entered the apartment. The patient indicated that she had been at the apartment before to visit Kathy Gonzales [sic] but was use[d] to entering through the back way while on this occasion they had entered through the front of the building. When Kathy Gonzales [sic] entered the bedroom she was struck by either Lobo's elbow or Mrs. Wilson's foot in the face and began bleeding. The patient described that Tom and Lobo continued to fight with the victim. She believes they brought the victim into the living room at that point as they wanted to sexually assault her and there was not enough room in the bedroom. The patient stated she walked close to Lobo and Tom as they brought the victim into the bedroom. [sic] She stated to an observer it would appear she had her hand underneath her but stated she was not touching her. She stated Lobo grabbed the victim by the shoulders while Tom had the victim by the feet. The woman's arms were behind her.

Once the victim was in the living room either Tom or Lobo removed her under clothes. Tom then grabbed the victim by the legs while Lobo had his hand by the victim[']s throat. With the other hand Lobo undid his pants and proceeded to rape the victim. During this time the patient was close to the victim's head. She recalled when she was raped as a child she continued to see her father's face which haunted her. Therefore she took a small pillow placing it over the face of the victim so she would not see Lobo's face while he was raping her. However, the patient stated she did not apply pressure to the pillow and stated the victim[']s death was an accident. The patient admitted that she had lied about this previously because she was scared. She was telling a different story today because she had decided to "let it all out." . . .She recalled Lobo telling the woman she deserved what she got. . . . At that point Lobo exchanged places with Tom who proceeded to place his face over the woman's vagina. The patient described that it looked like Tom was "eating her out." The patient recalled that during this activity the victim was still struggling. The patient stated the pillow over her face muffled any sounds.

126

> At this point the group began to search the house for money. The patient went into the bedroom where she "possibly found twenty to thirty dollars" between the mattresses. She recalled that James Dean was telling the group different places to look. At that point the patient became "edgy" and wanted to leave. . . .  As she left the apartment she heard Kathy Gonzales [sic] stating that she would meet them later. After the incident the group let Debbie Shelden off at her apartment and proceeded to Marshall's truck stop where they ate breakfast.

(Taylor's Ex. 106 [ECF 118-2] at 16-17.)

Based on his interviews with Taylor and his review of mental health records and police investigative materials, Dr. Logan concluded that Taylor was competent to stand trial and that she was sane at the time of the offense.  In his written report, which was signed on September 14, 1989, Dr. Logan stated:

> The patient is aware that she is being charged with first degree murder for which she could receive the death penalty. The patient could not explain the difference between first degree murder and manslaughter. However, the patient is aware of the various pleas open to her including the plea of not guilty by reason of insanity. . . .
>
> Initially the patient refused an offer to plead guilty to second degree murder. She gave as her reason that she knew the lady was not dead when she left the apartment. The patient was aware of testimony given by other witnesses in the case and had read their statements. She could recall what various individuals had said including that several witnesses maintained she talked to them about the killing of the victim following the event. The patient initially stated she could not recall covering the victim's face but later recanted this statement. The patient at that time stated she refused the plea because she would loose [sic] the right to an appeal. A third reason given by the patient was her fear of testifying. While the patient believes she would be able to testify she has a continuing fear that her daughter might be harmed if she testified against Tom Winslow or Joe White. The patient was aware that this was part of the plea agreement. Fourth, the patient did not believe she could stand to receive a long sentence as she was not use[d] to being indoors. The patient feared if she went to prison she might become suicidal.

127

Finally, the patient stated her fiance, a psychic, dreamed she was going home with him. . . .

At the time of the second interview the patient had changed her mind. After discussing things with her attorney and fiance she stated the three of them felt better if she entered a plea versus facing death row. . . .

The patient also changed her mind as for the first time the prosecutor made a definite sentencing recommendation of 15 years. . . . The patient stated that she and her attorney had not entered a plea earlier because the prosecutor had not offered to make a plea recommendation. However, the patient knew the judge was not bound by such a plea recommendation and could in fact give her a longer sentence. Finally, the patient stated that she had not earlier pled guilty to the charge because she and her attorney did not believe the evidence against her was strong enough. . . .

. . . She additionally stated she was not coerced in any manner into entering a plea. The patient denied suffering from any hallucinations, visions, or other minimal symptomatology which influenced her decision in this case. The patient further has no memory difficulties or decreased concentration which would prevent her from attending to the issues presented in court. The patient expressed no self-defeating motivation in entering her plea but rather a desire to preserve some future life with her fiance and son. The patient's decision did not seem to be influenced by any delusional thinking or abnormal mental state.

(*Id.* at 23-24.)

On September 1, 1989, an amended information was filed against Joann Taylor, charging that she "cause[d] the death of Helen Wilson intentionally but without premeditation." (Ex. 1D [ECF 51-5 at 26].) At a plea hearing conducted that same date, "William Logan, M.D., of the Menninger Clinic, Topeka, Kansas, testified regarding Ada Joann Taylor's competency to proceed with hearing" and the court made a finding that Taylor was competent. (*Id.* at 44.) After advisements from the court, Taylor entered a plea of guilty to the amended information. (*Id.* at 45.) "William Logan, M.D., was again called to testify regarding the defendant's competency to enter a plea and her sanity at the time of the offense." (*Id.*) The court then found that "the defendant is competent to enter a plea and was sane at the time

of the offense. The court thereupon asked defendant if she had been persuaded or influenced to enter her plea of guilty by reason of any threats made against her or any promises made to her on the part of any person or persons whomsoever, and defendant responded in the negative." (*Id.* at 45-46.) The plea bargain was discussed and "[t]he court thereupon asked defendant if she understood that any plea bargain was not in any way binding upon the court and the defendant responded in the affirmative." (*Id.* at 46.) "The County Attorney then outlined facts he expected to prove in the event [the] cause went to trial and defendant [was] given opportunity to respond thereto. Thereupon defendant's plea of guilty to the charge contained in the amended information . . . [was] taken, received, and entered by the court[.]" (*Id.*) Judge Rist found that Taylor "voluntarily, knowingly and intelligently entered her plea of guilty to the charge contained in the amended Information." (*Id.*)

Taylor has since testified that she knew at the time she entered into the plea agreement that she was not involved in Helen Wilson's murder. (Taylor's Ex. 140 [ECF 119-23, Deposition of Joann Taylor, 11/3/10] at 10.) Taylor was then asked why she was willing to sign the plea agreement and plead guilty to a crime she did not commit, to which she replied, "Because I had been threatened with death row." (*Id.*) She said that "[t]he officers, as well as my lawyer, reminded me on a very regular basis that I would be sent to death row . . . [i]f I did not cooperate with them in all areas." (*Id.*) She thought that going to trial would be the same as being sent to death row "[b]ecause I felt with everything that the law enforcement had told me, as well as my lawyer, that there was no hope for me." (*Id.*)

On September 12, 1989, after Dean was *Mirandized*, his statement was taken by DeWitt in the presence of his attorney, Richard Schmeling, and County Attorney Smith. Dean added that before the homicide, he had talked about robbing Wilson with White, Winslow, Taylor, Darren Munstermann, and Cliff Shelden and that White and Winslow had talked about having sex with an old lady. He stated that he had not mentioned these facts before because he did not think it was important since Munstermann and Cliff Shelden were not there. He stated that Gonzalez knew what

was going to happen and that she may have been at the apartment when they arrived. (DSF ¶ 117 (Ex. 4 [ECF 62-3], ¶29; Ex. 4I [ECF 62-4 at 18, DeWitt report dated September 13, 1989]); Dean's Ex. 20 [ECF 109-4, Gage County Sheriff's Office Supplementary Report dated September 13, 1989, regarding statement of James Dean of September 12, 1989].)

On September 13, 1989, DeWitt took Cliff Shelden's statement in the presence of Smith. Cliff Shelden reported that he was at a party at Dean's apartment that he shared with Kathy Bartek a week or less before the Wilson homicide. At the party, Taylor talked to several people in the bathroom about robbing someone. He did not know Gonzalez. When Cliff Shelden was at the Nebraska Department of Corrections Diagnostics and Evaluation Center, he spoke to Winslow. Winslow stated that the robbery was planned because Taylor and White needed money to leave town. Winslow told Cliff Shelden that they had robbed an old lady and that at the "planning party" Taylor had asked him to speak to her alone, but he refused. (DSF ¶ 118 (Ex. 4 [ECF 62-3], ¶ 30; Ex. 4J [ECF 62-4 at 19-20, DeWitt report dated September 13, 1989]); Taylor's Ex. 137 [ECF 119-20, GCS report, 9/13/89, DeWitt interview with C. Shelden].)

On September 23, 1989, DeWitt took a statement from Darren Munstermann in the presence of Smith. Munstermann confirmed many details provided by other witnesses. Those details included that he and some of the others would discuss robbing people, but he could not confirm any victim names. He stated that Dean and Taylor's version of the homicide was plausible. (DSF ¶ 119 (Ex. 4 [ECF 62-3], ¶ 31; Ex. 4K [ECF 62-4 at 21, DeWitt report dated October 2, 1989]).) According to DeWitt's report, "Darren stated that they had talked about several and many things and that most generally they would talk about robbery. No names were mentioned that he can remember. . . . Munstermann states it could have happened the way James Dean and JoAnne [sic] Taylor said, however he doesn't remember. Darren had stated that he didn't remember anything for sure . . . ." (Ex. 4K [ECF 62-4 at 21].) DeWitt also reported that "James Dean and Darren Munstermann confronted each other in my

office around eight o'clock in the evening of the 23rd of September, talking in reference of the Helen Wilson homicide" and "[a]t approximately 8:12 in the evening on September 23, 1989 JoAnne [sic] Taylor and Darren Munstermann confronted each other in my office with Richard Smith and myself talking about several things about the Helen Wilson homicide." (*Id.*)

On September 28, 1989, a deposition of Taylor was taken at the Gage County Jail. Present were Lyle Koenig (counsel for Taylor), Toney Redman (counsel for White), John Stevens Berry (counsel for Winslow), and Smith. (DSF ¶ 120 (Ex. 4 [ECF 62-3], ¶ 32).)  During the deposition Mr. Redman asked Taylor, "What else have they told you that helped you remember the case?" (Taylor's Ex. 115 [ECF 118-11, Deposition of Joann Taylor, 9/28/89] at 5.)  Taylor's response, and the follow-up questions and answers, were as follows:

> A.   Just that, you know, then that -- well, with her being suffocated and the things that we have discussed just mainly helped me remember.
> Q.   They also told you that Mark Goodson wasn't there?
> A.   Right.
> Q.   You originally said he was there, didn't you?
> A.   Yeah, I thought he was the one that was with Lobo because they always hung together.
> Q.   So that helped clear things up, didn't it?
> A.   Yeah.
> Q.   They also told you that Beth Johnson wasn't there, didn't they?
> A.   Em-hem.
> Q.   And you originally said she was there?
> A.   Em-hem.
> Q.   And so that helped clear things up?
> A.   Yeah.
> Q.   What else did they tell you that helped you clear things up?
> A.   Not much. Well, I didn't really figure out who the other person was until after we got back up here, and they showed me some photographs.
> Q.   Who did they show you photographs of?

> A.   Mark Goodson was one of the guys, and there was four others, and there was Tom Winslow. I could remember the build, but I could not remember the face, and after I saw the photographs was what helped me remember it was him.
>
> Q.   Did you remember it was Tom Winslow until you saw the photograph?
>
> A.   I recognized the build, but I could not place the name to it.
>
> Q.   What kind of photograph did they show you?  Was it of his face, his entire body, what?
>
> A.   It's one of the lineup pictures, you know, from when they harass you and got you standing against that wall.

(*Id.* at 5-6.)

On September 28, 1989, Price had his deposition taken by Toney Redman (counsel for White) and Smith. John Stevens Berry (counsel for Winslow) was also present. Price explained in the deposition that he did not use either relaxation or hypnosis with any of the criminal defendants and that he did nothing to suggest a version of the homicide for any of the criminal defendants to accept as their own.[82] Through his training and experience, Price is aware that extreme trauma and violence, such as that in the Wilson homicide, cause some persons not able to cope with it to repress and block out memories. (DSF ¶ 121 (Ex. 3 [ECF 62-1], ¶15; Ex. 3L [ECF 62-2 at 47-68]).)  Price noted that he performed psychological services for Joann Taylor in the past, that "she had been a severe borderline personality disorder,"[83] that he

---

[82] On February 7, 1985, at the request of the Beatrice Police Department, Price performed a hypnosis interview with a suspect, Levi Dodge. The interview produced no evidence or statements relevant to this matter. Since February 7, 1985, Price has not and does not use hypnosis or relaxation techniques as a tool when interviewing a suspect or witness in a criminal matter and did not in this case. (DSF ¶ 18 (Ex. 3 [ECF 62-1], ¶ 5).)

[83] According to Price, "[a] borderline personality disorder is someone who has difficulty getting close to people, difficulty trusting, has lots of shifts in moods, can be very happy, very sad.  They can become very angry very quickly.  If someone gets

thought Taylor had improved, and that he was frustrated and angry "as a therapist" to see his work go "down the tube." (Ex. 3L [ECF 62-2 at 52-53], pp. 22-23.) He also said that before he interviewed Taylor, he "was in hopes . . . that she had not lost reality." (*Id.*, pp. 30-31.) Price said that he, or someone else in his clinic, had also worked with Deb Shelden, Tom Winslow, and James Dean prior to the Wilson homicide. (*Id.*, pp. 50-51.) He said he believed Deb Shelden was "intellectually slower" than Joann Taylor and was "very desirous of being cooperative" with the investigators. (*Id.*, pp. 61-62.)

On October 3 or 4, 1989, DeWitt took a supplemental statement of Cliff Shelden in the presence of Smith. Cliff Shelden stated that he remembered Winslow telling him that Gonzalez was supposed to be a lookout for the Wilson homicide and give a signal if necessary. (DSF ¶ 122 (Ex. 4 [ECF 62-3], ¶ 33; Ex. 4L [ECF 62-4 at 22, DeWitt report dated October 24, 1989]); Taylor's Ex. 138 [ECF 119-21, GCS report, 10/24/89, DeWitt interview with C. Shelden].)

On October 5, 1989, Gonzalez entered into a plea agreement which provided, among other things, that "[t]he State has agreed to file an amended Information charging aiding and abetting for the Second Degree Murder of Helen L. Wilson. Defendant will plead nolo contendere to said amended Information. . . . The defendant agrees to testify truthfully to the best of her recollection in any and all cases and give total cooperation to the State of Nebraska regarding the homicide of

---

very close to them, they can become very angry. If someone withdraws from them, they can become very angry. They are an unstable person who is often overly reactive to situations and especially the interpersonal relationships. Many will have histories of being neglected or abused children, sexually abused victims. They will fluctuate between child-like behavior and adult behavior, appropriate and inappropriate behavior." (Ex. 3L [ECF 62-2 at 56-57], pp. 38-39.) He added that borderline personality disorder "can result in psychotic breaks at times," and he was aware that another mental health professional reported that Taylor experienced hallucinations. (*Id.*, pp. 54-55.)

Helen L. Wilson. . . .  The State will recommend the minimum sentence of 10 years for the defendant if she complies with all of the above." (Taylor's Ex. 53 [ECF 115-9, Gonzalez plea agreement, 10/5/89].)  The amended information was filed on October 5, 1989, and a plea of nolo contendere was tendered on behalf of Gonzalez.  (Ex. 1S [ECF 58-2 at 43-50].)  Gonzalez "was interrogated as to her understanding of the nature and significance of the charge made against her and was asked whether or not the plea had been tendered by reason of any threats made against the defendant or any promises made to the defendant.  Defendant answered in the negative and advised the court that the plea was tendered voluntarily." (*Id.* at 49.)  "The County Attorney then outlined facts he expected to prove in the event cause went to trial and defendant [was] given opportunity to respond thereto." (*Id.* at 50.)  Judge Rist accepted the plea and found that Gonzalez "voluntarily, knowingly and intelligently entered her plea of Nolo Contendere to the charge contained in the second amended Information." (*Id.*)

On October 6, 1989, pursuant to an agreement between the County Attorney's Office and White's attorneys, Paul Jacobson administered a polygraph examination to Joseph White. That same date he issued a polygraph report indicating deception. (DSF ¶ 123 (Ex. 1 [ECF 51-1], ¶ 33; Ex 1U [ECF 58-3 at 8-15, Polygraph examination for White dated October 6, 1989]).)

On November 9, 1989, Joseph White was found guilty of first-degree murder. (Ex. 1E [ECF 54-2 at 56-57].)

On December 8, 1989, Tom Winslow withdrew his previous plea of not guilty and pleaded no contest to an amended information charging that he did "aid, abet, procure or cause another to cause the death of Helen Wilson intentionally, but without premeditation." (Ex. 1F [ECF 56-1 at 56-62].)  After waiving the right to advance notice of the amended information and a preliminary hearing, Winslow was arraigned and his plea was accepted:

The court advised defendant of his rights, choice of pleas and penalties. More specifically, the amended Information was read to defendant and he was informed of the nature of the charges against him and the possible penalty in event of conviction; the right to assistance of counsel, and the right to a court appointed attorney if defendant was found to be indigent; the right to confront and cross-examine witnesses and to have the court subpoena witnesses on defendant's behalf; the right to a speedy and a public trial by jury, and the presumption of innocence and the privilege against self-incrimination. The court further advised that the State would have to prove the defendant was guilty of each and every material element of the amended Information filed in this cause beyond a reasonable doubt. The court then explained the choices of pleas available to defendant and asked defendant how he plead [sic] to the charge contained in the amended Information. A plea of No Contest was tendered on behalf of the defendant. Thereupon the defendant was interrogated as to his understanding of the nature and significance of the charge made against his [sic] and was asked whether or not the plea had been tendered by reason of any threats made against the defendant or any promises made to the defendant. Defendant answered in the negative and advised the court that the plea was tendered voluntarily.

The court thereupon inquired of the County Attorney and counsel for the defendant whether there had been any plea bargain; whereupon counsel for the parties answered in the affirmative and advised the Court of the nature thereof. The court thereupon asked defendant if he understood that any plea bargain was not in any way binding upon the court and the defendant responded in the affirmative. The County Attorney then outlined facts he expected to prove in the event cause went to trial and defendant given opportunity to respond thereto. Thereupon defendant's plea of No Contest to the charge contained in the amended Information is hereby taken, received and entered by the court, and the court finds that he has voluntarily, knowingly and intentionally waived his constitutional rights as previously explained by the court. It is further found by the court that the defendant has voluntarily, knowingly and intelligently entered his plea of No Contest to the charge contained in the amended Information.

(*Id.* at 60-62.)

On February 16, 1990, White was sentenced to life imprisonment. (Ex. 1E [ECF 54-3 at 9-22].) Judge Rist determined that the death penalty was not appropriate because, among other reasons, Taylor "in all probability was the party who directly caused the suffocation" and "the death appears to have occurred at some point" while Winslow was sexually assaulting the victim. (*Id.* at 21.)

The statements from witnesses and suspects were contradictory, incomplete and sometimes deceitful. Since the passage of time was great from the time of the murder to the revitalized investigation by the GCSO, it was not surprising to the defendants that the suspects would have memory issues or that their versions would not be completely consistent. Once White, Winslow, Taylor, Gonzales, and Dean were placed under arrest, the decision whether to prosecute them was a matter left to the judgment of the County Attorney. The remaining individual defendants are certain that if there were not probable cause to arrest the plaintiffs in these matters, the Gage County Attorney would have never filed criminal charges against them and a judge would not have ordered them to be held in custody. Based upon DeWitt's, Searcey's, Price's, and Lamkin's training and experience as law enforcement officers, they are aware that suspects will change their stories or remember more as the investigation progresses. Further, they were aware that Dean, White, and Gonzalez had failed polygraph tests, while Debra Shelden had passed. Based upon the failed polygraphs, the statements from the witnesses and criminal defendants, the descriptions by Debra Shelden and James Dean of the scene of the crime, the fact that arrest warrants were issued by the court for all six of the criminal defendants, they all believed there was sufficient probable cause to arrest them. Following the plaintiffs' arrests, the GCSO continued the investigation. They focused on locating persons with knowledge of the Wilson homicide and finding the truth. They continued to follow up leads, interview witnesses, and gather forensic evidence. (DSF ¶¶ 124, 125, 126 (Ex. 2 [ECF 59-1]; Ex. 3 [ECF 62-1]; Ex. 4 [ECF 62-3]; Ex. 5 [ECF 63-1]).)[84]

---

[84] Exhibits 2, 3, 4, and 5 are the affidavits of Searcey, Price, DeWitt, and Lamkin.

At all times from the initial report to the County Attorney's Office in its coroner capacity of the death of Helen Wilson, through and including all investigative activities by all law enforcement agencies, Smith would from time to time determine whether or not sufficient evidence had been gathered to support the filing of a criminal complaint against any individual. It was not until the investigative activities of law enforcement officers had uncovered sufficient evidence to justify filing a complaint by the County Attorney's Office that the Gage County Attorney's Office determined to file charges. (DSF ¶ 127 (Ex. 1 [ECF 51-1].)[85]

The record establishes that Paul Jacobson, the person who administered all of the polygraphs, was independent of the defendants and law enforcement more generally. Jacobson, whose office was in Lincoln, Nebraska, was a licensed private investigator and a licensed examiner. (*E.g.*, Ex. 1R [ECF 58-1] at 17.)

Ultimately, five of the six criminal defendants entered into plea agreements and pleaded to various criminal charges before the Honorable Judge William B. Rist. White was tried to a jury in Jefferson County. (DSF ¶ 127 (Ex. 1 [ECF 51-1].) Shelden, Taylor, Dean, and Gonzalez testified against White in that trial. (*Id.*; Ex. 1E [ECF 55-2] at 4-14.)[86] On the evidence presented, the jury found White guilty beyond a reasonable doubt of the crime of felony murder. (DSF ¶ 127 (Ex. 1 [ECF 51-1]).)

On January 26, 1990, Deb Shelden, Kathy Gonzalez, and James Dean each received 10-year sentences. (Ex. 1L [ECF 57-2 at 42-44]; Ex. 1S [ECF 58-2 at 69-71]; Ex. 1M [ECF 57-4 at 7-9].) Shelden and Gonzalez do not appear to have filed appeals. Dean did appeal his conviction and sentence, both of which were affirmed by the Nebraska Supreme Court in a decision issued on January 19, 1991. (Ex. 1M [ECF 57-4 at 25-46].) On January 29, 1990, Tom Winslow was sentenced to a term

---

[85] Exhibit 1 is Smith's affidavit.

[86] Winslow refused to testify. (Taylor's Ex. 104 [ECF 117-14] at 50.)

of 50 years' imprisonment.  (Ex. 1F [ECF 56-1 at 72-74].)  It appears that Winslow's conviction and sentence were affirmed without opinion by the Nebraska Supreme Court on January 14, 1991.  (Ex. 1F [ECF 56-2 at 7-8].)  On January 30, 1990, Joann Taylor was sentenced to a term of 40 years' imprisonment.  (Ex. 1D [ECF 51-5 at 60-62].)  Taylor does not appear to have filed an appeal.

### III.  Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  *See Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial.  *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)) (internal marks omitted).

### A. Qualified Immunity

"Qualified immunity is '*an immunity from suit* rather than a mere defense to liability' and 'is effectively lost if a case is erroneously permitted to go to trial.'"

138

*Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original).  "The inquiry is one of law, not fact, and is to be decided at the earliest possible stage of the litigation."  *Id.* (citing *Bridgewater v. Caples*, 23 F.3d 1447, 1449 (8th Cir. 1994)).

"Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenny v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A right is clearly established when 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Mathers*, 636 F.3d at 399 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"In determining whether the legal right at issue is clearly established, this circuit applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles." *Coates v. Powell*, 639 F.3d 471, 476 (8th Cir. 2011) (quoting *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989)). "This is a 'fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006)).

Taylor, Gonzalez, and Winslow claim that the defendants violated their "rights to due process of law as secured by the Fifth and Fourteenth Amendments. Specifically, Winslow's and Gonzalez's no contest pleas to aiding and abetting second-degree murder, and Taylor's guilty plea to second-degree murder, were involuntary and the product of the unlawful coercive conduct of the named Gage County employees and officials." (Filing 103 at 72.)  Although Dean does not argue the point, he has generally alleged in his complaint that "Defendants' actions deprived Plaintiff of his liberty without due process of law in violation of the Fifth

and Fourteenth Amendments to the Federal Constitution."  (Filing 1, ¶ 11.)  It has long been established that a conviction resulting from a coerced plea is inconsistent with due process.  *See Bayless v. United States, 150 F.2d 236, 238 (8th Cir. 1945); Waley v. Johnston, 316 U.S. 101, 104 (1942) (per curiam).*

## *1.  Overview*

Before proceeding to discuss the individual claims of these plaintiffs, an overview of the facts is helpful.  While hindsight might suggest that the case developed by the defendants had holes, viewed in the light most favorable to the plaintiffs, a reasonable law enforcement officer or prosecutor in 1989 could have been convinced that the "Beatrice Six" were guilty and that the pleas of these plaintiffs were voluntary and not coerced.  While not intended as an exhaustive listing, the following is illustrative:

* Like the defendants, a senior BPD officer (Lt. Fitzgerald) believed that the crime involved multiple perpetrators. The wrongful exclusion of Bruce Smith in 1985 had nothing to do with these defendants – that mistake involved the BPD, the NSP, an Oklahoma investigator, and an Oklahoma laboratory technician.  At the time, these defendants could not be faulted for focusing on the "Beatrice Six."

* Winslow lied, and admitted that he had lied, about his whereabouts on the night of the murder.

* Taylor and White left town shortly after the murder.

* Law enforcement officers had three witnesses (Podendorf, Bishop, and Goodson) who said that Taylor admitted, shortly after the killing, that she or she and White committed the crime.

\*    Before these defendants had any substantial contact with Taylor, she made admissions to North Carolina law enforcement officers, pursuant to a *Miranda* waiver, that she was present when White and another male committed the rape and murder.

\*    A witness (Podendorf) told law enforcement officers she knew that in the past White had torn currency in half as a part of a joke or trick. A BPD officer told one of the defendants that a partially torn five-dollar bill was found at the scene of the crime.

\*    A witness (Podendorf) placed a car that looked like Winslow's car at the victim's apartment on the night of the murder and she reported that White, Taylor, Winslow, and a fourth person exited the vehicle near the victim's apartment. Winslow admitted that he had loaned his car to White.

\*    A witness (Cliff Shelden) told police that Winslow admitted that he participated in the sexual assault of the victim together with White and Taylor. That same witness later told authorities that Winslow had also admitted that Gonzalez was supposed to be a lookout for the Wilson killing and was to give a signal if necessary. Gonzalez lived in the same apartment as Wilson, the victim.

\*    Winslow's highly experienced lawyer told law enforcement officers that in exchange for use immunity Winslow would implicate others, and the lawyer successfully negotiated a use immunity deal in exchange for a truthful statement of the facts. Winslow gave the interview and stated that he, White, Taylor, and a fourth person went to the victim's residence, and White and Taylor assaulted the victim. After Winslow gave the statement in the presence of his counsel, Winslow summoned the authorities, executed a *Miranda* waiver, recanted, and said he had

lied. He thus voluntarily exposed himself to the admissions he had made during the immunity interview. He waited until White was found guilty beyond a reasonable doubt by a jury to enter his plea.

* Dean had been implicated by Deb Shelden, who was related to the victim and who was an admitted participant in the crime. She gave specific information about Dean, including that she rode in the backseat of the car with him as the group left from Kathy Bartek's residence and proceeded to Wilson's apartment. Kathy Bartek told police that Dean, Bartek's boyfriend, had in fact met with White, Taylor, and Wilson on the night of the murder, although she claimed that Dean did not drive off in Winslow's car but left with her to go to Lincoln, Nebraska. Dean's lawyer requested that a polygraph be administered to Dean and the lawyer had an agreement with the prosecutor that if Dean failed a polygraph regarding Deb Shelden's accusations, they would discuss a plea agreement. Dean failed the polygraph. After Dean failed the polygraph, it was Dean's lawyer who sought the assistance of Price, the police psychologist, to consult with Dean in the absence of counsel. Thereafter, Dean gave several *Mirandized* statements in the presence of his lawyer where he implicated himself and others.

* Deb Shelden said that Gonzalez's nose was bleeding "a lot, quite a bit" when she came out of the bedroom of Wilson's apartment. A highly trained serologist (Dr. Reena Roy) testified that she could not exclude Gonzalez as being the contributor of blood found at the crime scene.

* Upon her arrest, Gonzalez stated that she had "been worried about this for 4 years."

* White, Gonzalez, and Dean failed polygraph examinations after asserting their innocence. All the polygraph examinations were

142

conducted by a licensed polygrapher who was completely independent. On the other hand, Shelden implicated herself and all the others while passing a polygraph examination conducted by the same independent examiner. Regarding Shelden, the polygrapher told the prosecutor that "[f]rom the very start she appeared to be truthful and at no time, did I see anything in her demeanor to indicate that she wanted to do anything other than tell the truth as nearly as she could recall." Regarding Shelden's mental capacity, he also said: "Although Debbie may have been somewhat neglected in her early childhood as to schooling etc., I found her to be basically intelligent. She may not do too well on an I.Q. test primarily because of deprivation as to cultural background, but she reads a lot better than some college grads I have had and was a fine responder on the galvo stimulus test, which is a good indication of how alert the person is. It seemed to me that she was mentally fit for a valid examination."

\*    The plaintiffs were represented by competent and zealous lawyers. The pleas[87] were accepted by an unbiased judge who complied with the constitutional requirements. Additionally, Taylor and Dean had the assistance of doctoral-level mental health experts who were independent of the defendants.

---

[87] As an aside, the common sense notion that innocent people are significantly less likely to accept plea bargains than their guilty counterparts may be borne out as an empirical matter when the data is examined by disinterested scholars. *See* Oren Gazal-Ayal & Avishalom Tor, *The Innocence Effect in Plea Bargaining* (last revised July 19, 2011) (first draft) (after analyzing various data, stating that "innocents are significantly less likely to accept plea offers than their guilty counterparts, even when these offers appear objectively attractive in light of the evidence against them and the expected sanction at trial"), available at the Social Science Research Network: http://ssrn.com/abstract=1878498. Whether that is true or not is, obviously, not a matter for me to resolve.

### *2. Joann Taylor*

Taylor summarizes her argument by stating that she "was an uneducated, mentally unstable, former drug user, with a well-known reputation for lying. The evidence that supported her arrest were obvious, false statements, and the statements were from questionable sources.  There was never any physical evidence linking her to the Wilson murder.  In the interrogations following her arrest, she never, at any time demonstrated any knowledge whatsoever of any non-public fact (or even public facts) about the Wilson homicide, absent clear and obvious contamination by her interrogators, Searcey and Smith. Searcey, DeWitt and Smith continually threatened her with the death penalty if she refused to cooperate, and promised a possible sentence of only 7 years if she told them what they wanted to hear.  Her own attorney told her that a conviction was assured if she went to trial."  (Filing 103 at 84.)

I have previously held that the statute of limitations bars Taylor's Fourth Amendment claim for unlawful arrest.  *See* Memorandum and Order entered on November 25, 2009 (filing 42 in Case No. 4:09CV3148), at 17. Because the claim does not require a showing that her subsequent conviction was invalid, Taylor was not precluded from bringing the claim under the rule announced by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477, 467-68 (1994) (holding that in order to recover damages for allegedly unconstitutional conviction or imprisonment, plaintiff must prove that conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by authorized state tribunal, or called into question by federal court's issuance of writ of habeas corpus).  *See Moore v. Sims*, 200 F.3d 1170, 1171-72 (8th Cir. 2000) (per curiam) (inmate's claim that he was unlawfully seized was not barred by *Heck* rule since proof that inmate's initial seizure and detention by officers was without probable cause would not necessarily imply the invalidity of his drug-possession conviction).  Taylor argues that "[b]ut for [her] arrest, there would have been no opportunity for Searcey, DeWitt, Lamkin, Price and Smith to coerce false admissions, a false confession or an involuntary plea."  (Filing 103 at 74).  However, even if an "initial Fourth Amendment violation set the wheels

in motion for [her] subsequent conviction and detention," the claim is time-barred. *Wallace v. Kato*, 549 U.S. 384 (2007). Taylor's allegations that she was arrested without probable cause are not relevant to her due process claim, nor to the claims of the other plaintiffs.

I also have previously ruled that the statute of limitations bars Taylor's claim under the Fifth and Fourteenth Amendments that her false confessions were coerced by the defendants. *See* Memorandum and Order entered on November 25, 2009 (filing 42 in Case No. 4:09CV3148), at 18. This is because the Eighth Circuit has held that a § 1983 action challenging the voluntariness of a confession is not *Heck*-barred. *See Simmons v. O'Brien*, 77 F.3d 1093, 1095 (8th Cir. 1996) (explaining that "judgment in favor of Simmons on this § 1983 action challenging his confession will not *necessarily* demonstrate the invalidity of his conviction") (emphasis in original). The other plaintiffs are not precluded from claiming that Taylor's false statements implicating them in the crime were the result of unlawful coercion, but she can no longer sue the defendants regarding her self-incriminating statements.

Taylor's guilty plea was also a false confession, of course, but she could not claim the plea was involuntary without challenging her conviction. *See Boykin v. Alabama*, 395 U.S. 238, 242 (1969) ("A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment."). Under *Heck*, this claim could not have been maintained prior to Taylor receiving her pardon. *See, e.g., Bills v. Adair*, No. 08-12207, 2009 WL 440642, at *10 (E.D.Mich. Feb. 23, 2009) (inmate could not bring § 1983 action claiming that defendants forced him to plead no contest to charges for which he was convicted); *Smith v. Hayden*, No. 5:05-cv-00884, 2009 WL 1299033, at *6-7 (S.D.W.Va. Feb. 3, 2009) (inmate's *Bivens* claim that he was "railroaded" into involuntary plea not cognizable pursuant to *Heck*), *report and recommendation adopted*, 2009 WL 1287033 (S.D.W.Va. May 8, 2009).

145

To the extent Taylor argues that her plea was involuntary because she and her attorney concluded her allegedly coerced confession assured a conviction if she went to trial, her claim is specious.  In *McMann v. Richardson*, 397 U.S. 759 (1970), the Supreme Court considered similar arguments made by three habeas petitioners.  One petitioner claimed to have confessed to robbery after being beaten, refused counsel, and threatened, and he entered a plea of guilty to a reduced charge after his attorney advised that he did not stand a chance because of his confession.  Another petitioner claimed to have been beaten into confessing to first-degree murder, and he followed his attorney's advice by pleading guilty to second-degree murder in order to avoid the electric chair.  A third petitioner claimed to have confessed to robbery after being threatened with a pistol and physically abused. He also pleaded guilty to a reduced charge on the advice of counsel.  Reversing the Court of Appeals for the Second Circuit, the Supreme Court ruled that the petitioners were not entitled to a hearing on their claims that the guilty pleas were involuntary.  The Supreme Court stated:

> A conviction after a plea of guilty normally rests on the defendant's own admission in open court that he committed the acts with which he is charged. *Brady v. United States*, 397 U.S. 742, at 748, 90 S.Ct. 1463, at 1468, 25 L.Ed.2d 747; *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1170-1171, 22 L.Ed.2d 418 (1969). That admission may not be compelled, and since the plea is also a waiver of trial – and unless the applicable law otherwise provides, a waiver of the right to contest the admissibility of any evidence the State might have offered against the defendant – it must be an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.' *Brady v. United States*, 397 U.S., at 748, 90 S.Ct., at 1469, 25 L.Ed.2d 747.

> For present purposes, we put aside those cases where the defendant has his own reasons for pleading guilty wholly aside from the strength of the case against him as well as those cases where the defendant, although he would have gone to trial had he thought the State could not prove its case, is motivated by evidence against him independent of the confession. In these cases, as the Court of Appeals recognized, the confession, even if coerced, is not a sufficient factor in

the plea to justify relief. Neither do we have before us the uncounseled defendant, *see Pennsylvania ex rel. Herman v. Claudy*, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956), nor the situation where the circumstances that coerced the confession have abiding impact and also taint the plea. *Cf. Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940). It is not disputed that in such cases a guilty plea is properly open to challenge.

The issue on which we differ with the Court of Appeals arises in those situations involving the counseled defendant who allegedly would put the State to its proof if there was a substantial enough chance of acquittal, who would do so except for a prior confession that might be offered against him, and who because of the confession decides to plead guilty to save himself the expense and agony of a trial and perhaps also to minimize the penalty that might be imposed. After conviction on such a plea, is a defendant entitled to a hearing, and to relief if his factual claims are accepted, when his petition for habeas corpus alleges that his confession was in fact coerced and that it motivated his plea? We think not if he alleges and proves no more than this.

Since we are dealing with a defendant who deems his confession crucial to the State's case against him and who would go to trial if he thought his chances of acquittal were good, his decision to plead guilty or not turns on whether he thinks the law will allow his confession to be used against him. . . .

. . . Nothing in this train of events suggests that the defendant's plea, as distinguished from his confession, is an involuntary act. His later petition for collateral relief asserting that a coerced confession induced his plea is at most a claim that the admissibility of his confession was mistakenly assessed and that since he was erroneously advised, either under the then applicable law or under the law later announced, his plea was an unintelligent and voidable act. The Constitution, however, does not render pleas of guilty so vulnerable.

*Id.* at 766-69 (footnotes omitted).

147

Taylor cannot avoid the bar of the statute of limitations merely by claiming that a coerced confession was followed by a plea of guilty. Rather, she must show that the defendants' allegedly coercive conduct had "an abiding impact and also taint[ed] *the plea*." *See id.* at 767 (emphasis added). I conclude as a matter of law that there is not sufficient evidence to support such a finding.

Taylor was arrested in North Carolina on March 15, 1989, and gave a statement to the local authorities in which she admitted being present when White and an unknown male raped and killed Wilson. Searcey and DeWitt flew to North Carolina the next day and took another statement in which Taylor, after waiving her *Miranda* rights, again admitted being present during the murder. On March 17, 1989, back in Nebraska, Taylor provided more details to Searcey after being *Mirandized* and she identified Winslow as the other male participant. At her request, Taylor was also interviewed by Price, who made clear that she was not his client and that he was working for the Gage County Sheriff's Office. Price and Taylor did not discuss the facts of the case, and there was no subsequent interview between them. In a proffer interview on August 30, 1989, Taylor repeated many of the same things that she had stated previously. She admitted talking to Lisa Podendorf the day after the murder and telling Podendorf that she and White were responsible for Wilson's death. On September 1, 1989, pursuant to a plea bargain, Taylor pleaded guilty to an amended information charging her with second-degree murder. The court, after receiving testimony from an examining psychiatrist, determined that Taylor was competent to enter a plea and was sane at the time of the offense. Taylor denied she had been induced, persuaded, or influenced to enter her plea of guilty by reason of any threats made against her or any promises made to her on the part of any person. Moreover, Taylor has admitted that she knew she was innocent when she entered her plea of guilty.

Taylor claims that she accepted the plea bargain because Smith, Price, DeWitt, and Searcey repeatedly told her that she was going to death row if she didn't "come clean." However, that argument misses the point because it is well-established that

"a plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty." *Brady v. United States*, 397 U.S. 742, 755 (1970). Also, "[a] threat to prosecute under state law where the facts warrant prosecution should not be considered as coercive or intimidating.  To constitute fear and coercion on a plea 'Petitioner must show he was subjected to threats or promises of illegitimate action'; and fear of a greater sentence may induce a valid plea of guilty." *Ford v. United States*, 418 F.2d 855, 859 (8th Cir. 1969) (quoting *Kent v. United States*, 272 F.2d 795, 799 (1st Cir. 1959)). "While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable – and permissible – attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Nguyen v. United States*, 114 F.3d 699, 704 (8th Cir. 1997) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (internal quotations and citation omitted)).  Taylor's plea bargain is not in evidence, but she claims the State recommended a sentence of 15 years while a 40-year sentence was actually imposed. At the plea hearing, however, Judge Rist advised Taylor that he was not bound by the plea agreement and Taylor affirmed that she understood this fact.  "Where a defendant is aware that his plea is not in exchange for a particular sentence but hopes that the court will follow the recommendation, he is not misled so as to undermine the voluntariness of the plea." *Lindner v. Wyrick*, 644 F.2d 724, 728 (8th Cir. 1981).

In summary, Taylor's evidence is not sufficient to show that her guilty plea was the result of unlawful coercion, intimidation, or inducements.  Her other claims are barred by the statute of limitations.

### 3.  James Dean

Dean claims that County Attorney Smith violated his constitutional rights by (1) "[taking] part in questioning Dean after he requested counsel, thus violating his Sixth Amendment right to representation," and (2) "coerc[ing] Dean when he took part in interrogating Dean and in setting up the polygraph that resulted in his

involuntary statements, thus constituting a violation of his Fifth and Fourteenth Amendment rights not to incriminate himself." (Filing 104 at 33.)  Leaving aside the question of whether Smith is entitled to absolute immunity in connection with these alleged "investigatory" activities, I find as a matter of law that Dean cannot prevail on either claim.

The first violation allegedly occurred on April 16, 1989, when Dean was questioned about the murder and denied any involvement.  He claims that "one of those present – Smith, Lamkin, or DeWitt[88] – specifically told Dean that he did not need a lawyer, and he needed to tell them what had happened[.]"  (*Id.* at 34.) It is claimed that "Dean repeatedly asked for a lawyer, maybe as many as five to six times," but that "police – with Smith present – continued to question Dean after his requests."  (*Id.*) However, there is no showing that the alleged interrogation produced any incriminating evidence. Dean has stated, in fact, that he "repeatedly" and "continually" told his interrogators that he knew nothing about the crime and took no part in it.  (Dean's Ex. 16 [ECF 109-1], ¶ 19; Taylor's Ex. 146 [ECF 121-5] ¶ 19.) Dean "has no cause of action under 42 U.S.C. § 1983 because he has not . . . show[n] that he was prejudiced by having been questioned without his counsel present." *Pasdon v. City of Peabody*, 417 F.3d 225, 228 (1st Cir. 2005).

In support of the second claim, Dean argues "[t]here is evidence that Smith, along with Price, Searcey, Lamkin, and DeWitt, engaged in an extensive campaign of thought reform to coerce Dean into admitting his involvement in Wilson's murder. Smith personally participated in at least two of Dean's interrogations and instigated a polygraph that helped to coerce Dean into giving involuntary confessions to a murder that evidence has proven he did not, in fact, commit. According to Dean, Smith substantially participated in actually questioning him on two occasions: April 16, 1989 (after Dean had asked for counsel but before counsel's appointment), and May 8, 1989."  (Filing 104 at 36-37.)  I have previously held that a four-year

---

[88] In Dean's affidavit, he also claims that Searcey was present.

statute of limitations precludes Dean from bringing this "coerced confession" claim against Smith and the other defendants.  *See* Memorandum and Order entered on November 25, 2009 (filing 32), at 7.

Dean next argues that "[o]n April 14, 1989, Searcey, acting in his capacity as a Gage County Deputy Sheriff, swore out an Affidavit for Dean's arrest warrant. . . . The information on which Searcey relied in the warrant did not tell the whole story, but instead contained unreliable information that he knew or should have known would create a false impression regarding the evidence." (Filing 104 at 42.)  Again, I have previously held this Fourth Amendment "false arrest" claim is barred by the applicable statute of limitations.  *See* Memorandum and Order entered on November 25, 2009 (filing 32), at 5-6.

Dean contends that Searcey and Lamkin violated his Sixth Amendment rights by allegedly speaking to him in jail without counsel being present and by allegedly taking him from the jail to view Helen Wilson's apartment without his counsel's knowledge.  Dean argues:

> Searcey and Lamkin would certainly have known that, after an accused invokes his right to have counsel present during questioning, officers simply may not interrogate him further. *Edwards v. Arizona,* 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885 (1981). An accused who has expressed his desire to deal with the police only through counsel is not subject to further interrogation by authorities until counsel has been made available to him, unless *the accused himself* initiates further communication, exchanges, or conversations with the police. *Id.* Where officers deliberately elicit an incriminating statement from a defendant in the absence of counsel, they have committed a Sixth Amendment violation. *See Fellers v. United States,* 540 U.S. 519, 523, 124 S.Ct. 1019 (2004), citing *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199 (1964).

> Searcey and Lamkin knew, or certainly should have known, that they were not to initiate conversations with Dean after he unequivocally

requested counsel when he was first arrested on April 15, 1989, and after April 19, 1989, when Schemling was appointed to represent Dean. Yet, Searcey and Lamkin initiated interrogations with Dean on numerous occasions. An interrogation includes both direct questions and actions that officers should know will likely elicit an incriminating response from an accused. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682 (1980). Dean has stated that, although Schmeling represented him, both Searcey and Lamkin spoke to him on numerous occasions while he was incarcerated in the Beatrice jail. Almost on a daily basis, law enforcement officers would initiate contact with Dean, either taking him out of his cell or coming into his cell. During these conversations, officers repeatedly advised Dean that, if he did not cooperate, he would be subject to the electric chair.

Most egregiously, Searcey and Lamkin actually took Dean out of his cell, drove him to the crime scene, and questioned him regarding the events. In addition to doing so, they lied to him about his attorney's knowledge of this. Dean has testified that, at some point after the polygraph on April 29, 1989, but before he confessed on May 8, 1989, Searcey and Lamkin took him out of Beatrice jail and drove him to Helen Wilson's apartment. The apartment door was then opened, and Dean was shown the apartment's interior. The deputies did not stop there, however. From Wilson's apartment, they continued to drive Dean to Marshall's Truck Stop, where Dean indicated the perpetrators had eaten after the crime. The deputies then manufactured evidence, telling Dean exactly what he had eaten for breakfast after Wilson's murder.

(Filing 104 at 48-50 (emphasis in original; internal references to record omitted).)

There is no evidence that the defendants elicited any incriminating statement from Dean when his attorney was not present.  The evidence shows that Dean confessed on May 8, 1989, pursuant to a plea bargain, and then provided another statement on May 17, 1989, immediately prior to entering a plea of guilty to second-degree murder.  On both occasions his attorney was present.  While there may be sufficient evidence to support Dean's claim that Searcey and Lamkin engaged in unauthorized interrogation activities by advising him that he needed to cooperate to

152

avoid the death penalty and by taking him to view the crime scene, the evidence does not show that Dean incriminated himself as a result of these actions or that he was coerced to enter a plea of guilty because of those actions.

Although I did not address this issue when ruling on the defendants' motion to dismiss, because Dean did not specifically allege this Sixth Amendment claim in his complaint, it also is apparent the claim is barred by the statute of limitations. In *Simmons*, the Eighth Circuit held that a § 1983 action challenging the plaintiff's confession was not precluded by *Heck* "[b]ecause harmless error analysis is applicable to the admission at trial of coerced confessions[.]" *Simmons*, 77 F.3d at 1095. Dean's claim that he was interrogated after invoking his right to counsel is likewise subject to harmless error analysis. *See Milton v. Wainwright*, 407 U.S. 371 (1972) (holding that admission of post-indictment, pretrial confession obtained by police officer who posed as prisoner confined in cell with petitioner was harmless error).

Dean claims that Searcey and Lamkin also violated his rights under the Fifth and Fourteenth Amendments by "engag[ing] in a prolonged campaign of psychological coercion, using unreasonable tactics that can only be seen as compulsion, to elicit Dean's inculpating statements." (Filing 104 at 51.) The alleged coercive tactics essentially are those mentioned above in connection with Dean's Sixth Amendment claim. Additionally, it is claimed that "Price . . . use[d] the polygraph results to convince Dean that he had committed the murder, but that he had 'repressed' the memory of it" and "showed Dean crime scene photographs depicting Wilson's body." (*Id.* at 66, 70.) Dean argues that "Price used his position as a psychologist and the skills he had acquired in the profession to exploit Dean in his role as sheriff's deputy. . . . Price's own report shows that he used questionable psychological theories and techniques to convince Dean he had actually committed the murder; to abandon his belief in his own innocence; to accept the fact that he may have been 'repressing' his memories of Wilson's murder; then to 'recover' pseudo memories.'" (*Id.* at 76.) It is further claimed that "DeWitt also participated in

interrogating Dean and convincing him that he had 'repressed' his memory of the murder.  During the weeks after Dean initially saw Price on May 2, 1989, Searcey, Lamkin and DeWitt repeatedly spoke to him without Schmeling present."  (*Id.* at 60.) "On May 17, 1989, . . . with Schmeling present, DeWitt, Searcey, Price and Smith subjected Dean to a viewing of a videotape of the original crime scene that showed graphic images of the dead Mrs. Wilson[89] . . . [because] Price had suggested that this procedure might shock Dean into 'remembering' his participation in the murder." (*Id.* at 61-62.)

As stated above, I have previously held that Dean's "coerced confession" claim under the Fifth and Fourteenth Amendments is barred by the statute of limitations. *See* Memorandum and Order entered on November 25, 2009 (filing 32), at 7. Although Dean does not specifically argue that his guilty plea was coerced, I now find after having carefully reviewed the record that there is not sufficient evidence to support such a claim.  After all, it was Dean's counsel, Richard Schmeling, who requested that his client be administered a polygraph and it was his counsel who asked Price to consult with Dean after Dean failed the polygraph; it was Dean's counsel, Richard Schmeling, who agreed that Price could provide Dean with therapy without counsel being present; it was Dean's counsel, Richard Schmeling, who sat through numerous interviews of Dean, conducted pursuant to *Miranda* waivers, whereat Dean inculpated himself and others; it was Dean's counsel, Richard Schmeling, who told the judge who accepted the plea that the summary recited by the prosecutor "fairly well sets forth the facts"; and it was Dean's counsel, Richard

---

[89] Dean's confession was obtained on May 8, 1989, before the videotape was shown to him.  Dean states in his argument that the videotape was viewed on May 17, 1989.  He also testified to this fact in a deposition taken on July 17, 1989, and his attorney agreed that May 17 was the correct date.  Conflicting statements in recent affidavits filed by Dean and his attorney, stating that the viewing took place either on May 1 or May 8, do not create a genuine issue of material fact.  *See, e.g., Lykken v. Brady*, 622 F.3d 925, 933 (8th Cir. 2010) (plaintiff's "summary judgment saving" affidavit ignored to the extent it conflicted with prior deposition testimony).

Schmeling, who told the judge who accepted the plea that the lawyer had nothing to add to Dean's statement that he (Dean) had participated in the events that the prosecutor had outlined.  It is also important to note that a unanimous Nebraska Supreme Court came to a similar conclusion when it determined that Dean's guilty plea was a voluntary and intelligent choice among alternative courses of action open to him.  *State v. Dean*, 464 N.W.2d 782, 787-789 (Neb. 1991) (stating, among other things, that Dean "made a judicial admission [in answer to the judge's questions] that he actively participated in certain events outlined by the county attorney, including forcing entry into the victim's apartment and giving advice on where to look for money.")  Under these circumstances, it is impossible to believe that Dean's guilty plea was coerced.

### 4. Kathy Gonzalez

Gonzalez was arrested after James Dean and Debra Shelden both told Searcey on May 24, 1989, that she was at the scene of the murder.  Gonzalez contends their statements were inconsistent and unbelievable, and she complains that Shelden identified her after being shown a single mug shot.  Gonzalez argues that the warrant for her arrest was issued without probable cause, but I have previously held this claim is barred by the statute of limitations, for the reasons discussed above in connection with Taylor's and Dean's Fourth Amendment claims.  *See* Memorandum and Order entered on November 25, 2009 (filing 44 in Case No. 4:09CV3146), at 16-17.

The record shows that Gonzalez entered into a plea agreement on October 5, 1989, and that a nolo contendere plea to aiding and abetting second-degree murder was entered on her behalf.  According to Gonzalez, "Smith told her that if she went to trial, he would get a conviction, ask for the death penalty, and at the least, she would get life in prison." (Filing 103 at 89.) As discussed above in connection with Taylor's claim of coercion, there was nothing improper about Smith's statement. Gonzalez also claims that "[j]ust like with Dean and Taylor, [she] was continually harassed by DeWitt and Searcey while in county jail, when her lawyer was not

present.  DeWitt would tell [her] to come clean and tell the truth, and Searcey would implore her to consider the family, and 'don't you want this to be over.'" (*Id.* at 88 (internal citations to record omitted).)  To the extent Gonzalez is claiming a Sixth Amendment violation, her claim fails because (1) she did not give any incriminating statements and (2) the statute of limitations applies to bar the claim.  There is no evidence that Gonzalez's plea bargain resulted from the alleged harassment.

Gonzalez states in her brief that "[s]he made her 'choice' [to plea bargain] because she was convinced that fabricated witness testimony and false physical evidence would put her in the electric chair." (*Id.* at 89.)  It is also argued that "White's conviction was the direct and exclusive product of the knowing use of false and unreliable evidence, primarily in the form of claimed witness testimony," and that "Kathy Gonzalez' and Tom Winslow's decisions to enter no contest pleas were the direct and exclusive product of the knowing use of false and unreliable evidence against Joe White. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Wilson v. Lawrence County*, 260 F.3d at 954." (*Id.* at 91.)

Considering that Kathy Gonzalez was convicted in advance of White's trial, and, in fact, appeared as a witness for the prosecution in White's trial, it can hardly be said that her decision to plea bargain resulted from the knowing use of false and unreliable evidence during White's trial.  It is fair to say, though, that Gonzalez's decision not to go to trial undoubtedly was influenced by the potential testimony of James Dean and Deb Shelden, both of whom placed her at the scene of the crime and recalled that she was injured.  It is likely her decision was also influenced by the fact that blood similar to hers was found on various items in Helen Wilson's apartment.  Gonzalez testified in a deposition taken on September 15, 2010, that DeWitt had informed her the bloodstains found at Wilson's apartment matched her blood "100 percent."  She notes the laboratory reports show that at least one genetic marker was different and argues the defendants should have known from reading the reports that it was not her blood in the apartment.  The record establishes, however, that this issue was explored during a deposition of Dr. Roy that was taken on September 8, 1989,

almost one month before Gonzalez's plea.  Even if DeWitt falsely represented that there was a "100 percent" match, deceiving a suspect is not unconstitutional *per se*. *See United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) ("The mere fact that an officer may have elicited a confession through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.") (internal quotations omitted).  The statements of Dean and Shelden also had known weaknesses.

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court held that the petitioner, who was convicted of murder, was denied due process when a key witness for the prosecution falsely denied that he had been promised consideration for his testimony.  The Court stated that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.]" *Id.* at 269.  In the other case cited by the plaintiffs, *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001), involving a § 1983 action, the Eighth Circuit applied this principle to a situation where a witness's false statement, allegedly the product of police coercion, was used both at a probable cause hearing and at an *Alford* plea hearing[90] to secure a murder conviction.  In finding that the police officers were not entitled to qualified immunity, the Court stated:

> Appellants argue that this claim is not cognizable because it is an attempt by Wilson to assert the constitutional rights of a third party. The district court correctly noted that this claim is not an attempt by Wilson to assert Wall's rights, but rather a claim that the appellants knowingly

---

[90] *North Carolina v. Alford*, 400 U.S. 25, 37 (1970) (permitting a defendant to maintain his or her claims of innocence while admitting that the government possesses the evidence necessary to successfully prosecute the charged offense).

used false or unreliable evidence (the coerced statement from Wall) against Wilson at his criminal proceedings. If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (noting that this principle is implicit in any concept of ordered liberty); *cf. Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (stating that due process is "a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured"). Appellants do not argue that this due process right was not clearly established. Nor do they challenge the district court's finding that the right applied where the false statement was used at Wilson's probable cause and *Alford* plea hearings rather than at a trial.

*Id.* at 954-55 (footnote omitted).

False evidence may have been used at White's trial, but his § 1983 action is not before me. I am concerned only with Gonzalez's and Winslow's claims that they were convicted through the use of false evidence. Neither has shown that any evidence was presented at their plea hearings, although it appears from journal entries that, as required by Nebraska procedures, a determination was made that a factual basis existed for their pleas of nolo contendere and no contest.[91] In each case County Attorney Smith outlined the facts he expected to prove in the event of a trial. However, there is no transcript (*i.e.*, bill of exceptions) in the record to show what those facts were.

---

[91] In *State v. Irish*, 394 N.W.2d 879, 883 (Neb. 1986), the Nebraska Supreme Court ruled that in order to support a finding that a plea of guilty or nolo contendere has been entered freely, intelligently, voluntarily, and understandingly, the record must establish that there is a factual basis for the plea.

Regardless, "the due process clause does not impose a constitutional duty on state trial judges to ascertain a factual basis before accepting a plea of guilty or nolo contendere that is not accompanied by a claim of innocence." *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1982).  "Only when a defendant proclaims his innocence while pleading guilty have federal courts required a judicial finding of some factual basis for the plea as an essential part of the constitutionally required finding that the plea was voluntary." *Id.* (citing, *inter alia*, *North Carolina v. Alford*, 400 U.S. at 38 n. 10).  Otherwise, "the establishment of a factual basis for a guilty [or no contest] plea is not a requirement of due process." *Beans v. Black*, 605 F. Supp. 342, 346 (D. Neb. 1984) (citing *Wabasha v. Solem*, 694 F.2d 155 (8th Cir.1982); *White Hawk v. Solem*, 693 F.2d 825 (8th Cir.1982)).

Because the record does not show that any of the plaintiffs – Gonzalez, Winslow, Taylor, or Dean – asserted their innocence while entering pleas of guilty or no contest, I conclude as a matter of law that they cannot claim the defendants violated their right to due process by knowingly using false evidence to secure their convictions.  Some of the plaintiffs also maintain, again citing *Wilson v. Lawrence County*, that the defendants' investigatory activities violated the plaintiffs' right to substantive due process. They state that "[g]enerally, conduct denying a liberty interest[92] is sufficient to violate the requirements of due process when it shocks the conscious [sic]."  (Filing 103 at 91.)

---

[92] "It almost goes without saying that the liberty interest involved here is the interest in obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that suppression by the prosecution of evidence favorable to the defendant material to either guilt or punishment violates due process); *Napue*, 360 U.S. at 269, 79 S.Ct. 1173 (holding that the use of false evidence against a criminal defendant violates due process and this principle is inherent in any concept of ordered liberty)." *Wilson v. Lawrence County*, 260 F.3d at 956 n. 8.

Negligent failure to investigate other leads or suspects does not violate due process. *See Daniels v. Williams*, 474 U.S. 327, 334, 106 S.Ct. 662 (1986) (holding that protections of the Due Process Clause are not triggered by negligence); *Baker v. McCollan*, 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (finding no cognizable constitutional claim where defendant's actions in detaining plaintiff for three days despite his protestations of innocence, without investigating those protests, amounted to no more than negligence). Even allegations of gross negligence would not rise to the level of a constitutional violation. *Myers v. Morris*, 810 F.2d 1437, 1468 (8th Cir.1987) (stating that gross negligence is generally not sufficient to state a procedural or substantive due process violation), *overruled on other grounds*, *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). . . . [O]nly reckless or intentional failure to investigate other leads offends a defendant's due process rights. *See Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir.1992) (denying qualified immunity where evidence could support a finding that defendant had deliberately ignored exonerating information indicating he had arrested the wrong person); *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir.1980) (noting that while negligent acts in an investigation do not violate due process, intentional acts do).

*Wilson v. Lawrence County*, 260 F.3d at 955.

To establish a substantive due process violation, Gonzalez and the other plaintiffs must show that the defendants' "failure to investigate was intentional or reckless, thereby shocking the conscience." *Cooper v. Martin*, 634 F.3d 477, 481 (8th Cir. 2011) (quoting *Brockinton v. City of Sherwood*, 503 F.3d 667, 672 (8th Cir. 2007)). "An officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009). "Likewise, allegations of gross negligence do not give rise to a constitutional violation." *Amrine v. Brooks*, 522 F.3d 823, 833 (8th Cir. 2008). "Where state officials 'have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly.'" *Id.* at 833-34 (quoting *Wilson*, 260 F.3d at 956). "Whether the alleged

conduct shocks the conscience is a question of law." *Akins*, 588 F.3d at 1183 (citing *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005) (en banc)).

The Eighth Circuit "ha[s] held that the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id.* (citing *Amrine*, 522 F.3d at 833-35).  As summarized in *Amrine*, the facts in the prior cases were as follows:

> In *Wilson*, we found that the allegations of a mentally impaired twenty year old, that a confession had been coerced from him by officers investigating a murder, met the recklessness bar if proven at trial, *id. at 957*, and the motion for summary judgment based on qualified immunity was therefore denied. Officers had interviewed Wilson twice, and on both occasions he claimed that he knew nothing about the murder and that he had been shopping with his mother when the murder occurred. A sixteen year old, also mentally impaired and known by school officials as a "very skilled liar," had told the officers that Wilson confessed the murder to him. They picked up Wilson, read him his rights but told him he was not under arrest, detained him in a windowless interrogation room for hours playing portions of the other youth's statement, told him that an eyewitness placed him at the crime scene, asked leading questions, threatened him when he gave answers inconsistent with the crime facts, and encouraged him when his answers reflected the details of the murder. *Id.* at 950. Eventually Wilson confessed. *Id.* [In 1995 the governor granted Wilson a full pardon after an independent investigation made it clear that Wilson had not committed the murder.]

> A similar due process claim was raised in *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002) (en banc), where a police officer brought a § 1983 case against police officials and the St. Louis Board of Police Commissioners after being acquitted of beating a man during a mistaken arrest. He charged that other officers had intentionally set up an innocent

161

man, and he produced evidence of "questionable procedures, of pressures placed on officers to incriminate a specific person or corroborate the department's official line, of a hasty condemnation of [himself] and of improper consideration of his race" in addition to proof that defendants had "purposely ignored" exculpatory evidence. *Id.* at 648. We held that Moran could establish a due process violation if a jury were to find his evidence credible.

Another claim of reckless investigation, also arising in the Missouri state penitentiary [as in Amrine's case] and also involving investigator George Brooks, was brought in *Clemmons v. Armontrout*, 477 F.3d 962 (8th Cir.), *cert. denied* ___ U.S. ___, 128 S.Ct. 155, 169 L.Ed.2d 32 (2007). After a prisoner was stabbed to death, Corrections Officer Steigerwald identified Clemmons as the perpetrator. Although inmate Dwight Clark told Captain Gross that another prisoner named Fred Bagby was involved in the murder, *id.* at 964, Gross never questioned Bagby or searched his cell. Captain Gross had decided Clark was not a credible witness because Bagby's name was not on a list of prisoners who were said to be out of their cells at the time of the murder, and he prepared an investigation memorandum for investigator Brooks to that effect. *Id.* Brooks never interviewed Clark or Bagby. *Id.* [Clemmons eventually succeeded in winning a new trial after filing a habeas petition claiming that exculpatory evidence had been withheld, particularly Clark's statement. *Clemmons v. Delo*, 124 F.3d 944, 952 (8th Cir.1997). He was acquitted in his retrial. *Clemmons*, 477 F.3d at 965.] We concluded that the actions of the investigating officers were not intentional or reckless, particularly because Officer Steigerwald's eyewitness account had identified Clemmons as the killer. *Id.* at 966-67. Clemmons also had not produced any evidence that Brooks consciously sought to suppress exculpatory facts or pressured others not to investigate leads. *Id.* We determined that on these facts a reasonable factfinder could not find that Brooks had acted recklessly. *Id.*

*Amrine v. Brooks*, 522 F.3d at 834-35.

In *Amrine*, the Eighth Circuit held that the district court did not err in denying the plaintiff leave to amend to allege a substantive due process claim because the amendment would have been futile. Amrine was convicted in 1986 of murdering

162

another inmate at the Missouri state penitentiary, but his conviction was set aside in 2003 when the Missouri Supreme Court granted habeas relief based upon a finding that there was clear and convincing evidence Amrine was actually innocent.  The Court of Appeals explained:

> Amrine has produced no evidence suggesting that Brooks and Hemeyer attempted to coerce or threaten him as the officers did to the *Wilson* plaintiff. There is also no evidence that the investigators purposely ignored evidence suggesting that Amrine was innocent, as occurred in *Wilson* and *Moran*. Neither was there any indication of systemic pressure to implicate Amrine in the face of evidence to the contrary as in *Moran*. The facts alleged by Amrine more closely resemble those in *Clemmons*, for Brooks and Hemeyer similarly failed in his case to follow through on investigating other leads. They did not investigate inconsistencies related to Russell's location at the time of the murder . . . .  Construed with all reasonable inferences in favor of Amrine, their early focus on him and their conduct of the investigation still do not rise above negligence. Significant evidence uncovered during the investigation pointed to Amrine. That trial witnesses later recanted some testimony does not establish that the investigation into Barber's murder was reckless. Amrine, like *Clemmons*, offered no evidence that the investigators consciously suppressed potentially exculpatory evidence or recklessly pinned the murder on a convenient suspect.

*Id.* at 835.

The plaintiff in *Akins* was acquitted of assaulting a police officer by running him over with a motor vehicle.  Akins, who was shot twice during the incident, sued the investigating officers (Trammell and Vaughan), claiming that they violated his right to substantive due process by failing to conduct an adequate investigation.  The Eighth Circuit held the officers were entitled to qualified immunity, stating:

> Akins highlights multiple errors and inconsistencies in Trammell's and Vaughan's investigation, but he has failed to show conscience-shocking reckless or intentional conduct. There is no

163

> evidence that Vaughan or Trammell ever coerced or threatened Akins.
> Nothing in the record establishes that Vaughan or Trammell
> purposefully ignored evidence suggesting Akins's innocence. . . .
> [T]here is no evidence that Vaughan intended to misconstrue the
> evidence against Akins. . . . Further, there is no evidence that either
> Vaughan or Trammell was pressured to implicate Akins or to improperly
> strengthen the state's case against him. Akins presents no evidence
> Trammell and Vaughan were complicit in an attempt to legitimize the
> shooting officers' conduct. At most, Trammell and Vaughan failed to
> investigate other leads and to explore inconsistencies in the evidence.
> In a word, then, Trammell and Vaughan were tangential figures in this
> incident. Akins thus has not established that Trammell and Vaughan
> were guilty of more than mere negligence, which is insufficient to
> establish a claim of conscience-shocking conduct.

*Akins v. Epperly*, 588 F.3d at 1184.

The plaintiff in *Brockinton* was arrested for stealing a boat that he kept as
security on a debt owed by Pamela Murphy's late husband. Defendant deputy Randy
Gurley filed the theft report without verifying who owned the boat, even though he
had previously arrested Murphy for crimes of dishonesty. The Eighth Circuit
affirmed qualified immunity for Gurley, stating:

> Gurley examined the purported bill of sale, contacted Mills, and
> considered Murphy's account before filing the theft report. Although
> there was a legitimate question concerning Murphy's ownership of the
> boat, it was not entirely unreasonable for Gurley to credit Murphy's
> story. Even though Gurley was ultimately incorrect in his conclusion,
> qualified immunity protects officers from these types of "mistaken
> judgments." *Malley*, 475 U.S. at 343, 106 S.Ct. 1092. Brockinton's
> allegations, including that Gurley's supervisor believed that Gurley
> should have conducted further investigation and that Gurley had
> previously arrested Murphy for crimes of dishonesty, may show
> negligence by Gurley, but they do not rise to the level of recklessness
> that shocks the conscience. Thus, Brockinton has not established a
> violation of a constitutional right. The Supreme Court has stressed that
> the Fourteenth Amendment is not "a font of tort law." *Paul v. Davis*, 424

U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *see also* *Daniels,*
*474 U.S. at 332, 106 S.Ct. 662*.

*Brockinton v. City of Sherwood*, 503 F.3d at 672-73.

Finally, in *Cooper*, the plaintiff sued a sheriff's investigator after charges
against him were dropped.  As outlined by the Eighth Circuit, the facts of the case
were as follows:

> Cooper and two friends had a roadside encounter with Charles
> Williams in Crittenden County. Williams threatened to kill them. Cooper
> did not strike Williams, although one of the friends, Jeffrey McGee, did.

> When investigator Martin interviewed Williams about the fight,
> he could not recall how many people were involved, or who, or how
> many, hit him. Although Williams told Martin he had consumed "several
> beers" the night of the fight, Martin did not interview the paramedics
> who treated him at the scene. Williams later told Martin that, according
> to his nephew, Cooper and Bradley Gill were at the scene of the fight.

> Martin contacted Cooper's father about bringing in Cooper (then
> a minor) for a statement. Cooper's father called Martin the next day,
> saying that Cooper wanted to give his side of the story, that he had not
> touched Williams during the fight. The Coopers later met Martin by
> chance at a gas station, where Martin joked with Cooper about the fight
> and told him he had nothing to worry about. Cooper offered at that time
> to give a statement. Cooper's counsel contacted Martin about setting up
> a meeting with his client. Cooper's father also called Martin many times
> to set up a meeting. Despite these efforts, Martin did not meet with
> them. Martin never spoke with any of Cooper's friends, either.

> The victim Williams swore to affidavits for the arrests of Cooper,
> McGee, and Gill on charges of both first- and second-degree battery.
> Martin stopped investigating, gave the prosecutor Williams's affidavits,
> and told the prosecutor that "I was not having any cooperation [from the
> suspects]." The prosecutor gave his approval for Martin to apply for
> arrest warrants. Martin's warrant application included his case file and
> Williams's affidavits (materials that are not in the record on appeal).

165

Martin did not swear to any facts in support of the warrant application, or speak with the state judge about its contents. The judge issued arrest warrants for Cooper, McGee, and Gill. Martin refused to meet with Cooper after the arrest warrants were issued. The charges eventually were nolle prossed.

*Cooper v. Martin*, 634 F.3d at 479.  The Court of Appeals reversed the district court's denial of qualified immunity to Martin, and dismissed Cooper's § 1983 claim against Martin in his individual capacity, finding that "Cooper has not established that Martin's investigation violated a constitutional right." *Id.* at 481.  The Court stated:

> Martin failed to interview any of the suspects, joked with Cooper that there was nothing to worry about, credited the intoxicated victim's sworn account of the attack over Cooper's father's account, and misrepresented (to the prosecutor) the suspects' lack of cooperation. Assuming these facts to be true, Martin conducted a negligent investigation, but, under *Brockinton*, the facts "do not rise to the level of recklessness that shocks the conscience."

*Id.*

Kathy Gonzalez's complete argument is as follows:

> Kathy Gonzalez was a high school graduate. (Ex. 109 at 17:9-18:1) She was reasonably self-directed and not particularly susceptible to undue influence. She never experienced the false memories that James Dean, Joann Taylor and Debra Shelden fell victim to. The salient circumstances that led to her involuntary confession concerned the false evidence stacked against her, and Kathy's resignation to what she believe was an inescapable fate.
>
> There was never probable cause for Kathy Gonzalez' arrest. She was always a suspect in Searcey's mind, ostensibly because she let Joe White stay in her apartment for a couple nights, and she happened to live in the same apartment building as Helen Wilson. Searcey and Stevens repeatedly pressed Joe White about his "girlfriend" Kathy Gonzalez. (Ex. 27 at 3, 4, 8, 9, 12, 16, & 21) Joe told the truth, that Kathy was not his girlfriend, and that he had only stayed with her for a

couple days. Searcey and Stevens brought up Kathy's name while interrogating Joann Taylor, but Joann didn't recall Kathy at all. When James Dean claimed to have some memory of the murder, Searcey and Lamkin suggested to Dean that Kathy Gonzalez was involved in some way. (Ex. 59 at 31)[93]

Before May 24, no suspect or witness claimed that Kathy Gonzalez was involved in Helen Wilson's murder. In fact, on March 14, Debra Shelden unequivocally told Searcey and Lamkin that the only people involved in the murder were herself, James Dean, Joe White, Tom Winslow and Joann Taylor. (Ex. 49 at 49) When Dean started to

---

[93] The record actually shows that Dean brought up Kathy Gonzalez's name. When questioned by Searcey about what, if anything, had been said in the car while Dean was riding with White, Taylor, Winslow, and Deb Shelden, before going to Helen Wilson's apartment, Dean stated, "I thought we was gonna stop and see one of their friends or something, because Lobo was supposed [sic] living with a girl in that building you know so. . . ." (Taylor's Ex. 59 [filing 115-11] at 13.) Later in the interview Lamkin followed up on Dean's statement:

| | |
|---|---|
| Lamkin: | Jim you stated that when you first went to the apartment building you thought ah you was gonna visit somebody in the apartment building? |
| Dean: | Yea. |
| Lamkin: | Okay you said that ah ah Lobo had a girlfriend living in the apartment complex? |
| Dean: | Yea it was Kathy _____ or Gonzales or whatever I didn't know her that well. Kathy Bartak [sic] knew her better I was just ..... |
| Lamkin: | Lobo was living with this person? |
| Dean: | That's where Lobo told Kathy he was going to live so. |
| Lamkin: | Did you guys go up and visit her? |
| Dean: | Kathy _____ no. |
| Lamkin: | You went straight to the apartment of Helen Wilson? |
| Dean: | As I remember it yea. You know I just you know I assume that that's where we was going is Kathy's house because Lobo you know lived there or Joseph White. |

(*Id.* at 31-32.)

167

remember, he too said only himself, Shelden, Taylor, White and Winslow were involved. (Ex. 58 at 2; Ex. 59 at 5)

However, that changed on May 17 when Dean "recalled" another female in Wilson's apartment, but could not provide any other information, only a promise to remember more in the future. (Ex. 60 at 4-5) By this time, Searcey, Smith, DeWitt and Lamkin knew that they did not have someone with type B blood under arrest. On Thursday, May 18, Searcey obtained a mug shot photograph of Kathy Gonzalez from the Beatrice Police. (Ex. 126) On May 24, both Debra Shelden and Dean gave recorded statements claiming that Kathy Gonzalez was in Wilson's apartment at the time of the murder. However, the statements were factually inconsistent.

Dean said that Gonzalez came into the apartment right behind him after Wilson answered the door. (Ex. 60 at 3) However, Shelden said that Gonzalez came into the apartment much later, after Dean had left and when Wilson was taken to the bedroom. (Ex. 127 at 2-3) Shelden said that she saw a lot of blood coming from Gonzalez' nose when she left the bedroom and exited the apartment, closing the door behind her. (Ex. 127 at 4 & 7-8) Dean, however, said that Gonzalez remained in the bathroom of Wilson's apartment and at one point shouted from the bathroom that she had been injured. (Ex. 60 at 4)

The claim that Gonzalez had been hit in the nose on the night of Wilson's homicide is obviously false. Beatrice Police Lt. Fitzgerald interviewed Gonzales the day Wilson's body was discovered, and did not observe anything that would indicate Gonzalez had been hit in the face the night before. (E4)[94]

---

[94] I have excluded Taylor's Ex. 4 because it is not properly authenticated, but the claim that Lt. Fitzgerald "did not observe anything that would indicate Gonzalez had been hit in the face the night before" is not supported by his report. The complete entry regarding Fitzgerald's interview with Gonzalez reads as follows:

I contacted Kathy A. Gonzalez, 04-08-60, apartment 7 of 212 N. Sixth Street. She stated she arrived home approximately 6:00 p.m. and was last in the hallway of 212 N. Sixth Street around 9:00 p.m. to do her wash and that all of the hall lights were on at that time. She went to bed around 10:00 p.m. She stated approximately September or October of last year, there was a man approximately 40-45 years old, wearing

Moreover, Shelden's explanation regarding why she now remembered Gonzalez when on April 14 she didn't, is patently absurd and contrary to fact. Shelden claimed that she remembered Gonzalez was involved in Wilson's murder when she had a nightmare after thinking about the case. (Ex. 127 at 10) Shelden claimed to have first met Gonzalez in the laundry room of Wilson's apartment building when she and Cliff moved into Wilson's old apartment in May or June of 1985. (Ex. 127 at 9) However, Kathy Gonzalez moved to Omaha in February shortly after Wilson's murder. Not only had Kathy told Sgt. Stevens that she had moved in February, but the fact of her move was independently verified by the 1985 statement of Garey Woodard. (E23, E9 & E10)

Searcey was only able to have Shelden name Gonzalez by showing her [a] mug shot of Gonzalez, the same day he obtained it. (Ex. 127 at 10-11) Searcey brought the mug shot to Shelden's jail cell and held up the photograph to the cell door, at which time Shelden claimed to recognize Gonzalez as a person involved in Wilson's murder, and that she forgot to include in her prior statements. (Id.)[95] This identification procedure is the kind that is impermissibly suggestive so as to give rise to a very substantial likelihood of irreparable misidentification. *See Simmons v. United States*, 390 U.S. 377 (1968).

Searcey's arrest affidavit was predicated on Shelden's and Dean's identification of Gonzalez. (Ex. 128) However, Searcey did not tell the court that both Shelden and Dean, for more than a month, specifically denied that Gonzalez was involved in the Wilson murder and only recently changed their stories. Searcey hid the fact of his single

_____

glasses, approximately 5' 8"-5' 9", brown hair, wore a nice suit, short hair, well dressed, approached her at her apartment and was requesting an opportunity to sell her insurance. Other than that individual, she knew of nobody that was soliciting in the area, had not [sic] problem with prowlers, and had not observed anyone out of the ordinary in the apartment complex.

(Taylor's Ex. 4 [filing 114-4] at 5.)

[95] It is undisputed that Deb Shelden received no information about the person in the photo when she looked at it, yet identified her as Kathy Gonzalez.

photograph identification procedure from the court. Searcey did not tell the court that Lt. Fitzgerald interviewed Gonzalez the day after the Wilson murder and did not report any suspicion that Gonzalez suffered an injury to her face. Searcey found no need to inform the court that Shelden could not have seen Gonzalez in the laundry room of the apartment building in May.

What Searcey left out of his affidavit made the affidavit actually filed with the court a false and misleading report of the information known to Searcey. *See Franks v. Delaware*, 438 U.S. 154 (1978)(false statements made in an arrest affidavit, knowingly and intentionally, or with reckless disregard for the truth, and necessary to find probable cause, are in violation of the 4th and 14th Amendments).[96]

After she was arrested, Kathy volunteered a sample of her blood. (Ex. 130) Her blood was initially tested for blood group substance by a technician at the Beatrice Community Hospital. The result indicated that she was type B -- the blood type Searcey, Smith, DeWitt and Lamkin had been searching for. (Id.) However, when the test results came back from the Nebraska State Patrol laboratory on June 13, the report identified that there was at least one genetic marker in Gonzalez' blood (Gc 2-1) that differed from the genetic markers of the type B blood (Gc 1) found on Wilson's comforter, bed sheet, bedspread, and Wilson's nightgown. (Ex. 141) If Smith, Searcey, DeWitt, Lamkin or Price had read the State Patrol report, they would have known Kathy Gonzalez's blood was not the blood on Wilson's bed.

Instead, DeWitt, Searcey and Smith told Kathy that her blood was in Wilson's apartment, it was 100% certain that it was her blood, and that the result was confirmed with DNA testing. (Ex. 109 at 41:22-42:14 & 71:7-72:4)

Just like with Dean and Taylor, Kathy was continually harassed by DeWitt and Searcey while in county jail, when her lawyer was not present. (Ex. 109 at 32:16-35:5 & 54:4-61:14) DeWitt would tell Kathy to come clean and tell the truth, and Searcey would implore her to consider the family, and "don't you want this to be over." (Ex. 109 at 56:9-17)

---

[96] As previously discussed, this "false arrest" claim is barred by the statute of limitations.

When she was arrested, Kathy believed in our system of justice. She thought she would come back to Nebraska, give law enforcement a sample of her blood, tell the truth and be exonerated. (Ex. 109 at 61:15-62:2) After sitting in county jail for a couple months, she realized that no one was listening to her and that she was going to prison for something she did not do. (Ex. 109 at 44:15-45:1) She continually and consistently denied any knowledge of Wilson's murder, but no one listened. (Ex. 109 at 33:1-35:9)

Kathy concluded that her only option was to plead no contest to a charge of aiding and abetting second-degree murder. (Ex. 53; Ex. 109 at 37:9-41:9) By pleading no contest, she would not be admitting guilt for something she knew she did not do. (Ex. 109 at 40:1-8) Smith told her that if she went to trial, he would get a conviction, ask for the death penalty, and at the least, she would get life in prison. (Ex. 109 at 38:25-39:12) If she accepted a plea, things would be easier for her, and Smith would recommend a 10-year sentence. (Ex. 109 at 38:9-40:14)

Kathy didn't want to die in prison, so she elected to plead, however, her plea wasn't close to being voluntary. She made her "choice" because she was convinced that fabricated witness testimony and false physical evidence would put her in the electric chair. This is coercion resulting in an involuntary, and unconstitutional plea -- plain and simple.

(Filing 103 at 84-89.)

After considering Gonzalez's argument, as well as the arguments of the other plaintiffs, and viewing the evidence in the light most favorable to Gonzalez, I find as a matter of law that she is unable to prove a claim that the defendants' behavior shocks the conscience.  It was not unreasonable for Searcey to identify Gonzalez as a suspect since she lived in the same apartment building as Helen Wilson and was believed to be Joseph White's girlfriend.[97]   James Dean's and Deb Shelden's

---

[97] Taylor's Exhibit 23 (filing 114-18) indicates that a bra with blood on it was found in a dumpster following the murder, and that the bra belonged to Gonzalez. Searcey reported to Richard Smith on March 29, 1989, that this piece of evidence had gone missing.

statements may have been inconsistent and open to challenge on other grounds, but Gonzalez and her attorney made a determination that the statements could withstand close scrutiny at trial.  Apart from the DNA tests that ultimately freed Joseph White from prison and resulted in the plaintiffs' pardons, there is no newly discovered evidence from which to conclude that the statements were false. Gonzalez's polygraph examination indicated deception, whereas Shelden's exam, taken after her confession but prior to her implicating Gonzalez, did not indicate deception.  The evidence does not show that the defendants induced Dean and Shelden to implicate Gonzalez by improper means. There is no showing that the defendants withheld any exculpatory information from Gonzalez or her attorney.  Gonzalez's blood test results were disclosed, and the serologist who prepared the report was deposed, before Gonzalez entered her plea.  Dr. Roy could not exclude Kathy Gonzalez as the source of the type B blood.  All in all, the record will not support a finding that the defendants engaged in conscience-shocking behavior in order to obtain Gonzalez's conviction.

Furthermore, Gonzalez has failed to demonstrate that the constitutional right to be free from reckless investigatory police work was clearly established in 1989. *See Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (noting that although qualified immunity is an affirmative defense for which the defendant carries the burden of proof, the burden is on the plaintiff to demonstrate that the law was clearly established).  At least one court has held that the right was not clearly established in 1989.  *See Whitley v. Allegheny County*, No. 07-403, 2010 WL 892207, at *38 (W.D. Pa.) (although the right to a fair trial was clearly established prior to 1989, the contours of that right, at least to the extent that right relates to the level of care required in criminal investigations, were not clearly established; thus, a reasonable officer in 1989 would not have fair warning that conducting a reckless investigation was unconstitutional), *aff'd*, 402 Fed.Appx. 713 (3rd Cir. 2010), *cert. denied*, 131 S. Ct. 2153 (2011).  The Eighth Circuit did not address this prong of the qualified immunity analysis in *Wilson v. Lawrence County* because the appellants "[did] not

challenge the district court conclusion that this right was clearly established at the time of the alleged violation." *Wilson v. Lawrence County*, 260 F.3d at 955.

In summary, Gonzalez, like Taylor, frames her argument in terms of being forced to plead in order to avoid being tried on a capital offense. I find there is not sufficient evidence to establish that her plea was coerced by the defendants in violation of her rights under the Fourteenth Amendment, nor has it been shown that Gonzalez was convicted through the defendants' knowing use of false evidence.

### 5. Tom Winslow

Winslow, having been granted use immunity by Smith, provided a statement on March 14, 1989, in which he claimed to have witnessed Joseph White and Joann Taylor attack Helen Wilson. This statement was used to procure arrest warrants for White and Taylor. After Taylor provided a statement on March 17, 1989, saying that White and Winslow had both raped Wilson, Winslow was arrested. He then retracted his prior statement. On April 12, 1989, Cliff Shelden gave a statement to Searcey and Lamkin indicating that Winslow had admitted his involvement in the rape and murder and had also implicated Deb Shelden, along with White and Taylor. The next day, Deb Shelden confessed and confirmed Winslow's involvement in the crime. Dean identified Winslow as a participant on May 8, 1989.

Winslow simply argues:

Like Kathy Gonzalez, Tom Winslow never "remembered" the Wilson homicide. He always denied any involvement in the rape or murder of Helen Wilson. He did, however, make false statements to law enforcement regarding Joe White and Joann Taylor, in his misguided effort to bond out of jail for a separate assault charge. However, his false statements never implicated himself in Wilson's murder, and certainly never provided Searcey, DeWitt, Lamkin or Smith with information that could be corroborated by the physical evidence of the Wilson crime scene.

Instead, Tom Winslow's no contest plea was coerced by the fact of Joe White's conviction, and Tom's knowledge that the same false evidence used to convict Joe White would be used to convict him of Wilson's murder and rape. (Ex. 104 at 97:20-100:10) His attorney told him that there was no way to dispute the false testimony of the claimed witnesses with the physical evidence of the crime, and when he was convicted, he would probably get the death penalty. (Ex. 104 at 42:23-43:13) Tom pled no contest because he refused to plead guilt to a crime he did not commit. (Ex. 104 at 97:9-11)

Moreover, Tom rejected an earlier plea deal that recommended a significantly lighter sentence if he pled guilty and agreed to testify against Joe White. (Ex. 104 at 50:5-21) That deal did not come about because Tom refused to lie. Smith required Tom to testify that he and Joe raped and assaulted Wilson, something that Tom knew was a lie. (Ex. 104 at 50:15-21 & 100:11-102:1) [98]

Smith, on the other hand, had no compunction about lying to the court. At White's trial, Smith proposed a stipulation that, in part, recited that the State Patrol serologist, Dr. Reena Roy would testify that "stains on the carpet revealed semen from a person who were (sic) similar to the blood type of Tom Winslow . . ." (Ex. 41 at 3) This is a demonstrably false statement.[99] Dr. Roy actually testified in her deposition that Tom Winslow was a secretor of blood group A, and that the blood in Wilson's apartment was not type A, and that Winslow "certainly should be excluded as the source of the semen stains or any other body fluid stains" that she examined, because the source of the semen was a non-secretor. (Ex. 42 at 5)

(Filing 103 at 89-91.)

As with Gonzalez and the others, I find as a matter of law that there is not sufficient evidence to establish that Winslow's no contest plea was coerced or that his

---

[98] Taylor's Exhibit 104 is Winslow's recent deposition testimony.

[99] This statement does appear to be false, but it was approved by White's counsel and received in evidence. *See* Taylor's Ex. 41 [filing 115-1] at 4. Winslow's attorney presumably would not have entered into the same stipulation had his case gone to trial.

conviction was obtained through the knowing use of false evidence or conscience-shocking investigatory activities by the defendants. Any claim that Winslow's plea was coerced or that the defendants knowingly used false evidence or acted in a shocking manner is particularly weak. The evidence against Winslow was strong and included two especially damning actions by Winslow himself. That is, Winslow admitted that he lied about his whereabouts on the night of the murder and he voluntarily made admissions during a use immunity interview, while in the presence of his counsel, wherein he implicated himself, White, and Taylor. That later statement became available to the prosecution after Wilson recanted and admitted that he had continued with his lying ways after promising to tell the truth.[100] Certainly none of these things can be laid at the feet of the defendants. In fact, according to Winslow's own brief in this case, his very experienced criminal defense "lawyer told him that there was no way to dispute" the prosecution's case. Obviously wanting to calculate the risks of a trial himself, Winslow waited until a jury had found White guilty beyond a reasonable doubt before deciding which side of the fence to come down upon. Following a full opportunity to assess the risks, Winslow made an entirely voluntary plea based upon the forceful recommendations of his able lawyer.

In sum, while it is surely regrettable that Winslow and the other plaintiffs served time in prison for crimes they evidently did not commit, their constitutional rights were not violated.[101] And, of course, the question of whether the defendants

_____

[100] *See, e.g., United States v. Reed*, 272 F.3d 950, 954 (7th Cir. 2001) (defendant materially breached his use immunity agreement with the government by lying to investigating officer and that justified admission of incriminating statements defendant made to officer in a prosecution for manufacture of methamphetamine; even though officer knew that defendant was lying, use immunity was conditioned upon defendant telling the truth).

[101] While my earlier discussion of Taylor's and Dean's claims did not include a discussion of the alleged use of false evidence against them, or of the defendants' allegedly reckless investigation – because their arguments did not specifically address these due process claims – I find there is not sufficient evidence to support a finding

175

were negligent or committed some other tort under Nebraska law is not before me and I express no opinion about such matters. Nor do I approve or disapprove of the acts or omissions of the defendants–I conclude only that plaintiffs' constitutional rights were not violated and that each of the defendants has qualified immunity from suit.

## B. Absolute Immunity

Prosecutors are absolutely immune from liability in suits under § 1983 for activities that are "intimately associated with the judicial phase of the criminal process[.]" *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976). However, "that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009). A "functional approach" is used to decide whether absolute immunity attaches to a particular kind of prosecutorial activity. *Id.* (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

For example, in the years since *Imbler*, the Supreme Court has held "that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application." *Id.* (citations omitted). On the other hand, the Court has held "that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support of a warrant application." *Id.* (citations omitted).

---

in their favor on such claims. Even though I may not have discussed in this opinion every argument made by each plaintiff, I have given careful consideration to all of the arguments. I also have endeavored to set forth as much of the plaintiffs' evidence as has been relied upon in their briefs, but the rest of the evidence has been carefully reviewed as well.

"Before the establishment of probable cause to arrest, a prosecutor generally will not be entitled to absolute immunity."  *McGhee v. Pottawattamie County*, 547 F.3d 922, 929 (8th Cir. 2008) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993)), *cert. granted*, 129 S. Ct. 2002 (Apr. 20, 2009) (No. 08-1065).  The Eighth Circuit has also found that "immunity does not extend to the actions of a County Attorney who violates a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not 'a distinctly prosecutorial function.'" *Id.*, at 933.

In previous rulings on the defendants' motions to dismiss, I determined that County Attorney Smith was immune from suit regarding certain claims alleged by the plaintiffs because he was acting as a prosecutor, but that it could not be determined from the pleadings whether he had immunity regarding other claims.  Now that the facts are available, I find that Smith is entitled to absolute immunity as to all claims.

## C. Claims Against the County

Because I have determined that the plaintiffs' constitutional rights were not violated, the claims brought against Smith, DeWitt, Searcey, Price, and Lamkin in their official capacities, and against Gage County, necessarily fail.  "[I]n order for municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Cooper*, 634 F.3d at 481-82 (quoting *Brockinton*, 503 F.3d at 674).  Judgment therefore will be entered dismissing the plaintiffs' actions in their entirety.

IT IS ORDERED:

1.  Defendants' motions to strike (filing 127 in Case No. 4:09CV3144; filing 129 in Case No. 4:09CV3146; filing 127 in Case No. 4:09CV3147; and filing 127 in Case No. 4:09CV3148) are granted in

177

part and denied in part, as explained in the memorandum accompanying this order.

2.     Defendants' motions for summary judgment (filing 49 in Case No. 4:09CV3144; filing 61 in Case No. 4:09CV3146; filing 59 in Case No. 4:09CV3147; and filing 59 in Case No. 4:09CV3148) are granted.

3.     Final judgment shall be entered by separate document dismissing Plaintiffs' actions with prejudice.

DATED this 3rd day of August, 2011.

                                        BY THE COURT:
                                        s/ Richard G. Kopf
                                        United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.